LINK: 102

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re COUNTRYWIDE FINANCIAL CORP. MORTGAGE-BACKED SECURITIES LITIGATION | Case No. 2:11-ML-02265-MRP (MANx) |
| AMERICAN INTERNATIONAL GROUP, INC. et al., | Case No. 2:11-CV-10549 MRP (MANx) |
| Plaintiff, | **ORDER RE MOTION TO DISMISS THE COMPLAINT** |
| v. | |
| COUNTRYWIDE FINANCIAL CORPORATION, et al., | |
| Defendants. | |

# I.   INTRODUCTION & BACKGROUND

This case has been transferred to the Court for pre-trial proceedings as part of Multidistrict Litigation No. 2265, captioned *In re Countrywide Financial Corp. Mortgage-Backed Securities Litigation* ("the MDL").  Plaintiffs, American International Group, Inc. and 21 related entities (collectively "AIG" or "Plaintiffs") bring suit against Countrywide Financial Corporation ("CFC"), Countrywide Capital Markets LLC ("CCM"), Countrywide Home Loans, Inc. ("CHL"), Countrywide Securities Corporation ("CSC"), CWABS, Inc., CWALT, Inc., CWHEQ, Inc., CWMBS, Inc. (collectively "Countrywide" or the "Countrywide Defendants"), Bank of America Corporation, Bank of America, N.A., and NB Holdings Corporation (collectively "Bank of America") in connection with AIG's purchase of residential mortgage-backed securities ("RMBS") originated and/or issued by Countrywide.[1]  Between 2005 and 2007, AIG allegedly purchased RMBS Certificates[2] with a total price of $28 billion.  Complaint ¶ 2.  AIG alleges that the Countrywide Defendants are liable because the Certificates' Offering

---

[1] AIG's suit originally included RMBS issued by Bank of America, Merrill Lynch & Co., a number of their subsidiaries (collectively, the "Bank of America/Merrill Offerings"), and a number of unrelated third parties (collectively, the "Third Party Offerings").  The Judicial Panel on Multidistrict Litigation ("JPML") split the case and transferred only the portion that stems from Countrywide's origination practices.  The remaining claims are pending in the Southern District of New York.

[2] A Certificate is a document that shows ownership of a mortgage-backed security issued pursuant to a registration statement and prospectus supplement in a public offering.  Each Certificate represents a particular tranche within an offering.  An Offering refers to the process by which the Certificates were sold to Plaintiffs.  The Offering Documents refer to the Registration Statements, Prospectuses and Prospectus Supplements, Term Sheets, and other written materials pursuant to which the Certificates were offered.

1    Documents contain various misrepresentations.  AIG alleges that Bank of America
2    is liable under both successor liability and vicarious liability theories.[3]

3            At the Court's direction, Defendants filed a motion to dismiss based on
4    timeliness, with all additional grounds reserved for later briefing.  The timeliness
5    issues have been fully briefed and the Court heard oral argument on those issues on
6    May 14, 2012.

7            After due consideration, the Court decides as follows.  AIG's federal claims
8    are time-barred and are **DISMISSED WITH PREJUDICE**.  The negligent
9    misrepresentation claims brought by SunAmerica Annuity and Life Assurance
10   Company, SunAmerica Life Insurance Company, American General Life
11   Insurance Company of Delaware, American General Assurance Company,
12   American General Life Insurance Company, The Variable Annuity Life Insurance
13   Company, and Western National Life Insurance Company are also time-barred and
14   are **DISMISSED WITH PREJUDICE**.  The fraud claims brought by SunAmerica
15   Annuity and Life Assurance Company, SunAmerica Life Insurance Company, and
16   American General Life and Accident Insurance Company that were not covered by
17   a tolling agreement are time-barred and are **DISMISSED WITH PREJUDICE**.
18   The Court otherwise **DENIES** Defendants' motion.

19                          **II.   LEGAL STANDARD**

20           A Rule 12(b)(6) motion to dismiss should be granted when, assuming the
21   truth of the plaintiff's allegations, the complaint fails to state a claim for which
22   relief can be granted.  *See Epstein v. Washington Energy Co.*, 83 F.3d 1136, 1140
23   (9th Cir. 1996).  In deciding whether the plaintiff has stated a claim, the Court
24   must assume the plaintiff's allegations to be true and draw all reasonable
25   inferences in the plaintiff's favor.  *Usher v. City of Los Angeles*, 828 F.2d 556, 561
26   (9th Cir. 1987).  However, the Court is not required to accept as true "allegations

27   _____

28   [3] AIG disputes that the claims against Bank of America are properly before the
     Court.  Section III.A, *infra*, addresses this issue.

3

1   that are merely conclusory, unwarranted deductions of fact, or unreasonable

2   inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  A

3   court reads the complaint as a whole, together with matters appropriate for judicial

4   notice, rather than isolating allegations and taking them out of context.  *Tellabs,*

5   *Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).

6        To the extent that federal law is relevant, the Court will follow Ninth Circuit

7   precedent.  *Newton v. Thomason,* 22 F.3d 1455, 1460 (9th Cir. 1994).  Because the

8   case was originally filed in New York, the Court applies the substantive law of

9   New York, including New York choice-of-law rules.  *In re Nucorp Energy Sec.*

10  *Litig.*, 772 F.2d 1486, 1492 (9th Cir. 1985).

11                        **III.    DISCUSSION**

12  **A. CLAIMS TRANSFERRED**

13        The JPML transferred this case to the Court by a Transfer Order and

14  Simultaneous Separation and Remand of Certain Claims.  ECF No. 77.  That

15  Transfer Order sent a portion of the case to this Court and left a portion pending

16  before Judge Jones in the Southern District of New York.  The parties now dispute

17  which claims were transferred and which remain in New York.  The disputed

18  claims fall into two broad categories: (i) the successor liability claims against Bank

19  of America stemming from Countrywide's alleged primary violations; and (ii) the

20  claims stemming from Third Party Offerings.

21        The Transfer Order provided:

22        In our initial transfer order, the Panel limited this MDL to claims brought by

23        Countrywide MBS investors.  *AIG*, however, involves additional unique

24        claims relating to plaintiffs' purchase of Bank of America and Merrill Lynch

25        & Co. MBS offerings.  Accordingly, these non-Countrywide MBS claims

26        are appropriate for separation and simultaneous remand, under 28 U.S.C. §

27        1407(a), to the Southern District of New York.

28

ECF No. 77.  The Panel's use of "Countrywide MBS" and "Bank of America and Merrill Lynch & Co. MBS offerings" appears to draw a distinction based on whether Countrywide or Bank of America/Merrill issued a particular Certificate. The Court understands the Transfer Order to have therefore transferred all claims relating to Certificates that Countrywide issued (including the successor liability claims against Bank of America with respect to such Certificates), and remanded all claims relating to the Bank of America/Merrill Offerings.[4]

The Transfer Order does not explicitly address claims relating to Certificates issued by third parties.  However, three factors lead the Court to conclude that the Panel intended to transfer the claims relating to those Third Party Offerings that contain Countrywide-originated loans.  First, the purpose of the MDL is to centralize "actions sharing factual questions arising from allegations that Countrywide and affiliated defendants misrepresented to investors in Countrywide mortgage-backed securities (MBS) origination practices for, and the credit quality of, the mortgage loans Countrywide originated from 2004 to 2007."  Transfer Order, ECF No. 77.  Third Party Offerings that contain Countrywide-originated loans present many of the same factual and legal questions regarding Countrywide's underwriting practices that are in other MDL cases.  Second, the text of the Transfer Order made clear that it was transferring the entire case except for "*these* non-Countrywide MBS claims."  *Id.* (emphasis added).  The restrictive "these" refers to the Bank of America/Merrill Offerings; it follows that claims regarding other Offerings would be transferred to this Court.  Third, in another case, the Panel transferred claims relating to third-party-issued Certificates to this

---

[4] This understanding is consistent with other cases in the MDL, in which the Panel has consistently transferred successor liability claims.  *E.g.* Order Establishing the MDL, *In re Countrywide Fin. Corp. Mortgage-Backed Securities Litig.*, MDL No. 2265, ECF No. 143 (transferring four cases to this Court, each of which included successor claims against Bank of America).

1  Court because Countrywide had originated the underlying loans.  *See In re*

2  *Countrywide Fin. Corp. Mortgage-Backed Securities Litig.*, Transfer Order

3  (J.P.M.L. Feb. 7, 2012).  These three factors lead the Court to conclude that claims

4  relating to Third Party Offerings that contain Countrywide-originated loans have

5  been transferred to the MDL.  The successor liability claims against Bank of

6  America relating to these Third Party Offerings have also been transferred to the

7  Court for the reasons set out above.  The remaining Third Party Offerings

8  (including those that were underwritten by CSC) have nothing to do with the

9  "origination practices for, and the credit quality of, the mortgage loans

10  Countrywide originated from 2004 to 2007."  The Court does not believe that the

11  Panel intended to transfer such claims.

12  **B. THE SECURITIES ACT CLAIMS**

13        Causes of Action Three, Four, and Five assert violations of the Securities

14  Act of 1933.  Such claims are subject to a three-year statute of repose that begins to

15  run when the security is "bona fide offered to the public" (Section 11 claims) or on

16  the date of sale (Section 12(a)(2)).  15 U.S.C. § 77m.  The Complaint was filed on

17  August 8, 2011, more than three years after each of the Certificates in this case was

18  bona fide offered to the public and purchased by AIG.  Compl. Ex. A.  Tolling is

19  not available for the reasons set out in *Allstate Ins. Co. v. Countrywide Fin. Corp.*,

20  No. 2:11-CV-05236-MRP (MANx), 2011 WL 5067128, at *10 (C.D. Cal. Oct. 21,

21  2011).  AIG's federal claims are therefore barred by the Securities Act's three-year

22  statute of repose.  Causes of Action Three, Four, and Five are **DISMISSED**

23  **WITH PREJUDICE**.

24  **C. THE STATE LAW CAUSES OF ACTION**

25        The case was originally filed in New York state court.  The Court therefore

26  applies New York law, including New York's choice-of-law rules and New York's

27  borrowing statute.  *In re Nucorp Energy Sec. Litig.*, 772 F.2d at 1492.  New York's

28  borrowing statute, C.P.L.R. § 202, provides that when a nonresident sues on a

cause of action that accrued outside the state, the action must be timely under both New York law and the law of the place where the cause of action accrued. *Id.* The parties dispute which plaintiffs are New York residents, where the plaintiffs' causes of action accrued, and whether AIG's claims are timely under the laws of those states.

1.  *A Corporation with Its Principal Place of Business in New York is a New York Resident for Purposes of C.P.L.R. § 202*

The New York borrowing statute does not apply to plaintiffs that are New York residents. C.P.L.R. § 202. As a threshold matter, the Court must therefore determine which of the 22 plaintiffs are New York residents. Plaintiffs argue that a corporation is a resident of the state in which it has its principal place of business. Plaintiffs remain agnostic as to whether a corporation may also be a resident of another state for purposes of C.P.L.R. § 202. Defendants argue that a corporation is a resident of the state in which it is incorporated, and of only that state. The distinction is significant in this case because many of the plaintiffs are alleged to have their principal place of business in New York, but are incorporated in Delaware or other states.

The New York Court of Appeals has never addressed the precise issue raised by this case. In its closest decision, the Court of Appeals held that Puritan Industries, Inc., a New York corporation with its principal place of business in Massachusetts, was a New York resident for purposes of the borrowing statute. *Wydallis v. U.S. Fid. & Guar. Co.*, 63 N.Y.2d 872, 873–75 (1984). Despite its holding, *Wydallis* had never been cited for the proposition that a New York-incorporated company was a New York resident until this Court did so in a recent case. *In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*, 2:11-ML-02265-MRP, 2012 WL 1097244 (C.D. Cal. Mar. 9, 2012) ("*National Integrity*"). Adding to the confusion, a number of lower New York courts and federal courts in the Southern District of New York have, without citation to *Wydallis*, reached the

opposite conclusion.  *See, e.g.*, *Brinckerhoff v. JAC Holding Corp.*, 263 A.D.2d 352, 352–53 (1999) ("[P]ursuant to New York's borrowing statute, CPLR 202, the applicable Statute of Limitations is that of Georgia, since that is where [plaintiff] had its principal office" even though the [plaintiff] was incorporated in Delaware.); *Robb Evans & Associates LLC v. Sun Am. Life Ins.*, 10 CIV. 5999 GBD, 2012 WL 488257 (S.D.N.Y. Feb. 14, 2012) ("[W]hat constitutes the sole residency of a business entity for the purpose of the New York borrowing statute is its principal place of business."); *McMahan & Co. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 727 F. Supp. 833, 834 (S.D.N.Y. 1989) ("A corporation's principal place of business, rather than its state of incorporation, determines its residence.").

The lower state court decisions are based on a case released just weeks after *Wydallis*.  In that case, *Antone v. General Motors Corp.*, the Court of Appeals held that a motorist was a Pennsylvania resident because he lived in Pennsylvania at the time of an automobile accident.  64 N.Y.2d 20, 30 (1984).  The plaintiff had lived in New York for several years before the accident and, though he lived in Pennsylvania at the time of the accident, maintained that he was a New York resident because he was "still then domiciled in New York." *Id.* at 26.  The Court of Appeals disagreed.  It held that the "term 'residence' [as] employed in the C.P.L.R. . . . is not equivalent to domicile," and that the test of residency is "whether the plaintiff has a residence in New York" or "whether he has a significant connection with some locality in the State as the result of living there for some length of time during the course of a year." *Id.* at 29–30.

*Antone* dealt with a natural person, and so is relevant to a corporation only by analogy.  Nevertheless, successive decisions by federal courts and lower New York courts have extended *Antone* by holding that a corporation's state of incorporation (and therefore its domicile) does not determine residency.  These cases go on to reason that, if state of incorporation does not govern, residency must instead be determined by a corporation's principal place of business. *E.g.*

*McMahan*, 727 F. Supp. at 834.  Some cases rely directly on *Antone*, while others flow from a pre-*Wydallis* federal decision, *Allegaert v. Warren.*  480 F.Supp. 817, 820 (S.D.N.Y. 1979).

The New York Court of Appeals has never addressed this line of cases, revisited *Wydallis*, or determined whether it would extend *Antone* to a corporation. In a 2010 case, however, the Court of Appeals again addressed the residency of a corporation for purposes of C.P.L.R. § 202.  In *Portfolio Recovery Associates, LLC v. King*, the Court of Appeals considered a plaintiff that was incorporated in Delaware and also had its principal place of business in Delaware.  14 N.Y.3d 410, 415 (2010).  The Court of Appeals applied C.P.L.R. § 202 and borrowed Delaware's statute of limitations.  *Id.*  That result is unremarkable given that the plaintiff's principal place of business and state of incorporation were both in Delaware.  The Court of Appeals offered  the following justification: "Here, it is evident that the contract causes of action accrued in Delaware, the place where [plaintiff] sustained the economic injury in 1999 when [defendant] allegedly breached the contract.  [Plaintiff] is incorporated in Delaware and is not a New York resident.  Therefore, the borrowing statute applies." *Id.* at 416.  This justification for invoking C.P.L.R. § 202 mirrors the two-part structure of the statute.[5]

The context indicates that the non-resident requirement is met because the plaintiff "is incorporated in Delaware and is not a New York resident."  The use of "and" is peculiar in this context.  Taken literally, the second clause in the sentence ("is not a New York resident") is sufficient to satisfy the nonresident element of C.P.L.R. § 202.  There is therefore no reason to include the first clause and a linking conjunction.  This leads to the conclusion that "and" carries something other than its traditional meaning.  One possibility is that it means "and *therefore* is

---

[5] C.P.L.R. § 202 requires that a cause of action both (i) accrue without the state and (ii) accrue in favor of a non-resident.  C.P.L.R. § 202.

1  not a New York resident." This interpretation would support Defendants' position

2  that the state of incorporation controls. Alternatively, the clause could be

3  construed as "and *is not otherwise* a New York resident." That interpretation

4  would support AIG's position that residency is non-exclusive. Each construction

5  would be valid; at a bare minimum *Portfolio Recovery Associates* indicates that the

6  state of incorporation has some relevance to a corporation's residence for purposes

7  of C.P.L.R. § 202.

8       None of these subsequent cases, including *Portfolio Recovery Associates*,

9  cite or acknowledge *Wydallis*. To the extent that any of these subsequent cases

10  contradict *Wydallis*'s explicit holding that a New York-incorporated company is a

11  New York resident for purposes of C.P.L.R., the Court will disregard those cases.

12  *Wydallis* is a clear expression from New York's highest court; its holding is

13  binding on this Court unless and until the legislature or the New York Court of

14  Appeals revisits the issue.

15       Sadly, this does not resolve the issue. *Wydallis* holds that a New York-

16  incorporated corporation is a New York resident for C.P.L.R. § 202 even if its

17  principal place of business is elsewhere. It says nothing about the converse, where

18  a corporation has its principal place of business in New York but is incorporated

19  elsewhere. Of the 22 plaintiffs in this case, eight have their principal place of

20  business in New York but are incorporated in some other state.[6] Four of the eight

21  are incorporated in Pennsylvania, three in Delaware, and one in Illinois. *Wydallis*

22  makes clear that, for purposes of C.P.L.R. § 202, these subsidiaries are

23  Pennsylvania, Delaware, and Illinois residents. The question is whether they are

24  also New York residents.

25       Defendants argue that residency is exclusive, such that a Delaware resident

26  may not also be a New York resident. Plaintiffs argue the opposite, that the test of

27

28

---

[6] One additional plaintiff is a retirement plan that is administered in New York.

residency is "sufficient contacts," and that a corporation may therefore be resident in multiple states.  Each interpretation finds support in New York law, and each would vindicate certain policy considerations but inhibit others.

Though none is directly on-point, at least three cases from the New York Court of Appeals lend some support to AIG's contention.  In *Sease v. Central Greyhound Lines, Inc. of New York*, the Court of Appeals noted that, "[i]t is generally recognized that a corporation, like an individual, may have a place of residence other than its domicile.  Corporations often have their principal places of business outside of the State of incorporation.  The domicile of a corporation is the State in which it is incorporated."  306 N.Y. 284, 286 (1954).  Though relevant here, the quoted language from *Sease* is dicta; it is only tangentially relevant to the outcome of that case.  In *Sease*, the Court of Appeals held that a New York corporation was not a "foreign defendant" for purposes of a New York service-of-process provision.  *Id.*  Like *Wydallis*, *Sease* dealt with a corporation that was incorporated in New York, and merely held that it was not "foreign."  *Sease*'s discussion of the differences between principal place of business and domicile came amid a discussion of whether the plaintiff had known that the defendant was a New York corporation.  The discussion from *Sease* was not a holding, and it says nothing about C.P.L.R. § 202.  The quoted language is further suspect because *Sease* goes on to state that, "Possibly if defendant had merely listed Cleveland, Ohio, as its place of residence on its application for registration to the Commissioner of Motor Vehicles, this would have been equivalent to stating that it was an Ohio corporation."  *Id.*  This language is also not essential to *Sease*'s holding, and it seems to contradict AIG's point by conflating residence with domicile.  The relied-on portion of *Sease* did not consider C.P.L.R. § 202, is dicta, and is internally inconsistent.  The Court affords it scant weight.

As discussed above, *Antone* considered a natural person rather than a corporation.  Nevertheless, it endorsed (i) the concept that residence and domicile

are not coterminous; (ii) a test for residency based upon a "significant connection with some locality in the State;" and (iii) the concept that a person may have more than one residence. *Antone*, 64 N.Y.S.2d at 518 ("[R]esidence . . . is not equivalent to domicile."); *id.* ([T]he determination of whether a plaintiff is a New York resident, for purposes of CPLR 202, turns on whether he has a significant connection with some locality in the State as the result of living there for some length of time during the course of a year.); *id.* at 517 ("[W]hile a person can have but one domicile he can have more than one residence.").

Finally, as discussed above, one possible reading of *Portfolio Recovery Associates* is that C.P.L.R. § 202 applied because the plaintiff in that case was incorporated in Delaware and was not otherwise a New York resident. This interpretation, if adopted, would support AIG's contention that incorporating in New York is one path to New York residency, but that it is not the only path.

The arguments against AIG's position are valid and Defendants have done an admirable job mustering them. *Sease* was decided seventy years ago and is internally inconsistent. *Antone* was decided in the context of a natural person and says nothing about a corporation. The language in *Portfolio Recovery Associates* could as easily be read to support Defendants' position.

In addition, Defendants rely heavily on a Court of Appeals case to support their argument that a corporation can have only one place of residence. That case, *Global Finance Corporation v. Triarc Corporation*, considered where a cause of action "acrues"[7] for purposes of C.P.L.R. § 202. 93 N.Y.2d 525, 530 (1999). There, the New York Court of Appeals held that "[w]hen an alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss." *Global Finance Corp.* went on to state

---

[7] The Court sometimes uses the term "arise" instead of "accrue" when discussing C.P.L.R. § 202. The two terms are interchangeable in the context of the borrowing statute. *Global Fin. Corp.* 93 N.Y.2d at 529.

that, "CPLR 202 is designed to add clarity to the law and to provide the certainty of uniform application to litigants.  This goal is better served by a rule requiring the single determination of a plaintiff's residence than by a rule dependent on a litany of events relevant to the 'center of gravity' of a contract dispute."  *Id.*

Defendants argue that *Global Finance Corp.*'s exhortation for clarity and uniformity would be frustrated "[i]f a corporation's residence could be either its state of incorporation or its principal place of business."  Reply at 7.  But *Global Finance Corp.* itself endorsed such a result.  It held that the cause of action arose at the plaintiff's residence, and then noted that, "plaintiff's causes of action are time-barred whether one looks to its State of incorporation or its principal place of business.  Thus, we need not determine whether it was in [the state of incorporation] or [the state of principal place of business] that plaintiff more acutely sustained the impact of its loss."  *Global Fin. Corp.*, 93 N.Y.2d at 530.  The plaintiff corporation's place of residence could have been either its state of incorporation or its principal place of business, depending upon where the plaintiff most "acutely" sustained the loss.  *Id.*  A cause of action may only accrue in one place, and so in holding that accrual happens at a corporation's residence *Global Finance Corporation* does stand for the proposition that, at least in the context of accrual, a corporation may have only one residence.  It does not address whether the same is true for purposes of C.P.L.R. §202's residency requirement.  And, even in the context of accrual, the *Global Finance Corporation* decision recognized that that residence might be *either* the state of incorporation *or* the state of principal place of business.

Both sides have presented compelling arguments.  Ultimately the Court's decision is driven by *Antone* and the purpose of the borrowing statute.  The goal of the statute is to prevent foreign claimants from flooding into New York courts to take advantage of New York's favorable limitations period.  *Nat'l Sur. Co. v. Ruffin*, 242 N.Y. 413, 417 (1926) ("The obvious purpose of the provision as a

whole is to prevent a non-resident claimant from coming into this State and prosecuting a claim whether against resident or non-resident under our Statutes of Limitations if they are more favorable to him than the statutes prevailing in the State where the cause of action arose."). *Antone* made clear that (in the context the borrowing statute's residency requirement) a person may have more than one residence and that the test for whether a person is a New York resident for purposes of C.P.L.R. § 202 is whether he has "a significant connection with some locality in the State." *Antone*, 64 N.Y.2d at 30. A person who has such a significant connection with the state does not "come into" New York to take advantage of its laws, the person is already there. *Antone* warns that resident does not mean domicile precisely so that a person with a significant connection to New York, but whose permanent domicile is elsewhere, is protected by New York law. *Antone*, 64 N.Y.2d at 29–30 ("If, in fact, such an individual were domiciled elsewhere, and resident in CPLR 202 were interpreted as equivalent to domiciliary, this individual would be treated the same as someone with no contacts with New York, a result which would hardly be consistent with the statute's purpose."). That Mr. Antone was an individual and AIG is a multinational corporation does not change the analysis. Establishment of a principal place of business in New York is a sufficiently "significant connection" to New York to qualify as a resident for purposes of C.P.L.R. § 202. Accordingly, the Court will not apply the borrowing statute if a plaintiff is either incorporated in New York or maintains its principal place of business there.[8]

This holding may ultimately result in fact-intensive inquiries to determine whether a cause of action arose at a plaintiff's principal place of business or in its state of incorporation. That result is unfortunate, but it is an inquiry that the New

---

[8] At this stage the Court accepts, as it must, Plaintiffs' allegations regarding their principal places of business. The Court will revisit this issue at summary judgment should the factual record warrant it.

1  York Court of Appeals explicitly contemplated in *Global Finance Corporation*.

2  *Global Fin. Corp.*, 93 N.Y.2d at 530.

3  **2.     *The Financial Base Doctrine Does Not Apply***

4         Under the rule articulated in Section III.C.1 above, C.P.L.R. § 202

5  potentially applies to the state law claims brought by nine of the 22 plaintiffs.[9]

6  AIG argues that, even though those plaintiffs neither are incorporated in New York

7  nor have their principal places of business there, the claims accrued in New York.

8  This is because, allegedly, "[t]he AIG employees responsible for managing

9  Plaintiffs' portfolios and making the purchase decisions for all the RMBS at issue

10  were located in New York, New York.  These same employees conducted the due

11  diligence described below."  Complaint ¶ 103.

12         The general rule is that "[a] cause of action "accrues where the injury is

13  sustained rather than where the defendant committed the wrongful acts." *Gordon

14  & Co. v. Ross*, 63 F.Supp.2d 405, 408 (S.D.N.Y. 1999).  "When an injury is purely

15  economic, the place of injury for purposes of the borrowing statute is where the

16  economic impact of defendant's conduct is felt, which is usually the plaintiff's

17  place of residence."  *Id.*; *see also Global Fin. Corp.*, 93 N.Y.2d at 529 ("When an

18  alleged injury is purely economic, the place of injury usually is where the plaintiff

19  resides and sustains the economic impact of the loss.").  "The economic injury is

20  said to occur in a location other than where plaintiff resides only in the 'extremely

21  rare' case where the party has offered 'unusual circumstances.'"  *Epstein v. Haas

22  Secs. Corp.*, 731 F. Supp. 1166, 1178 (S.D.N.Y. 1990) (citing *Gorlin v. Bond

23  Richman & Co.*, 706 F.Supp. 236, 240 n. 8 (S.D.N.Y. 1989)).  Plaintiff has the

24  _____

25  [9] They are: American General Assurance Company, American General Life and
    Accident Insurance Company, American General Life Insurance Company,

26  American General Life Insurance Company of Delaware, Lexington Insurance
    Company, SunAmerica Annuity and Life Assurance Company, SunAmerica Life

27  Insurance Company, The Variable Annuity Life Insurance Company, and Western
    National Life Insurance Company.

28

15

burden to demonstrate that extraordinary circumstances justify a departure from the standard rule. *Katz v. Goodyear Tire and Rubber Co.*, 737 F.2d 238 (2d Cir. 1984). 582 F. Supp. 1421, 1426 (S.D.N.Y. 1984). In determining whether plaintiff has met this burden, the court must consider all relevant factors, including how and where plaintiff paid for the securities, where plaintiff maintained the accounts which incurred the loss, and where the securities were actually handled. *Sack v. Low*, 478 F.2d 360, 367–368 (2d Cir.1973).

One such exception, and the one claimed by AIG, is the "financial base" doctrine. That doctrine was developed in *Lang v. Paine, Webber, Jackson & Curtis, Inc.* in 1984, and it has been infrequently applied in the intervening decades. [10], [11] 582 F. Supp. 1421, 1425–26 (S.D.N.Y. 1984). The "financial base" doctrine may apply "[w]here a plaintiff 'maintains a separate financial base' and where the impact of the financial loss is felt at that location." *Baena v. Woori Bank*, No. 05 Civ. 7018, 2006 WL 2935752, at *6 (S.D.N.Y. Oct. 11, 2006).

---

[10] The New York Court of Appeals has not explicitly adopted the so-called "financial base" doctrine, but it cited *Lang* approvingly in *Global Financial Corp.* 93 N.Y.2d at 530 (citing *Lang* using the "cf" signal to support its conclusion that a corporation's residence is "usually" its residence."). For purposes of this motion the Court will assume that the New York Court of Appeals would approve of the "financial base" doctrine as it has been developed by courts in the Southern District of New York.

[11] Plaintiffs have identified for the Court only two cases where a court applied the financial base doctrine and held that a loss was suffered in a state other than the plaintiffs' residence. One is *Lang* itself, the other is *Epstein*, cited *supra*. Two other cases cited by AIG are inapposite. *Intellivision v. Microsoft Corporation* held that an injury to a joint venture was felt at its principal place of business rather than in the owner's states of residence. 784 F. Supp. 2d 356, 369–72 (S.D.N.Y. 2011). *Intellivision* therefore stands for the unexceptional proposition that a business' loss is felt by the business in its place of residence, not by the owners in theirs. As applied to this case, that rule militates against finding that all of Plaintiffs' injuries were felt in New York. *Maiden v. Biehl*, also cited by Plaintiffs, reached the same conclusion with respect to the distinction between a trust and its beneficiary. 582 F. Supp. 1209, 1218 (S.D.N.Y. 1984).

Maintenance of financial accounts in New York, or the presence in New York of personnel who actually make the investment decision, is insufficient to trigger the financial base exception. *E.g.*, *Robb Evans & Associates LLC v. Sun Am. Life Ins.*, 10 CIV. 5999 GBD, 2012 WL 488257, at *4 (S.D.N.Y. Feb. 14, 2012) (Allegation that the "financial base with regard to the financial transfers was in New York" is insufficient.); *Gorlin v. Bond Richman & Co.*, 706 F. Supp. 236, 240 (S.D.N.Y. 1989) (Allegation that an account was "maintained and traded on in New York" is insufficient.). This is because the relevant inquiry is not where the trading activity occurred, or where actions in reliance were taken, but rather where the economic impact of the loss was felt. Courts in the Southern District of New York have phrased the key question as "who became poorer and where did they become poorer?" *Appel v. Kidder Peabody & Co. Inc.*, 628 F.Supp. 153, 156 (S.D.N.Y. 1986).

Plaintiffs in this case have not demonstrated the sort of unusual circumstances that would justify deviation from the standard rule that a plaintiff "became poorer" in its state of residence. AIG's allegations, read in the light most favorable to AIG, establish that the investment decisions were made in New York. Complaint ¶ 103. The *Epstein* court correctly noted that "[t]hese facts might apply to any out-of-state plaintiff who sued a New York securities broker, and do not by themselves seem to justify departure from the general rule." *Epstein*, 731 F. Supp. 1166, 1179 (S.D.N.Y. 1990). The Court agrees; the economic impact of any losses in this case was felt by each plaintiff in its state of residence.

Under *Global Finance Corporation*, Plaintiffs' place of residence for purposes of accrual could be either their principal places of business or states of incorporation, wherever the losses were most acutely felt. 93 N.Y.2d at 530. In its brief, AIG urged that, if faced with such a choice, the Court "must find that [the losses] were incurred in their respective principal places of business." Opp. at 16.

1   For purposes of this motion, the Court will therefore apply the statute of limitations

2   of each plaintiff's principal place of business.[12]

3   *3.      Some of The Common Law Claims Subject to the Borrowing Statute Are*

4   *        Time-Barred*

5          In their initial motion,[13] Defendants moved to dismiss the claims of eight of

6   the 22 plaintiffs in this case on the basis of C.P.L.R. § 202.[14]   Those plaintiffs have

7   their principal places of business in Arizona, California, Texas, and Tennessee.

8   The Court will analyze the Arizona, California, and Tenessee plaintiffs together,

9   and will treat the Texas plaintiffs separately.

10          **Arizona, California, and Tennessee**

11          Arizona and California each have a three-year statute of limitations for fraud

12   and a two-year statute of limitations for negligent misrepresentation.  Ariz. Rev.

13   Stat. Ann. § 12-542 (two-year statute for general property torts); Ariz. Rev. Stat.

14   Ann. § 12-543 (three-year statute for fraud); Cal. Civ. Proc. Code § 338(d) (three-

15   year statute for fraud); *Platt Elec. Supply, Inc. v. EOFF Elec., Inc.*, 522 F.3d 1049,

16

17   [12] As appropriate at the motion to dismiss stage, the Court accepts as true

18   Plaintiffs' representations in the Complaint regarding their principal places of
    business.

19   [13] Defendants' initial motion to dismiss assumed that a plaintiff's principal place of

20   business governs its residence.  For purposes of this motion, Defendants' initial
    motion to dismiss therefore contains an accurate mapping of plaintiffs to their

21   states of residence.

22   [14] One additional plaintiff, Lexington Insurance Company, is not a New York

23   resident for purposes of C.P.L.R. § 202.  In their supplemental brief, Defendants
    moved to dismiss Lexington Insurance Company's claims under Delaware law

24   (Lexington Insurance Company's state of incorporation).  Defendants' initial

25   motion did not move to dismiss Lexington Insurance Company's claims under
    Massachusetts law (its principal place of business).  As discussed in the main text,

26   the Court accepts, for purposes of this motion, AIG's argument that each plaintiff's

27   injury was felt in its principal place of business.  Because the parties have not
    briefed Massachusetts law, the Court declines to pass on the timeliness of

28   Lexington Insurance Company's claims at this time.

1054 (9th Cir.2008) ("For negligent misrepresentation, [California has] a two-year statute of limitations").  Tennessee has a three-year statute of limitations for all claims of injury to property.  Tenn. Code. Ann. § 28-3-105 (2011).  Each of the three states uses an inquiry notice standard.  *Kline v. Turner*, 87 Cal.App.4th 1369, 1374 (Cal. App. 2001) (California statute begins to run when the plaintiff "has information which would put a reasonable person on inquiry."); *Mister Donut of Am., Inc. v. Harris*, 150 Ariz. 321, 323 (1986) (Arizona statute begins to run when the "defrauded party discovers or with reasonable diligence could have discovered the fraud.")  As such, it may begin to run before a person has actual knowledge of the fraud or even all the underlying details of the alleged fraud.); *Potts v. Celotex Corp.*, 796 S.W.2d 678, 681 (Tenn. 1990) (Tennessee statute begins to run "when the injury occurs or is discovered, or when in the exercise of reasonable care and diligence, it should have been discovered.").

The Complaint was filed on August 8, 2011.  Certain claims in the case were subject to a tolling agreement (the "Tolling Agreement") that tolled the claims between January 13, 2011, and August 5, 2011.  In *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, this Court held that a reasonable investor was on inquiry notice of RMBS claims relating to Countrywide's loan-origination practices by February 14, 2008.  802 F. Supp. 2d 1125, 1140 (C.D. Cal. 2011).  Plaintiffs concede that, under *Stichting*, the Arizona plaintiff's negligent misrepresentation claim and all of the Arizona, California, and Tennessee plaintiffs' common law claims that are not subject to the Tolling Agreement are time-barred.  Opp. at 35 n.40.  The California Plaintiff's negligent misrepresentation claim is subject to a two-year statute of limitations and is time-barred also.  *Platt*, 522 F.3d at 1055–56 (applying two-year statute of limitations to California negligent misrepresentation claim).

The remaining common law claims are untimely if the respective plaintiffs were on inquiry notice as of January 15, 2008.  A plaintiff is on inquiry notice

1   when it, "at least suspects a factual basis, as opposed to a legal theory, for [the
2   elements of the cause of action], even if [it] lacks knowledge thereof-when, simply
3   put, [it] at least suspects that someone has done something wrong to [it], wrong
4   being used, not in any technical sense, but rather in accordance with its lay
5   understanding." *Norgart v. Upjohn Co.*, 21 Cal.4th 383, 397–98 (1999). In
6   *Stichting*, the Court determined that an RMBS investor did have such inquiry
7   notice by February 14, 2008. The Court cannot, as a matter of law, say the same of
8   January 15, 2008. As noted in another Countrywide case, January and February
9   2008 was, "an important time in the Countrywide saga." *Allstate Ins. Co. v.*
10  *Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1183 (C.D. Cal. 2011). Bank of
11  America announced its acquisition of Countrywide only four days before the
12  January 15, 2008, trigger date, and several other significant events occurred
13  between January 15, 2008, and February 14, 2008. Notably, this Court appointed a
14  lead plaintiff in the consolidated shareholders case (*In re Countrywide Fin. Corp.*
15  *Sec. Litig.*, No. 07–CV–05295–MRP (MANx) (C.D. Cal.), ECF No. 102), and the
16  *New York City Employees Retirement System* plaintiffs filed their complaint. *New*
17  *York City Emp. Ret. Sys. v. Countrywide Fin. Corp.*, No. 08–CV–00492–ODW
18  (C.D. Cal.). In light of these developments, the question of whether AIG was on
19  inquiry notice by January 15, 2008, is better suited for determination when more
20  facts are available to the Court. The Court therefore **GRANTS** Defendants'
21  motion with respect to the California and Arizona Plaintiffs' negligent
22  misrepresentation claims. The Court **GRANTS** Defendants' motion with respect
23  to the California, Arizona, and Tennessee Plaintiffs' common law claims that were
24  not covered by the Tolling Agreement. The Court **DENIES** Defendants' motion
25  with respect to the California, Arizona, and Tennessee Plaintiffs' common law
26  claims that were covered by the Tolling Agreement.
27
28

**Texas**

Texas has a four-year statute of limitations for fraud and a two-year statute of limitations for negligent misrepresentation.  Tex. Civ. Prac. & Rem. Code Ann. §§ 16.003 (negligence); 16.004 (fraud).  AIG therefore concedes that the Texas Plaintiffs' negligent misrepresentation claims are time-barred.  Opp. at 35 n.40. "The statute of limitations for fraud begins to run from the time the party knew of the misrepresentation."  *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 216 (Tex. 2011) (citing *Little v. Smith*, 943 S.W.2d 414, 420 (Tex. 1997)). *See also*, *Ford v. Exxon Mobil Chem. Co.*, 235 S.W.3d 615, 617 (Tex. 2007) ("The parties agree this claim had to be brought within four years of when the fraud should have been discovered by reasonable diligence."); *Computer Associates Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996) ("[W]here fraud is alleged, we have granted the claimant the benefit of deferring the cause of action until the claimant discovered or should have discovered the fraud.); *Little*, 943 S.W.2d at 420 ("Generally, in a case of fraud the statute of limitations does not commence to run until the fraud is discovered or until it might have been discovered by the exercise of reasonable diligence."); *Val-Com Acquisitions Trust v. Bank of Am., N.A.*, 4:10-CV-421, 2011 WL 4591959, at *4 (E.D. Tex. Sept. 30, 2011) ("A claim for fraud accrues "when the fraud should have been discovered by reasonable diligence.").

Defendants argue that a cause of action for securities fraud accrues at the date of purchase, and that it may be tolled only by two narrow doctrines: the "discovery rule" and the fraudulent concealment doctrine.  In Defendants' characterization, the cases cited above are merely an expression of the fraudulent concealment doctrine.  Reply at 14.  This view is supported by *Woods v. William M. Mercer, Inc.*, which held that, "[i]n an action for fraud, limitations begins to run when the fraud is perpetrated, or if the fraud is concealed, from the time it is discovered or could have been discovered by the exercise of reasonable diligence."

769 S.W.2d 515, 517 (Tex. 1988).  The view is contravened by the many other Texas Supreme Court cases cited above.

Texas cases have occasionally blurred the lines between the accrual of a fraud claim, the deferred accrual of any claim due to fraudulent concealment, and the deferred accrual of any claim based on the discovery rule.  *S.V. v. R.V.*, 933 S.W.2d 1, 5–6 (Tex. 1996) ("The justifications we have offered for deferring accrual have been diverse, somewhat inconsistent, and often overly broad.").  The *S.V.* court went on to clarify that fraud and fraudulent concealment are separate bases for tolling the statute of limitations: "[f]raud . . . in and of itself prevents running of the statute of limitations, as does fraudulent concealment." *Id.* at 6 (internal citation omitted).  This approach squares with that taken by the Texas Supreme Court in *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d at 216, and *Ford v. Exxon Mobil Chem. Co.*, 235 S.W.3d at 617.  In each case, the plaintiff pleaded a straightforward fraud claim, not a claim of fraudulent concealment, and the Texas Supreme Court found that the claim accrued upon inquiry notice.

Defendants rely heavily on *BP America Production Co. v. Marshall*, a fraud case which identified two "recognized" doctrines that "may apply to extend the statute of limitations," the discovery rule and fraudulent concealment.  342 S.W.3d 59, 65 (Tex. 2011).  *BP America* did not include "fraud" as a recognized basis for extending the statute of limitations, only fraudulent concealment.  *Id.*  A footnote in that case states that, "we do not decide whether the discovery rule would prevent accrual of a cause of action in instances where the fraud alleged is not aimed at concealing wrongdoing until limitations has run." *Id.* at 66 n.4.  This statement implies that accrual of an alleged fraud that is "not aimed at concealing wrongdoing" could be deferred, if at all, only by the discovery rule.  That implication does not address the threshold question of when such a claim accrues in the first place.  In fact, the *BP America* decision lacks any discussion of when a

fraud claim accrues.  This absence is possibly explained by the procedural posture of that case.  At trial the plaintiff had pressed the discovery rule and fraudulent concealment, not accrual.  The intermediate appellate court therefore analyzed the discovery rule.[15]  *BP Am. Prod. Co. v. Marshall*, 288 S.W.3d 430, 452 (Tex. App. 2008) *rev'd*, 342 S.W.3d 59 (Tex. 2011) (intermediate appellate ruling discussing the discovery rule).  By the time it reached the Texas Supreme Court, therefore, *BP America* was a case about the discovery rule and fraudulent concealment, not when a fraud cause of action accrues.[16]

Whatever *BP America* says about accrual, it says through silence and implication.  By contrast, the *Exxon Corp. v. Emerald Oil & Gas Co* case was decided five weeks earlier and explicitly held that, "[t]he statute of limitations for fraud begins to run from the time the party knew of the misrepresentation."  348 S.W.3d, 216.  That rule appears in the earlier Texas Supreme Court cases cited above.  It is also the majority rule in most other jurisdictions and it comports with common sense and sound policy.  The Texas Supreme Court justified it on the grounds that, "fraud vitiates whatever it touches."  *Computer Associates*, 918 S.W.2d at 455–56 (citing *Morris v. House*, 32 Tex. 492 (1870)).  A victim of fraud, by definition, does not know of his injury right away; it is therefore appropriate that the statute does not begin to run until, "the fraud is discovered or could have been discovered by the defrauded party by exercise of reasonable diligence."

---

[15] The intermediate appellate decision did not reach fraudulent concealment because it was not necessary given its holding on the discovery rule.

[16] Even if it had been at issue, it would have been superfluous for the *BP America* court to discuss the accrual date of the fraud cause of action.  In its discussion of the discovery rule, the court had already held that the injury "could have been discovered with the exercise of reasonable diligence." *BP Am.*, 342 S.W.3d at 67. The fraud cause of action would have already accrued in that case for the same reason that the discovery rule did not apply.

23

1    *Computer Associates*, 918 S.W.2d at 456 (citing *Estate of Stonecipher v. Estate of*

2    *Butts*, 591 S.W.2d 806, 809 (Tex. 1979)).

3            The rule in Texas, as stated and applied in multiple cases from the Texas

4    Supreme Court, is that a fraud cause of action accrues upon inquiry notice.  The

5    rule was stated most recently in 2011, and *BP America* did not explicitly overturn

6    it.  The Court will therefore apply an inquiry notice standard to the Texas

7    Plaintiffs' claims.  As detailed above, the Court declines to find, as a matter of law,

8    that AIG was on inquiry notice before January 15, 2008.  The Court therefore

9    **DENIES** Defendants' motion with respect to the Texas Plaintiffs' fraud claims.

10   The Court **GRANTS** Defendants' motions with respect to the Texas Plaintiffs'

11   negligent misrepresentation claims.  Dismissal is **WITH PREJUDICE**.

1

2

### IV.   CONCLUSION

3   For the reasons set out above, AIG's federal claims are time-barred and are

4   **DISMISSED WITH PREJUDICE**.  The negligent misrepresentation claims

5   brought by SunAmerica Annuity and Life Assurance Company, SunAmerica Life

6   Insurance Company, American General Life Insurance Company of Delaware,

7   American General Assurance Company, American General Life Insurance

8   Company, The Variable Annuity Life Insurance Company, and Western National

9   Life Insurance Company are also time-barred and are **DISMISSED WITH**

10  **PREJUDICE**.  The common law claims brought by SunAmerica Annuity and Life

11  Assurance Company, SunAmerica Life Insurance Company, and American

12  General Life and Accident Insurance Company that were not covered by the

13  Tolling Agreement are time-barred and are **DISMISSED WITH PREJUDICE**.

14  The Court otherwise **DENIES** Defendants' motion.

15

16   **IT IS SO ORDERED.**

17

18  DATED:  May  23, 2012        _____

19                                               Hon. Mariana R. Pfaelzer

20                                               United States District Judge

21

22

23

24

25

26

27

28