1  James R. Asperger (SBN 83188)
   jimasperger@quinnemanuel.com
2  **QUINN EMANUEL URQUHART &**
3  **SULLIVAN, LLP**
   865 South Figueroa Street, 10th Floor
4  Los Angeles, CA 90017
5  Tel: 213-443-3000
   Fax: 213-443-3100
6
7  Michael B. Carlinsky
   michaelcarlinsky@quinnemanuel.com
8  Maria Ginzburg
   mariaginzburg@quinnemanuel.com
9  **QUINN EMANUEL URQUHART &**
10 **SULLIVAN, LLP**
   51 Madison Avenue, 22nd Floor
11 New York, NY 10010
   Tel: 212-849-7000
12 Fax: 212-849-7100
13
14 *Attorneys for Plaintiffs*

15

16 UNITED STATES DISTRICT COURT

17 CENTRAL DISTRICT OF CALIFORNIA

18

19

| AMERICAN INTERNATIONAL GROUP, INC., AIG SECURITIES LENDING CORPORATION, AMERICAN GENERAL LIFE AND ACCIDENT INSURANCE COMPANY, AMERICAN GENERAL LIFE INSURANCE COMPANY, AMERICAN GENERAL LIFE INSURANCE COMPANY OF DELAWARE, AMERICAN HOME ASSURANCE COMPANY, AMERICAN INTERNATIONAL GROUP RETIREMENT PLAN, CHARTIS PROPERTY CASUALTY COMPANY, CHARTIS SELECT INSURANCE COMPANY, CHARTIS SPECIALTY INSURANCE COMPANY, COMMERCE AND INDUSTRY INSURANCE COMPANY, LEXINGTON INSURANCE COMPANY. NATIONAL | Case No. 11-ML-02265-MRP (MANx)<br><br>Case No. 11-CV-10549-MRP (MANx)<br><br>**AMENDED COMPLAINT**<br>**JURY TRIAL DEMANDED** |
|---|---|

| | |
|---|---|
| 1 | UNION FIRE INSURANCE COMPANY OF |
| 2 | PITTSBURGH, PA, NEW HAMPSHIRE INSURANCE COMPANY, SUNAMERICA |
| 3 | ANNUITY AND LIFE ASSURANCE COMPANY, SUNAMERICA LIFE |
| 4 | INSURANCE COMPANY, THE INSURANCE COMPANY OF THE STATE |
| 5 | OF PENNSYLVANIA, THE UNITED STATES LIFE INSURANCE COMPANY IN |
| 6 | THE CITY OF NEW YORK, THE VARIABLE ANNUITY LIFE INSURANCE |
| 7 | COMPANY, and WESTERN NATIONAL LIFE INSURANCE COMPANY, |
| 8 | Plaintiffs, |
| 9 | -against- |
| 10 | BANK OF AMERICA CORPORATION, BANC OF AMERICA SECURITIES LLC, |
| 11 | BANK OF AMERICA, NATIONAL ASSOCIATION, BANC OF AMERICA |
| 12 | FUNDING CORPORATION, BANC OF AMERICA MORTGAGE SECURITIES, |
| 13 | INC., ASSET BACKED FUNDING CORPORATION, NB HOLDINGS |
| 14 | CORPORATION, MERRILL LYNCH & CO., INC., MERRILL LYNCH MORTGAGE |
| 15 | LENDING, INC., FIRST FRANKLIN FINANCIAL CORPORATION, MERRILL |
| 16 | LYNCH MORTGAGE CAPITAL INC., MERRILL LYNCH CREDIT |
| 17 | CORPORATION, MERRILL LYNCH, PIERCE, FENNER & SMITH INC., |
| 18 | MERRILL LYNCH MORTGAGE INVESTORS, INC., COUNTRYWIDE |
| 19 | FINANCIAL CORPORATION, COUNTRYWIDE CAPITAL MARKETS |
| 20 | LLC, COUNTRYWIDE HOME LOANS, INC., COUNTRYWIDE SECURITIES |
| 21 | CORPORATION, CWABS, INC., CWALT, INC., CWHEQ, INC., and CWMBS, INC., |
| 22 | |
| 23 | Defendants. |

# TABLE OF CONTENTS

**Page**

NATURE OF ACTION ................................................................. 2

PARTIES.......................................................................... 15

JURISDICTION AND VENUE ........................................................ 26

BACKGROUND...................................................................... 26

I.      THE MECHANICS OF MORTGAGE SECURITIZATION ......................... 26

II.     THE RAPID EXPANSION OF MORTGAGE SECURITIZATION
        TRANSFORMS THE INDUSTRY................................................... 29

III.    DEFENDANTS OPERATED ON EVERY LEVEL OF THE
        SECURITIZATION PROCESS .................................................... 31

ALLEGATIONS ..................................................................... 37

IV.     DEFENDANTS' MATERIAL MISREPRESENTATIONS........................... 37

        A.      Defendants' Offering Materials.............................................. 37

        B.      Defendants' Misrepresentations Regarding Loan Underwriting
                Standards and Practices ........................................................ 40

        C.      Defendants' Misrepresentations Regarding Loan-to-Value and
                Combined Loan-to-Value Ratios............................................ 45

        D.      Defendants' Misrepresentations Regarding Owner-Occupancy.......... 49

        E.      Defendants' Misrepresentations Regarding Credit Ratings................ 50

V.      DEFENDANTS' REPRESENTATIONS TO AIG WERE FALSE .............. 51

        A.      Loan-to-Value Ratios Represented by Defendants Were False........... 53

        B.      Combined Loan-to-Value Ratios Represented by Defendants
                Were False ....................................................................... 60

        C.      Owner-Occupancy Levels Represented by Defendants Were
                False.............................................................................. 64

        D.      Defendants Made Material Misrepresentations Concerning
                Originated Loans ............................................................... 69

                (1)     Countrywide Made Material Misrepresentations as an
                        Originator ............................................................. 69

                (2)     Merrill Lynch Made Material Misrepresentations as an
                        Originator ............................................................. 70

Case No. 11-CV-10549-MRP (MANx)
AMENDED COMPLAINT

|   |   |   |   |   |
|---|---|---|---|---|
| | (3) | | Bank of America Made Material Misrepresentations as an Originator ................................................................. | 71 |
| E. | | | Defendants Engineered Inflated Credit Ratings ................................. | 72 |
| | (1) | | All Deals Have Suffered Significant Credit Rating Downgrades ......................................................................... | 77 |
| F. | | | Defendants Ignored Stated Underwriting Guidelines ........................ | 78 |
| | (1) | | Countrywide Ignored Its Underwriting Guidelines ................. | 78 |
| | | (a) | Countrywide Schemes to Increase Its Market Share But Pledges Continued Rigorous Underwriting .............. | 80 |
| | | (b) | Countrywide Cedes Its Underwriting Policy to the Market's Lowest Common Denominator Through Its "Matching" Mandate ...................................................... | 84 |
| | | (c) | Countrywide's Use of "Exceptions" Guaranteed that Virtually Every Loan Would Be Approved ..................... | 87 |
| | | (d) | Through Countrywide's Matching Program and Its Use of Exceptions, "Saleability" Became the Sole Criteria Used to Approve a Loan ................................... | 92 |
| | | (e) | Countrywide Abused the No-Documentation Loan Process and Falsified Loan Applications ........................ | 93 |
| | | (f) | Countrywide's Fraud Investigators Identified Numerous Instances of Fraud ...................................... | 98 |
| | | (g) | Countrywide Ignored Its Internal Risk Department Who Warned that Underwriting Standards Had Been Abandoned ............................................................. | 101 |
| | | (h) | Countrywide's Inflated Appraisals Skewed Loan-to-Value Figures Reported to Investors Like AIG ............. | 105 |
| | | (i) | Countrywide Encouraged Staff Through Compensation and Other Incentives to Put Borrowers Into Higher Risk Loans More Profitable to Countrywide ................................................................ | 113 |
| | | (j) | Countrywide Developed Toxic "Exotic" Loan Products With Extreme Risk ........................................ | 115 |
| | | (k) | Countrywide Admits to Using Adverse Selection in Pooling Loans, Keeping the Best Loans For Itself ........ | 116 |
| | | (l) | Third-Party Due Diligence Firms Conclude that Countrywide Loans Are Defective ................................ | 117 |

Case No. 11-CV-10549-MRP (MANx)
AMENDED COMPLAINT

(m)     Analysis by Parties with Access to Actual Loan Files Shows that Countrywide Abandoned Its Underwriting Guidelines ............................................. 121

(n)     AIG's Limited Access to Loan Files Confirms Countrywide Abandoned Its Underwriting Guidelines ................................................................ 125

(2)     Merrill Ignored Its Underwriting Guidelines ............................ 126

(a)     Merrill Seeks to Increase Its Market Share ................... 127

(b)     Merrill Instructed Subprime Originators to Increase Their Origination Volumes and Originate Riskier Loans .............................................................. 129

(c)     Merrill Waived in Loans that Failed to Meet Underwriting Guidelines ............................................. 136

(d)     AIG's Limited Access to Loan Files Confirms Merrill Lynch Abandoned Its Underwriting Guidelines ................................................................ 141

(3)     Bank of America Ignored Its Underwriting Guidelines ........... 142

(a)     Former Employees Confirm that Bank of America Abandoned Its Underwriting Guidelines ...................... 144

(b)     AIG's Limited Access to Loan Files Confirms Bank of America Abandoned Its Underwriting Guidelines .... 148

VI.    THE DEFENDANTS KNEW THEIR REPRESENTATIONS WERE FALSE ................................................................................................. 151

A.     Countrywide Knew Its Representations Were False ............................ 151

B.     Merrill Knew Its Representations Were False ..................................... 157

C.     Bank of America Knew Its Representations Were False ................... 161

VII.   AIG'S DETRIMENTAL RELIANCE AND RESULTING DAMAGES ... 163

VIII.  OTHER MATTERS .......................................................................... 169

A.     Bank of America is Liable for Countrywide's Actions ..................... 169

(1)     Bank of America is Countrywide's Successor-in-Interest ....... 178

(a)     The Transactions Constituted a *De Facto* Merger and Were Undertaken in Bad Faith and with the Intent to Defraud Countrywide's Creditors ................... 178

(b)     Bank of America Assumed Countrywide's Liabilities ................................................................ 194

1    (2)   Bank of America and Countrywide Engaged in a
           Fraudulent Conveyance of Countrywide's Assets ................... 199
2          (a)   Constructive Fraudulent Conveyance ............................ 200
3          (b)   Actual Fraudulent Conveyance ...................................... 200
4    B.   Bank of America, N.A. is Jointly and Severally Liable With First
5         Franklin for First Franklin's Wrongful Acts ........................ 201
6    C.   Tolling of the Securities Act of 1933 Claims ...................... 202
7          (1)   Tolling of 1933 Act Claims Against Countrywide ................ 203
8          (2)   Tolling of 1933 Act Claims Against Merrill ............................ 204
9    D.   Liability of Countrywide Financial, Countrywide Capital
          Markets, and Merrill Lynch & Co., Inc. as Control Persons ............. 206
10         (1)   Countrywide Financial and Countrywide Capital Markets ..... 206
11         (2)   Merrill Lynch & Co., Inc. ........................................... 210
12   E.   AIG's Sale of Certain RMBS to Maiden Lane II ................................ 212

FIRST CAUSE OF ACTION .............................................................. 212

SECOND CAUSE OF ACTION ........................................................... 213

THIRD CAUSE OF ACTION ............................................................... 214

FOURTH CAUSE OF ACTION ............................................................ 218

FIFTH CAUSE OF ACTION ............................................................... 222

SIXTH CAUSE OF ACTION ............................................................... 223

SEVENTH CAUSE OF ACTION ......................................................... 225

EIGHTH CAUSE OF ACTION ........................................................... 225

NINTH CAUSE OF ACTION .............................................................. 226

PRAYER FOR RELIEF .................................................................... 227

JURY TRIAL DEMANDED ............................................................... 228

Plaintiffs American International Group, Inc., AIG Securities Lending Corporation, American General Life and Accident Insurance Company, American General Life Insurance Company, American General Life Insurance Company of Delaware, American Home Assurance Company, American International Group Retirement Plan, Chartis Property Casualty Company, Chartis Select Insurance Company, Chartis Specialty Insurance Company, Commerce and Industry Insurance Company, Lexington Insurance Company, National Union Fire Insurance Company of Pittsburgh, Pa., New Hampshire Insurance Company, SunAmerica Annuity and Life Assurance Company, SunAmerica Life Insurance Company, The Insurance Company of the State of Pennsylvania, The United States Life Insurance Company in the City of New York, The Variable Annuity Life Insurance Company, and Western National Life Insurance Company (collectively, "AIG"), by its attorneys, Quinn Emanuel Urquhart & Sullivan LLP, for its Amended Complaint against Bank of America Corporation ("Bank of America Corp."), Banc of America Securities LLC, Bank of America, National Association ("Bank of America, N.A." or "BANA"), Banc of America Funding Corporation ("Banc of America Funding" or "BAFC"), Banc of America Mortgage Securities, Inc., Asset Backed Funding Corporation, NB Holdings Corporation ("NB Holdings"; collectively, "Bank of America"), Merrill Lynch & Co., Inc., Merrill Lynch Mortgage Lending, Inc. ("Merrill Lynch Mortgage Lending" or "MLML"), First Franklin Financial Corporation ("First Franklin"), Merrill Lynch Mortgage Capital Inc., Merrill Lynch Credit Corporation, Merrill Lynch Pierce, Fenner & Smith, Inc. ("MLPF&S"), Merrill Lynch Mortgage Investors, Inc. ("MLMI"; collectively, "Merrill Lynch" or "Merrill"), Countrywide Financial Corporation ("Countrywide Financial" or "CFC"), Countrywide Capital Markets LLC, Countrywide Home Loans, Inc. ("Countrywide Home Loans" or "CHL"), Countrywide Securities Corporation ("Countrywide Securities"), Bank of America, National Association as successor in interest to Countrywide Bank, National Association, formerly Countrywide Bank,

FSB ("Countrywide Bank"), CWABS, Inc., CWALT, Inc., CWHEQ, Inc., CWMBS, Inc. (collectively, "Countrywide") (all collectively, "Defendants") allege as follows[1]:

## NATURE OF ACTION

1.     This case arises from a massive fraud perpetrated by Defendants Bank of America, Merrill Lynch, and Countrywide that has resulted in nearly $10 billion in damages to AIG, and ultimately American taxpayers.   AIG brings this action as part of its overall efforts to recoup such damages from these Defendants and other parties.

2.     Between 2005 and 2007, Defendants fraudulently induced AIG to invest in nearly 350 residential mortgage-backed securities ("RMBS") at a price of over $27 billion.   Driven by a single-minded desire to increase their share of the lucrative RMBS market and the considerable fees generated by it, Defendants created and marketed RMBS backed by hundreds of thousands of defective mortgages.

3.     The Offering Materials used to sell the RMBS fraudulently misrepresented and concealed the actual credit quality of the mortgages by providing false quantitative data about the loans, thus masking the true credit risk of AIG's investments.   The Offering Materials also falsely claimed that the mortgages had been issued pursuant to objective underwriting guidelines.   In fact, the loan

---

[1]     This matter was removed from New York State Supreme Court (Index No. 652199/2011) to the Southern District of New York, and then partially transferred for pre-trial purposes to the Central District of California pursuant to an order of the Judicial Panel on Multidistrict Litigation (the "JPML").   AIG moved to remand the case to New York State Court and an interlocutory appeal of the denial of that motion is currently pending before the Second Circuit Court of Appeals.   AIG is filing this Amended Complaint with the caption of the Central District of California without waiving any rights with respect to its argument that New York State Court is the proper forum for this case.   This Amended Complaint is filed in this Court for pre-trial purposes only pursuant to the JPML's order.

1 | originators, including Defendants, encouraged borrowers to falsify loan
2 | applications, pressured property appraisers to inflate home values, and ignored
3 | obvious red flags in the underwriting process.

4 |     4.    The stated underwriting guidelines had been replaced by an undisclosed
5 | governing principle: Defendants would originate or acquire any loan that could be
6 | sold to third-party investors like AIG through RMBS securitizations, no matter how
7 | risky.   To make matters worse, Defendants provided the rating agencies with the
8 | same false credit metrics that riddled the Offering Materials.   This allowed
9 | Defendants to engineer inflated credit ratings for the RMBS, which they also used to
10 | market the securities.   AIG, which suffered nearly $10 billion in losses as a result of
11 | Defendants' misconduct, would not have purchased the securities had it known the
12 | truth.

13 |     5.    As Defendants knew, the true quality and value of the RMBS it was
14 | offering for sale depended on the credit quality of the mortgage loans underlying the
15 | RMBS.   Investors like AIG assessed the risk of investing in RMBS based on
16 | quantitative, risk-related metrics regarding the loans backing the RMBS such as
17 | loan-to-value ("LTV") ratios, combined loan-to-value ("CLTV") ratios, and owner-
18 | occupancy statistics.   These metrics are used to assess a borrower's ability to repay
19 | a loan, and the likelihood of repayment.   For investors, they are important measures
20 | of anticipated default rates and possible foreclosure recoveries in the mortgage
21 | pools.   In the Offering Materials for every one of the RMBS at issue, Defendants
22 | materially misrepresented this critical information and thus grossly understated the
23 | riskiness of the mortgage loans that backed these securities.

24 |     6.    Before filing this suit, AIG conducted an exhaustive forensic
25 | investigation of the loan pools underlying the RMBS it purchased to determine the
26 | extent of Defendants' misconduct.   AIG sampled loans from each RMBS
27 | transaction for which data was available.   In total, AIG analyzed over 250,000
28 | loans.   For each of these loans, AIG analyzed public records, and conducted a

1  retroactive appraisal using an industry leading valuation model and historical data.

2  The results of this forensic investigation are startling:

3  • *Defendants dramatically understated LTV and CLTV ratios.* On average,
4  35.6% of the sampled RMBS loans had LTV ratios more than 10 percentage
   points higher than what was represented to AIG and 44.2% had CLTV ratios
5  more than 10 percentage points higher than what was represented to AIG.

6  • *In almost every RMBS, Defendants falsely represented that not a single*
7  *mortgage had an LTV ratio above 100%.* In fact, on average, 17.0% of the
   loans in each sampled mortgage pool had LTV ratios above 100%, meaning
8  the loans exceeded the value of the mortgaged properties themselves and were
9  "underwater" *from the date of origination.*

10 • *Defendants grossly misrepresented the properties backing the mortgages as*
11 *owner-occupied.* It is a well known fact in the mortgage industry that loan
   default rates on owner-occupied homes are much lower than second or third
12 homes or investment properties. On average, Defendants overstated owner-
13 occupancy by 12.0 percentage points.

14 • *Defendants' representations in the Offering Materials were based on false*
15 *metrics in a staggering 40.0% of the sampled loans.* Of the 257,010 loans
   tested, 102,730 were inconsistent with one or more of Defendants' numerical
16 representations by 10 percentage points or more.

17 The enormity of these numbers demonstrates that Defendants were engaged in a

18 massive scheme to manipulate and deceive investors, like AIG, who had no

19 alternative but to rely on the lies and omissions made by Defendants.

20       7.    AIG also conducted a separate forensic analysis for those loans

21 originated by Defendants. In total, AIG tested 33,675 loans and the results of this

22 analysis were equally shocking.

23 • *Originator Defendants understated LTV and CLTV ratios.* On average,
24 36.3% of the sampled loans had LTV ratios more than 10 percentage points
   higher than what was represented to AIG and 45.0% had CLTV ratios more
25 than 10 percentage points higher than what was represented to AIG.

26 • *Originator Defendants falsely represented that almost every loan had an LTV*
27 *ratio below 100%.* 15.6% of the sampled loans had LTV ratios that
   exceeded 100%.

28

- *Originator Defendants grossly misrepresented the properties backing the mortgages as owner-occupied.*   Defendants misstated owner-occupancy in 15.9% of the loans tested.

- *Originator Defendants' representations concerning individual mortgage loans were based on false metrics in a staggering 41.0% of the sampled loans.*   Of the 33,675 loans tested, 13,805 were inconsistent with one or more of Defendants' numerical representations by 10 percentage points or more.

8.    The results of AIG's forensic analysis are just the tip of the iceberg. The systemic misrepresentations regarding LTV, CLTV, and owner-occupancy address only a subset, albeit an important subset, of the representations Defendants made concerning the quality of the loan pools.   These are the representations that AIG was able to analyze using forensic tools outside of the information in the loan files themselves.   A myriad of other key factors that further address the integrity (or lack thereof) of Defendants' loan underwriting process—such as borrowers' income, employment verification, and the supposed compensating factors that were considered in approving "exceptions" to stated guidelines—can only be scrutinized by reviewing the actual loan files.   AIG is confident that a review of the complete loan files in discovery will demonstrate that the fraud perpetrated by Defendants was even more rampant than AIG's forensic analysis reveals.

9.    Despite multiple requests by AIG, AIG has been unable to gain access to the loan files for nearly all of the RMBS at issue.   For the 14 RMBS where AIG did succeed in obtaining the relevant documents, a re-underwriting analysis revealed staggering breach rates.   Over 90% of the loans tested failed to comply with underwriting guidelines, including examples such as these:

- *Misrepresentation of Employment.*   The borrower stated on the loan application that she was self-employed as a builder for 25 years, earning $35,000 per month, and the co-borrower stated that he was also self-employed as a builder earning $30,000 per month.   The borrower also listed on the application that she had been the owner of her building/construction business for 25 years; however, she was born in 1971, which would have made the

-5-

borrower *10 years old* when she became the owner of the business. Additionally, the loan file contained letters of incorporation for both the borrower and co-borrower's businesses with inception dates of 9/28/1993 and 2/26/2002, respectively.   A reasonably prudent underwriter should have noticed that the age discrepancy was a red flag and questioned the validity of the information contained on the loan application.   The loan defaulted.

- *Misrepresentation of Income.*   On his loan application, the borrower stated he received $6,045 per month in retirement and social security income.   The loan file contained the borrower's retirement pay statement and social security statement. Both *documents were altered* to cover the income amounts.   Additionally, the loan file contained a mortgage loan worksheet signed by the borrower which indicated a total gross monthly income of $3,438.   The lender's guidelines required a borrower's employment history to be verified for the 24 months preceding the loan closing under the Stated Income Program.   There was no evidence in the loan file that the underwriter requested or obtained a current verification of the borrower's pension income as required.   The loan defaulted.

- *Misrepresentation of Debt Obligations.*   The application failed to disclose that the borrower simultaneously closed on a second mortgage, originated by the *same lender*, in the *same condominium* complex.   Public records show that the Borrower acquired a mortgage on the same day as the subject loan for $414,000 with a monthly payment of $4,995 for a property located in Dallas, TX.   The origination underwriter failed to include that monthly payment in the borrower's DTI ratio for the subject loan, resulting in an imprudent underwriting decision.   A recalculation of DTI based on the borrower's undisclosed debt, and recalculated income of $1,200 per month, yields a DTI of *1,129%*, which exceeds the guideline maximum allowable DTI of 55%. The loan defaulted.

10.   Not only did Defendants create RMBS with shoddy loans, but they also engineered unduly positive credit ratings for these securities.   Defendants knew that investors like AIG required RMBS to meet stringent credit ratings criteria, and thus duped the rating agencies into rating the senior tranches of these securities AAA. Defendants gave the rating agencies the same misrepresented data about loan characteristics and underwriting guidelines that they provided to AIG.   The rating agencies analyzed their performance based on the false assumptions Defendants

supplied.   Because these assumptions understated the risks of the collateral pools, the rating agencies assigned unduly high credit ratings for the securities. Defendants then marketed the RMBS with the inflated ratings and misrepresented in the Offering Materials that the artificially high ratings were an accurate measure of their credit quality based on the misstated collateral pool data.

11.    Also misstated in every one of the RMBS at issue were the underwriting guidelines that the lending banks were supposedly following.   Both in the Offering Materials and at in-person due diligence meetings with AIG credit research personnel, Defendants represented that the collateral loans were issued pursuant to rational, objective criteria that would assess each borrower's ability to pay and the market value of the underlying properties.   Defendants misled AIG into believing that the loans in the pools were issued pursuant to the disclosed underwriting guidelines, when in fact those guidelines had been long abandoned. In fact, the only measure of whether a loan would be approved was whether it could be sold into a securitization.

12.    Defendants' abandonment of underwriting practices has been revealed through regulatory and public scrutiny of Defendants' unscrupulous business practices.   Investigations by the New York Attorney General ("NYAG"), the Securities and Exchange Commission ("SEC"), the U.S. Senate Permanent Subcommittee on Investigations ("SPSI"), and Attorneys General for the states of California, Illinois, Florida, Washington, Indiana, and West Virginia, as well as interviews of Defendants' senior officers and other key employees conducted by the Financial Crisis Inquiry Commission ("FCIC"), have brought to light Defendants' shoddy practices.

13.    Creating and selling RMBS was an extremely profitable business. Defendants' internal documents, testimony from senior officers and other key employees under oath, as well as confidential interviews of former employees conducted by AIG prior to the filing of this Amended Complaint demonstrate that,

1  during the subprime lending "gold rush" years of 2004 to 2007, each of the

2  Defendants—Countrywide, Merrill, and Bank of America—competed fiercely to

3  increase market share and ratchet up profits from RMBS.   In the process,

4  Defendants brought to market hundreds of RMBS sold to AIG collateralized by loan

5  pools that did not come close to satisfying the underwriting guidelines touted in the

6  prospectus supplements.

7         14.   Countrywide was one of the worst offenders.   Its own senior officers

8  and internal auditors have *admitted* that Countrywide compromised its underwriting

9  integrity for the sake of fueling its profit machine:

10  •      Countrywide Financial's co-founder and CEO, Angelo Mozilo, stated to Wall
        Street analysts that his goal for Countrywide Financial was to "dominate" the
11       mortgage market and "to get our overall market share to the ultimate 30% by
12       2006, 2007."

13  •      A former Senior Regional Vice President of Countrywide was quoted in
        *Business Week* as saying that Countrywide "approached making loans like
14       making widgets, focusing on cost to produce and not risk or compliance.
        Programs like 'Fast and Easy' where the income and assets were stated, not
15       verified, were open to abuse and misuse.   The fiduciary responsibility of
16       making sure whether the loan should truly be done was not as important as
17       getting the deal done."

18  •      In a November 2007 internal report, Countrywide admitted: "We were driven
        by market share, and wouldn't say 'no' [to guideline expansion]. . . .   Market
19       share, size and dominance were driving themes . . . .   Created huge upside in
20       good times, but challenges in today's environment.   Net/net it was probably
21       worth it."

22         15.   Countrywide implemented a matching strategy in which it adopted any

23  lending practice of its competitors, no matter how liberal—a practice which resulted

24  in Countrywide offering a dizzying array of toxic loan products.   For example:

25  •      In internal e-mails, Mozilo himself characterized many of Countrywide's
        subprime loan products as "toxic," "poison," and "the most dangerous
26       product in existence."   Mozilo also observed that there was a "disregard for
27       process [and] compliance with guidelines."

28

- A former finance executive at Countrywide explained that: "To the extent more than 5 percent of the [mortgage] market was originating a particular product, any new alternative mortgage product, then Countrywide would originate it . . . . [I]t's the proverbial race to the bottom."

- John McMurray, Countrywide's Chief Risk Officer, testified before the SEC that he agreed that whether Countrywide was "ceding our credit policy to the most aggressive players in the market" was a "pretty serious concern."

- In an internal e-mail, Frank Aguilera, a Countrywide Managing Director responsible for risk management, reported that over 23% of the subprime loans at the time were generated as exceptions, even taking into account "all guidelines, published and not published, approved and not yet approved." Aguilera wrote that "[t]he results speak toward our inability to adequately impose and monitor controls on production operations."

16.    Though touting Countrywide's adherence to underwriting guidelines publicly, Countrywide senior officers internally admitted that "saleability"—that is, whether Countrywide could sell the loan on the secondary market, rather than compliance with underwriting guidelines—became the sole factor governing whether a loan would be approved:

- In his testimony to the SEC, David Sambol, Countrywide Home Loans' President and COO, identified a February 13, 2005 e-mail he wrote that said that "our pricing philosophy" should be expanded so that "we should be willing to price virtually any loan that we reasonably believe we can sell/securitize without losing money, even if other lenders can't or won't do the deal."

- In an internal e-mail, Countrywide's Executive Vice President of Credit Risk Management, Christian Ingerslev, asked "should the line in the sand still be 'unsaleable'?   After looking at the performance, it's hard to recommend anything other than no.   Heretofore that has been a challenging edict for Credit to implement (for obvious reasons) and the outcry is to just price the risk - regardless of performance."

17.    Countrywide's senior management *knew* that its loan origination guidelines were not being followed and that Countrywide was making loans that carried a high—and undisclosed—probability of default:

- In a May 22, 2005 internal e-mail, Chief Risk Officer McMurray warned President and COO Sambol that "exceptions are generally done at terms even more aggressive than our guidelines" and recommended that "[g]iven the expansion in guidelines and the growing likelihood that the real estate market will cool, this seems like an appropriate juncture to revisit our approach to exceptions." He continued: "As a consequence of [Countrywide's] strategy to have the widest product line in the industry, we are clearly out on the 'frontier' in many areas," adding that that "frontier" had "high expected default rates and losses."

- In the same e-mail thread, McMurray told Sambol that the company could face liability for its faulty underwriting practices and misrepresentations to investors: "We've sold much of the credit risk associated with high risk transactions away to third parties. *Nevertheless, we will see higher rates of default on the riskier transactions and third parties coming back to us seeking a repurchase or indemnification based on an alleged R[epresentation] & W[arranty] breach as the rationale.*" (Emphasis added).

- In a February 11, 2007 e-mail to Sambol, McMurray reiterated his concerns, stating: "I doubt this approach would play well with regulators, investors, rating agencies, etc. To some, this approach might seem like we've simply ceded our risk standards . . . to whoever has the most liberal guidelines."

- McMurray also testified before the SEC that he was aware that there were instances where his credit risk department "reject[ed] proposals for new products and the people in sales nevertheless used the exceptions procedure to achieve the same result."

- In an internal report forwarded to CEO Mozilo, Countrywide admitted that "borrower repayment capacity was not adequately assessed by the bank during the underwriting process for home equity loans" for mortgages originated by Countrywide in 2006 and 2007.

- A former Countrywide fraud investigator, Eileen Foster, made clear that not only did she detect rampant fraud throughout Countrywide, but that when she reported the results of her investigations to her superiors, including Bank of America executives, her investigations were stifled. Ultimately, she was terminated.

18. Moreover, Countrywide's own diligence demonstrated that the loans it was pooling failed its underwriting criteria, but Countrywide ignored the results of

1   its own analysis.   Documents recently disclosed by the FCIC show that

2   Countrywide retained the third-party due diligence firm Clayton Holdings, Inc.

3   ("Clayton") to analyze loans it was acquiring for securitization.   Reports prepared

4   by Clayton reveal that in the period between the fourth quarter of 2006 and the first

5   quarter of 2007, *26% of the mortgages Countrywide submitted to Clayton for*

6   *review were rejected as outside underwriting guidelines*.   Of the mortgages that

7   Clayton found defective, 12% were subsequently *"waived in"* by Countrywide and

8   included in securitizations like the ones in which AIG invested.   Clayton's reports

9   also include statistics on loans originated by Countrywide itself and submitted by

10  other parties to Clayton for review, including Countrywide loans that were sold on

11  the secondary market and included in non-Countrywide securitizations.   Between

12  the first quarter of 2006 and the first quarter of 2007 Clayton found that between

13  13% and 24% of those loans failed to meet underwriting guidelines.

14         19.   Merrill Lynch also systematically departed from its stated underwriting

15  guidelines.   Like Countrywide, starting in 2004, Merrill took aggressive action to

16  climb to the top of the RMBS pile.   In return for a guaranteed stream of mortgage

17  loans for its securitizations, Merrill began offering "warehouse" financing to

18  originating banks, which the lenders used to originate subprime mortgages, at little

19  to no cost.   At the same time, Merrill adopted liberal standards regarding the type of

20  mortgage loans it was willing to acquire.   In 2005, Merrill purchased a stake in

21  subprime lender Ownit Mortgage Solutions, Inc. ("Ownit") in order to control the

22  stream of mortgage loans it could pool and then sell.   In 2006, Merrill announced

23  plans to buy another subprime lender, First Franklin.   In his book on the financial

24  crisis, David Faber summarized Merrill's RMBS business strategy in no uncertain

25  terms: "[Merrill] wanted to originate more mortgages, buy more mortgages, package

26  more mortgages into securities, and package more of those securities into CDOs

27  [collateralized debt obligations].   And of course, it wanted to sell those securities

28  and CDOs as fast as it possibly could, because that's where the money was."

Case No. 11-CV-10549-MRP (MANx)
AMENDED COMPLAINT

20.     Intense industry competition led Merrill to abandon underwriting guidelines and to make as many loans as possible appear to pass muster under those guidelines.   Merrill encouraged subprime lenders—including its own affiliates—to originate more low- and no-documentation loans so that Merrill could create and sell more RMBS.   These types of loans were frequently referred to as "liar loans" within the mortgage industry because of the frequency with which borrowers lied on their applications, often with the originators' knowledge or active assistance. Merrill knew from its experience with loan securitization that "liar loans" were plagued by fraud, but it encouraged its affiliates and other subprime lenders to generate these loans anyway in order to increase loan volume and the price it could obtain for the RMBS.   Indeed, William Dallas, the CEO of Ownit, stated that Merrill paid Ownit more for no-income verification loans than for full-documentation loans.

21.     Confidential witnesses interviewed by AIG prior to the filing of this Amended Complaint revealed that Merrill's origination arms, Ownit and First Franklin, abandoned their underwriting guidelines to fuel Merrill's securitization machine.   For example, a former senior underwriter at Ownit told AIG that Ownit loan officers themselves were falsely inflating incomes and *"fudging the numbers"* to get stated income loans approved.   This same former employee said that, at Ownit, the appraisal process was "owned by the loan officers" who enjoyed "a cozy relationship" with the appraisers.   She stated that *"excessive adjustments"* were made to inflate appraisals and these adjustments were never challenged.   A former underwriter at First Franklin stated that some of the lending practices at First Franklin were *"basically criminal"* and that First Franklin required its underwriters to depart from stated underwriting guidelines in a way "that we did not agree with, but had to do" in order to keep their jobs.   When she and another former underwriter "spoke out" about the problematic lending practices taking place at First Franklin, they were both *fired* for attempting to "blow the whistle" on First

1  Franklin.   Another former First Franklin underwriter disclosed to AIG that if an
2  underwriter rejected a loan because it did not meet underwriting criteria, her
3  manager would re-direct the loan application to a loan processor who would *"sign*
4  *behind your back."*

5       22.   Merrill issued RMBS with loans that it knew failed to meet stated
6  guidelines.   Like Countrywide, it conducted its own due diligence that revealed that
7  loans it purchased from originators failed to meet disclosed underwriting standards.
8  Merrill also retained Clayton to perform due diligence.   *Clayton's reports reflected*
9  *its findings that 23% of the loans it reviewed for Merrill "failed to meet*
10  *guidelines."*   The loans had been granted despite the lack of any purported
11  compensating factors justifying an exception.   Yet Merrill "waived in" to its pools
12  32% of the toxic loans that Clayton identified as being outside the guidelines and
13  promptly sold them to investors like AIG.

14       23.   Merrill's former CEO John Thain summed up Merrill's problem when
15  he commented in a September 2010 interview: "[W]hen you have a system where
16  you pay someone for originating mortgages simply on volume and nothing happens
17  to them if the credit quality is bad, and nothing happens to them if the borrower is
18  fraudulent on his loan application, and nothing happens to him if the appraisal's
19  fraudulent, then that's probably not a very smart system."   This was precisely the
20  system Merrill used to originate or acquire loans, securitize them into RMBS, and
21  sell the securities to AIG and other unsuspecting investors.

22       24.   Bank of America also departed from its own underwriting standards in
23  order to keep pace with the market and to guarantee mortgage loans for its own
24  securitizations.   Bank of America was an aggressive competitor in the mortgage
25  market, offering products that other lenders could not beat.   Indeed, in an internal
26  Countrywide e-mail, Mozilo himself noted Bank of America's "aggressive move
27  into mortgages" and complained that even Countrywide could not match some of
28  Bank of America's riskier products.

25.     Confidential witnesses interviewed by AIG confirm Bank of America's fraudulent origination and securitization practices.   For example, one former employee revealed that Bank of America loan officers themselves inflated borrower income and *"doctor[ed] the numbers"* to get stated income loans approved. Another former Bank of America loan processor divulged that when borrowers accidentally submitted documentation for stated income loans that directly contradicted the income claimed by borrowers, management told the loan processors to simply ignore the documentation: *"we didn't have to consider evidence"* that directly contradicted borrowers' claims about their income.   And according to yet another former employee, loan officers would often call appraisers and tell them *"I need you to come in at this amount."*   The appraisers would then return with the requested valuation.   A confidential witness also revealed to AIG that Bank of America diverted severely credit-blemished loan applicants to its so-called "Plan C" group, which employed *alternative underwriting criteria* to approve and fund loans. The "Plan C" group had wide latitude to grant exceptions to Bank of America's stated underwriting guidelines, and the group's mandate was to find ways to fund loans that otherwise would be rejected—loans that one former Bank of America employee believed *"should not have been funded under any circumstances."*

26.     Reports prepared by Clayton, which Bank of America also retained to perform due diligence, informed Bank of America that *30% of the loans it reviewed were defective*.   But Bank of America nevertheless "waived in" 27% of these toxic loans and included them in securitizations.   Another confidential witness—a former Clayton employee—told AIG that Bank of America was not actually interested in the fundamental credit quality of the loans reviewed during Bank of America's due diligence process.   Instead, this former Clayton employee revealed that a Vice President of Structured Products at Bank of America specifically told him that he *"didn't give a flying f\*\*\* about DTI*   [debt-to-income ratios]" and other credit characteristics of the loans being reviewed.   The Bank of America Vice President

1   told this former Clayton employee that, *"we [Bank of America] can sell [the loans]*
2   *to whoever"* and *"we [Bank of America] can sell [the loans] down the line."*

3       27.    These facts are only illustrative of Defendants' pattern of misconduct,
4   which is discussed in further detail below.   Defendants' misconduct can be
5   explained quite simply:   Countrywide, Merrill, and Bank of America did not tell
6   AIG the truth about the loans that collateralized the securities.   AIG reviewed and
7   relied on the misleading misrepresentations about loan characteristics, favorable
8   ratings, and embellished underwriting practices.   It would not have purchased these
9   securities had it known the truth.   As a result, AIG lost nearly $10 billion.

10                               **PARTIES**

11       28.    ***The Plaintiffs.***  Plaintiff American International Group, Inc. ("AIG
12   Parent" and, together with its subsidiaries, "AIG") is an international insurance
13   organization.   Plaintiffs purchased the RMBS at issue as identified in Exhibit A.

14       29.    AIG Parent is a Delaware corporation with its principal place of
15   business at 180 Maiden Lane, New York, New York, 10038.   AIG Parent was a
16   purchaser of certain of the RMBS at issue.

17       30.    Plaintiff AIG Securities Lending Corporation (f/k/a AIG Global
18   Securities Lending Corporation) ("AIG GSL Corp.") is an indirect, wholly-owned
19   subsidiary of AIG Parent.   It is a Delaware corporation with its principal place of
20   business in New York, New York.   AIG GSL Corp. purchased certain of the RMBS
21   at issue as part of AIG's securities lending program (the "Global Securities
22   Lending" or "GSL" program).   Under the GSL program, AIG GSL Corp. loaned
23   securities owned by various AIG subsidiaries to financial institutions.   AIG GSL
24   Corp. then received cash collateral from these borrowers and invested it in fixed
25   income securities, primarily RMBS.

26       31.    Beginning on September 28, 2007, AIG Parent entered into a series of
27   make whole agreements and made payments to offset losses in AIG GSL Corp.'s
28   investment pool.   Upon making these payments, AIG Parent became equitably

1    subrogated to all of the respective rights and remedies of AIG GSL Corp. with
2    respect to these RMBS-related losses.

3         32.    Plaintiff American General Life and Accident Insurance Company sells
4    life insurance, annuity, and accident and health products to American consumers.   It
5    is a Tennessee corporation, has its principal offices in Nashville, Tennessee, and is
6    an indirect, wholly-owned subsidiary of AIG Parent.

7         33.    Plaintiff American General Life Insurance Company is an indirect,
8    wholly-owned subsidiary of AIG Parent engaged in the business of selling life
9    insurance to American consumers.   It is a Texas corporation with its principal
10   offices in Houston, Texas.

11        34.    Plaintiff American General Life Insurance Company of Delaware
12   offers life insurance, fixed annuities, accident and health products, and worksite
13   benefits to consumers in the United States.   It is a Delaware corporation, has its
14   principal offices in Houston, Texas, and is an indirect, wholly-owned subsidiary of
15   AIG Parent.

16        35.    Plaintiff American Home Assurance Company is a New York
17   corporation with its principal offices at 175 Water Street, New York, New York,
18   10038.   It provides property and casualty insurance products to businesses,
19   including public entities, educational institutions, and transportation and
20   construction companies.   It is an indirect, wholly-owned subsidiary of AIG Parent.

21        36.    Plaintiff American International Group Retirement Plan is a retirement
22   plan for AIG's employees.   The plan is administered in New York.

23        37.    Plaintiff Chartis Property Casualty Company is a Pennsylvania
24   corporation with principal offices at 175 Water Street, New York, New York,
25   10038.   It provides property and casualty lines of insurance and is an indirect,
26   wholly-owned subsidiary of AIG Parent.

27
28

Case No. 11-CV-10549-MRP (MANx)
AMENDED COMPLAINT

1     38.   Plaintiff Chartis Select Insurance Company is a Delaware corporation

2  with principal offices in New York, New York.   It provides excess casualty and

3  financial insurance and is an indirect, wholly-owned subsidiary of AIG Parent.

4     39.   Plaintiff Chartis Specialty Insurance Company is an Illinois corporation

5  with principal offices in New York, New York.   It offers property and casualty

6  insurance and is an indirect, wholly-owned subsidiary of AIG Parent.

7     40.   Plaintiff Commerce and Industry Insurance Company is a New York

8  corporation with principal offices at 70 Pine Street, New York, New York, 10270.

9  It offers insurance brokerage services and is an indirect, wholly-owned subsidiary of

10  AIG Parent.

11     41.   First SunAmerica Life Insurance Company was a New York

12  corporation with principal offices in New York, New York.   It provided tax-

13  deferred annuities for retirement savings through financial institutions, and was an

14  indirect, wholly-owned subsidiary of AIG Parent.   On December 31, 2011, First

15  SunAmerica Life Insurance Company was merged into The United States Life

16  Insurance Company in the City of New York, an indirect, wholly owned subsidiary

17  of AIG Parent.   Accordingly, The United States Life Insurance Company in the

18  City of New York currently holds the claims of First SunAmerica Life Insurance

19  Company.

20     42.   Plaintiff Lexington Insurance Company is a surplus lines insurer.   It is

21  a Delaware corporation with principal offices in Boston, Massachusetts, and is an

22  indirect, wholly-owned subsidiary of AIG Parent.

23     43.   Plaintiff National Union Fire Insurance Company of Pittsburgh, Pa. is a

24  Pennsylvania corporation with its principal offices at 175 Water Street, New York,

25  New York, 10038.   It is an insurance company and an indirect, wholly-owned

26  subsidiary of AIG Parent.

27     44.   Plaintiff New Hampshire Insurance Company provides property and

28  casualty insurance services.   Founded in 1869, it is a Pennsylvania corporation with

1 | principal offices at 175 Water Street, New York, New York, 10038. It is an
2 | indirect, wholly-owned subsidiary of AIG Parent.

3 |     45.   Plaintiff SunAmerica Annuity and Life Assurance Company is an
4 | issuer of variable annuities. It is an Arizona corporation, has its principal offices in
5 | Phoenix, Arizona, and is an indirect, wholly-owned subsidiary of AIG Parent.

6 |     46.   Plaintiff SunAmerica Life Insurance Company is an indirect, wholly-
7 | owned subsidiary of AIG Parent engaged in the business of selling life insurance.
8 | It is an Arizona corporation with its principal offices in Los Angeles, California.

9 |     47.   Plaintiff The Insurance Company of the State of Pennsylvania is an
10 | insurance company incorporated in Pennsylvania, with its principal offices at 175
11 | Water Street, New York, New York, 10038. It is an indirect, wholly-owned
12 | subsidiary of AIG Parent.

13 |     48.   Plaintiff The United States Life Insurance Company in the City of New
14 | York is a New York insurance company incorporated in New York in 1850. Its
15 | principal offices are at One World Financial Center, 200 Liberty Street, New York,
16 | New York, 10281 and it is an indirect, wholly-owned subsidiary of AIG Parent.

17 |     49.   Plaintiff The Variable Annuity Life Insurance Company is a financial
18 | services company. It is a Texas corporation, has its principal offices in Houston,
19 | Texas, and is an indirect, wholly-owned subsidiary of AIG Parent.

20 |     50.   Plaintiff Western National Life Insurance Company is a life insurance
21 | company. It is a Texas corporation, has its principal offices in Amarillo, Texas,
22 | and is an indirect, wholly-owned subsidiary of AIG Parent.

23 |     51.   **_The Defendants._** All of the Defendants in this action are now
24 | subsidiaries of Bank of America Corporation, including some entities that were
25 | acquired by certain Defendants by reason of a merger, sale, or transfer of all or a
26 | portion of their assets.

27 |     52.   **_The Countrywide Defendants_**. Defendant Countrywide Financial
28 | Corporation is a corporation organized under the laws of the State of Delaware with

its principal executive offices in Calabasas, California.   Countrywide Financial Corporation, itself and through its subsidiaries, engaged in mortgage lending, mortgage servicing, and other real estate finance-related businesses, including securities dealing and insurance underwriting.   It was the corporate parent of all of the Countrywide Defendants.   Pursuant to a transaction completed on July 1, 2008, Countrywide Financial was merged into a subsidiary of Bank of America Corporation.   As of April 27, 2009, Countrywide Financial and its subsidiaries ceased operating under the brand name Countrywide.   Now combined with Bank of America's pre-existing mortgage and home loan business, Countrywide Financial's main businesses operate as Bank of America Home Loans, a division of Bank of America Corp.   It acted as the seller for certain of the offerings at issue, as detailed in Exhibits 1 to 346.   It is a Seller Defendant.

53.   Defendant Countrywide Capital Markets LLC, a wholly-owned subsidiary of Countrywide Financial Corporation, is a corporation organized under the laws of the State of California with its principal place of business in Calabasas, California.   Countrywide Capital Markets operated through its two main wholly-owned subsidiaries, Defendant Countrywide Securities Corporation and Countrywide Servicing Exchange.

54.   Defendant Countrywide Home Loans, Inc., a wholly-owned subsidiary of Countrywide Financial Corporation, is a corporation organized under the laws of the State of New York with its principal place of business in Calabasas, California. It acted as the sponsor, seller, and/or loan originator for certain of the offerings at issue, as detailed in Exhibits 1 to 346.   It is a Sponsor, Seller, and Originator Defendant.

55.   Countrywide Bank, National Association, (f/k/a Countrywide Bank, F.S.B.) was a national bank with its principal place of business in Alexandria, Virginia and operated as a subsidiary of Countrywide Financial Corporation.   In 2008, it became a subsidiary of Bank of America Corporation.   In 2009, it merged

Case No. 11-CV-10549-MRP (MANx)
AMENDED COMPLAINT

1  with Bank of America, N.A, which is a wholly-owned subsidiary of Bank of

2  America Corporation.   As a result of this merger, Defendant Bank of America,

3  N.A. assumed all of the liabilities of Countrywide Bank, and therefore Bank of

4  America N.A. is liable for the wrongful acts of Countrywide Bank, as alleged

5  herein.   Countrywide Bank acted as the loan originator for certain of the offerings

6  at issue, as detailed in Exhibits 1 to 346.   Through Bank of America N.A., its

7  successor by merger, it is an Originator Defendant.

8      56.   Defendant Countrywide Securities Corporation is a corporation

9  organized under the laws of the State of California, with its principal place of

10  business in Calabasas, California.   It operated as a subsidiary of Countrywide

11  Financial Corporation.   Countrywide Securities Corporation was the underwriter

12  for certain of the offerings at issue, as detailed in Exhibits 1 to 346.   It is an

13  Underwriter Defendant.

14      57.   Defendant CWABS, Inc. is a Delaware corporation and a limited

15  purpose finance subsidiary of Countrywide Financial Corporation with its principal

16  place of business in Calabasas, California.   It is an indirect, wholly-owned

17  subsidiary of Bank of America Corporation.   CWABS, Inc. was the depositor for

18  certain of the offerings in which AIG invested, the registrant for certain Registration

19  Statements filed with the SEC, and an issuer of certain mortgage-backed certificates

20  purchased by AIG, as detailed in Exhibits 1 to 346.   The depositor is considered the

21  issuer of the certificates within the meaning of Section 2(a)(4) of the Securities Act

22  of 1933, 15 U.S.C. § 77b(a)(4), and in accordance with Section 11(a), 15 U.S.C. §

23  77k(a).   It is a Depositor Defendant.

24      58.   Defendant CWALT, Inc. is a Delaware corporation and a limited

25  purpose finance subsidiary of Countrywide Financial Corporation with its principal

26  place of business in Calabasas, California.   It is an indirect, wholly-owned

27  subsidiary of Bank of America Corporation.   CWALT, Inc. was the depositor for

28  certain of the offerings in which AIG invested, the registrant for certain Registration

1  Statements filed with the SEC, and an issuer of certain mortgage-backed certificates
2  purchased by AIG, as detailed in Exhibits 1 to 346. The depositor is considered the
3  issuer of the certificates within the meaning of Section 2(a)(4) of the Securities Act
4  of 1933, 15 U.S.C. § 77b(a)(4), and in accordance with Section 11(a), 15 U.S.C. §
5  77k(a). It is a Depositor Defendant.

6      59.   Defendant CWHEQ, Inc. is a Delaware corporation and a limited
7  purpose finance subsidiary of Countrywide Financial Corporation with its principal
8  place of business in Calabasas, California. It is an indirect, wholly-owned
9  subsidiary of Bank of America Corporation. CWHEQ, Inc. was the depositor for
10 certain of the offerings in which AIG invested, the registrant for certain Registration
11 Statements filed with the SEC, and an issuer of certain mortgage-backed certificates
12 purchased by AIG, as detailed in Exhibits 1 to 346. The depositor is considered the
13 issuer of the certificates within the meaning of Section 2(a)(4) of the Securities Act
14 of 1933, 15 U.S.C. § 77b(a)(4), and in accordance with Section 11(a), 15 U.S.C. §
15 77k(a). It is a Depositor Defendant.

16     60.   Defendant CWMBS, Inc. is a Delaware corporation and a limited
17 purpose finance subsidiary of Countrywide Financial Corporation with its principal
18 place of business in Calabasas, California. It is an indirect, wholly-owned
19 subsidiary of Bank of America Corporation. CWMBS, Inc. was the depositor for
20 certain of the offerings in which AIG invested, the registrant for certain Registration
21 Statements filed with the SEC, and an issuer of certain mortgage-backed certificates
22 purchased by AIG, as detailed in Exhibits 1 to 346. The depositor is considered the
23 issuer of the certificates within the meaning of Section 2(a)(4) of the Securities Act
24 of 1933, 15 U.S.C. § 77b(a)(4), and in accordance with Section 11(a), 15 U.S.C. §
25 77k(a). It is a Depositor Defendant.

26     61.   *The Merrill Defendants.*   Defendant Merrill Lynch & Co., Inc.
27 purports to be a leading global trader and underwriter of securities and derivatives
28 across a broad range of asset classes and a strategic advisor to corporations,

governments, institutions and individuals worldwide.   Under its trade name Merrill Lynch & Co., it was the underwriter for certain of the offerings at issue, as detailed in Exhibits 1 to 346.   Merrill Lynch & Co., Inc. is a Delaware corporation.   During the relevant time frame, Merrill Lynch & Co., Inc.'s principal place of business was New York, New York.   On January 1, 2009, Merrill Lynch & Co., Inc. became a wholly-owned subsidiary of Bank of America Corporation.   It is an Underwriter Defendant.

62.   Defendant Merrill Lynch Mortgage Lending, Inc. is a Delaware corporation with its principal place of business in New York, New York and is a subsidiary of Bank of America Corporation.   It is engaged in the business of, among other things, acquiring residential mortgage loans and selling those loans through securitization programs.   It acted as the sponsor and seller for certain of the offerings at issue, as detailed in Exhibits 1 to 346.   It also acted as an originator for certain of these offerings through its program, Specialty Underwriting & Residential Finance ("SURF"), as detailed in Exhibits 1 to 346.   It is a Sponsor, Seller, and Originator Defendant.

63.   Defendant First Franklin Financial Corporation is a Delaware corporation with its principal executive offices in San Jose, California.   It is a home mortgage lender that specialized in subprime home loans.   First Franklin was the sponsor, seller, and/or loan originator for certain of the offerings at issue, as detailed in Exhibits 1 to 346.   It is currently a subsidiary of Bank of America Corporation, and is a Sponsor, Seller, and Originator Defendant.

64.   Defendant Merrill Lynch Mortgage Capital Inc. is a Delaware corporation with its principal executive offices in New York, New York, and is a subsidiary of Bank of America Corporation.   It acted as the seller for certain of the offerings at issue, as detailed in Exhibits 1 to 346.   It is a Seller Defendant.

65.   Defendant Merrill Lynch Credit Corporation is a Delaware corporation with its principal executive offices in Jacksonville, Florida.   It was the originator

1  for certain of the offerings at issue, as detailed in Exhibits 1 to 346, and is now a

2  subsidiary of Bank of America Corporation.   It is an Originator Defendant.

3      66.    Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. is a Delaware

4  corporation and registered broker-dealer and investment advisor with its principal

5  place of business in New York, New York.   It acted as an underwriter for certain of

6  the offerings at issue, as detailed in Exhibits 1 to 346.   On January 1, 2009, it

7  became a subsidiary of Bank of America Corporation.   It is an Underwriter

8  Defendant.

9      67.    Defendant Merrill Lynch Mortgage Investors, Inc. is a Delaware

10  corporation with its principal place of business in New York, New York.   It is a

11  subsidiary of Bank of America Corporation.   Merrill Lynch Mortgage Investors,

12  Inc. was the depositor for certain of the offerings at issue here, the registrant for

13  certain Registration Statements filed with the SEC, and the issuer for certain of the

14  offerings at issue in this action, as detailed in Exhibits 1 to 346.   The depositor is

15  considered the issuer of the certificates within the meaning of Section 2(a)(4) of the

16  Securities Act of 1933, 15 U.S.C. § 77b(a)(4), and in accordance with Section 11(a),

17  15 U.S.C. § 77k(a).   It is a Depositor Defendant.

18      68.    ***The Bank of America Defendants.***   Defendant Bank of America

19  Corporation purports to be one of the world's largest financial institutions, serving

20  individual consumers, small and middle-market businesses, large corporations, and

21  governments with a full range of banking, investing, asset management and other

22  financial and risk management products and services.   It is a Delaware corporation

23  with substantial business operations and offices at the Bank of America Tower at

24  One Bryant Park, New York, New York 10036.   Every defendant named in this

25  action is a subsidiary of Bank of America Corporation.

26      69.    Defendant Banc of America Securities LLC, a wholly-owned broker-

27  dealer subsidiary of Bank of America Corporation, acted as the underwriter for

28  certain of the deals at issue, as detailed in Exhibits 1 to 346.   Bank of America

1  Securities LLC was a Delaware limited liability corporation with its principal place
2  of business in New York, New York.   On November 1, 2010, it merged into
3  MLPF&S, with MLPF&S as the surviving corporation.   As a result of this merger,
4  MLPF&S remained a direct wholly-owned broker-dealer subsidiary of Merrill
5  Lynch & Co. and an indirect wholly-owned broker-dealer subsidiary of Bank of
6  America Corporation.   It is an Underwriter Defendant.

7      70.   Defendant Bank of America, National Association is a nationally-
8  chartered United States bank with substantial business operations and offices at the
9  Bank of America Tower at One Bryant Park, New York, New York 10036.   It acted
10 as a sponsor, seller and loan originator for certain of the offerings at issue, as
11 detailed in Exhibits 1 to 346.   It is a wholly-owned subsidiary of Bank of America
12 Corporation.   It is a Sponsor, Seller, and Originator Defendant.

13     71.   Defendant Banc of America Funding Corporation is a Delaware
14 corporation with substantial business operations and offices at the Bank of America
15 Tower at One Bryant Park, New York, New York 10036, and is a subsidiary of
16 Bank of America Corporation.   Banc of America Funding Corporation was the
17 depositor for certain of the offerings at issue here, the registrant for certain
18 Registration Statements filed with the SEC, and the issuer for certain of the
19 offerings at issue in this action, as detailed in Exhibits 1 to 346.   The depositor is
20 considered the issuer of the certificates within the meaning of Section 2(a)(4) of the
21 Securities Act of 1933, 15 U.S.C. § 77b(a)(4), and in accordance with Section 11(a),
22 15 U.S.C. § 77k(a).   It is a Depositor Defendant.

23     72.   Defendant Banc of America Mortgage Securities, Inc. is a Delaware
24 corporation with substantial business operations and offices at the Bank of America
25 Tower at One Bryant Park, New York, New York 10036, and is a subsidiary of
26 Bank of America Corporation.   Banc of America Mortgage Securities, Inc. was the
27 depositor for certain of the offerings at issue here, the registrant for certain
28 Registration Statements filed with the SEC, and the issuer for certain of the

offerings at issue in this action, as detailed in Exhibits 1 to 346.   The depositor is
considered the issuer of the certificates within the meaning of Section 2(a)(4) of the
Securities Act of 1933, 15 U.S.C. § 77b(a)(4), and in accordance with Section 11(a),
15 U.S.C. § 77k(a). It is a Depositor Defendant.

73.    Defendant Asset Backed Funding Corporation is a Delaware
corporation with substantial business operations and offices at the Bank of America
Tower at One Bryant Park, New York, New York 10036, and is a subsidiary of
Bank of America Corporation.   It was the depositor for certain of the offerings at
issue here, the registrant for certain Registration Statements filed with the SEC, and
the issuer for certain of the offerings at issue in this action, as detailed in Exhibits 1
to 346.   The depositor is considered the issuer of the certificates within the meaning
of Section 2(a)(4) of the Securities Act of 1933, 15 U.S.C. § 77b(a)(4), and in
accordance with Section 11(a), 15 U.S.C. § 77k(a).   It is a Depositor Defendant.

74.    Defendant NB Holdings Corporation is a Delaware corporation with
principal offices in Charlotte, North Carolina, and is a subsidiary of Bank of
America Corporation.

75.    Defendants Bank of America Corporation, Bank of America, N.A., and
NB Holdings Corporation participated in Bank of America's acquisition of
substantially all of Countrywide Financial through a series of acquisitions and
transactions that commenced on July 1, 2008.   They are the successors-in-interest
to the Countrywide Defendants.

76.    At all relevant times, Defendants committed the acts, caused or directed
others to commit the acts, or permitted others to commit the acts alleged in this
Amended Complaint.   Any allegations about acts of the corporate Defendants
means that those acts were committed through their officers, directors, employees,
agents, and/or representatives while those individuals were acting within the actual
or implied scope of their authority.

Case No. 11-CV-10549-MRP (MANx)
AMENDED COMPLAINT

## JURISDICTION AND VENUE

77.    The Supreme Court of New York has jurisdiction over this proceeding pursuant to CPLR §§ 301 and 302.   Almost all activity pertaining to the securitization of the mortgage loans at issue occurred in New York, including the underwriting, negotiating, drafting, and signing of the operative agreements, the formation of the trusts, and the compilation and transmission of the Offering Materials.   Each of the Defendants also maintains offices, derives substantial revenue from, and/or regularly transacts or has transacted business within the State.

78.    Venue is proper in New York county pursuant to CPLR § 503.   AIG Parent is a resident of New York County, New York.

## BACKGROUND

## I.    THE MECHANICS OF MORTGAGE SECURITIZATION

79.    RMBS take the form of mortgage "certificates."   The certificates represent interests in a pool of mortgage loans; they are "shares" in the pool that are sold to investors.   The certificates entitle the holder to payments from the pool of mortgages.   Although the structure and underlying collateral may vary by offering, the basic principle of "pass-through" certificates remains the same:   as borrowers make payments on the loans in the mortgage pool, that cash flow is "passed through" to the certificateholders based on their share of the pool.

80.    The creation of an RMBS starts with "originators" of mortgage loans. Originators either create mortgage loans directly by lending to borrowers pursuant to their own guidelines or they acquire loans from other lenders, typically underwritten to the originators' guidelines.   Originators of subprime loans understand and expect that the loans they originate will be sold into RMBS like those purchased by AIG.   Selling mortgage loans to securitizers is their business model.   Originators provide information regarding their underwriting guidelines and credit metrics concerning the loans they sell to securitizers, including the key

Case No. 11-CV-10549-MRP (MANx)
AMENDED COMPLAINT

1   credit information at issue here.   Originators know and expect that such information
2   will be distributed to RMBS investors like AIG.

3        81.   The "sponsor" for the securities (also typically referred to as the
4   "seller" prior to 2006) puts the transaction together.   The sponsor originates the
5   loans or acquires the loans from other mortgage originators.   Then a "depositor"
6   acquires an inventory of loans from the "sponsor" or "seller."   The types of loans in
7   the inventory may vary, including conventional, fixed-rate or adjustable-rate
8   mortgage loans (or mortgage participations), secured by first liens, junior liens, or a
9   combination of first and junior liens, with various lifetimes to maturity.   Upon
10  acquisition, the depositor transfers, or deposits, the acquired pool of loans to an
11  "issuing trust."

12       82.   The issuing trust then "securitizes" the pool of loans so that the rights
13  to the cash flows from the pool can be sold to investors in the form of certificates.
14  The securitization transactions are structured such that the risk of loss is divided
15  among different levels of investment, or "tranches."   Any losses on the underlying
16  loans - whether due to default or otherwise - are generally applied in reverse order
17  of seniority.   As such, the most senior tranches of certificates receive the highest
18  credit ratings.   Junior tranches, being less insulated from risk, typically obtain lower
19  credit ratings, but offer greater potential returns.

20       83.   Once the tranches are established, the issuing trust passes the securities
21  or certificates back to the depositor, who becomes the issuer of the securities.   The
22  depositor then passes the securities to one or more underwriters, who market and
23  sell the securities to investors.

24       84.   The underwriters, often Wall Street banks and financial institutions,
25  play a critical role in the securitization process by purchasing the securities from the
26  issuing trust through a depositor and then selling them to investors.   Significantly,
27  the underwriters directly provide the information that potential investors like AIG
28  use to decide whether to purchase the securities.   Underwriters are supposed to

1  conduct diligence to ensure the accuracy of the information they provide to
2  investors.

3      85.   Because the cash flow from the loans in the collateral pool of a
4  securitization is the source of payments to holders of the securities issued by the
5  trust, the credit quality of the securities depends directly upon the credit quality of
6  the loans in the collateral pool.   The most important information about the credit
7  quality of the loans is contained in the "loan files" that the mortgage originator
8  develops while making the loans.   For residential mortgage loans, each loan file
9  normally contains documents including the borrower's application for the loan;
10 verification of the borrower's income, assets, and employment; references; credit
11 reports on the borrower; an appraisal of the property that will secure the loan and
12 provide the basis for measures of credit quality, such as LTV ratios; and a statement
13 of the occupancy status of the property.

14     86.   The collateral pool for each securitization usually included thousands
15 of loans.   Instead of having each potential investor go through what would be an
16 impractical, inordinately expensive, and time consuming task of reviewing
17 thousands of loan files, the underwriters were generally responsible for gathering
18 loan data from the depositor, sponsor, seller, and originators, and then verifying and
19 presenting to potential investors accurate and complete information about the loans
20 that are deposited into the issuing trust.   Here, Defendants provided information
21 about loan characteristics to AIG through a variety of offering materials, including
22 registration statements, prospectuses, prospectus supplements, free writing
23 prospectuses, presentations, term sheets, and other written materials.   Defendants
24 also provided information about loan characteristics to AIG in response to AIG's
25 specific requests for data.   (The information provided to AIG is collectively
26 referred to as the "Offering Materials").   In addition, as further discussed herein,
27 AIG conducted multiple in-person meetings with Defendants to assess their
28 underwriting standards.   Defendants hosted additional in person meetings with

1   other originators who sold loans into the RMBS.   In all of these meetings AIG

2   received false assurance about the supposedly robust underwriting and diligence

3   practices for issuing mortgage loans.

4        87.   Before the RMBS were issued, Defendants also provided the rating

5   agencies with information about loan characteristics and deal structure.   Relying on

6   this information, the ratings agencies assigned each tranche of a securitization a

7   credit rating reflecting their assessment of its risk.   The Offering Materials used to

8   market and sell the securities to investors like AIG disclosed these ratings.   The

9   credit ratings were an important tool for many investors, including AIG, which had

10  internal policies requiring certain ratings as a criteria for investment.   Indeed, AIG

11  GSL Corp.'s investment policy required 95% of its asset-backed investments to be

12  AAA rated.

13       88.   The *Wall Street Journal* has summarized the securitization process as

14  follows:



**Follow the Mortgage** What happens to your mortgage after you sign on the dotted line

Source: WSJ Reporting

## II.   THE RAPID EXPANSION OF MORTGAGE SECURITIZATION TRANSFORMS THE INDUSTRY

26       89.   Traditionally, mortgage originators financed their mortgage business

27  through customer deposits, retained ownership of the loans they originated, and

28  directly received the mortgage payment streams.   This became known as the

1    "originate to hold" model.   When an originator held a mortgage through the term of
2    the loan, the originator also bore the risk of loss if the borrower defaulted and the
3    value of the collateral was insufficient to repay the loan.   As a result, the originator
4    had a strong economic incentive to verify the borrower's creditworthiness through
5    prudent underwriting and to obtain an accurate appraisal of the value of the
6    underlying property before making the mortgage loan.

7         90.   In the 1980s and 1990s, most mortgage securitizations were conducted
8    through the major Government Sponsored Enterprises (the "Agencies"), *i.e.*, the
9    Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan
10   Mortgage Corporation ("Freddie Mac"), and the Government National Mortgage
11   Association ("Ginnie Mae").   The Agencies purchased loans from originators and
12   securitized the loans.   These Agency securitizations had high credit quality because
13   the Agencies required the underlying loans to be originated in accordance with strict
14   underwriting guidelines.

15        91.   In the 2000s, the volume of non-Agency mortgage securitizations
16   skyrocketed, led by the Wall Street investment banks.   Mortgage loan securitization
17   shifted the traditional originate to hold model to an "originate to distribute" model,
18   in which originators sold the mortgages and transferred credit risk to investors
19   through the issuance and sale of RMBS.   Under the new model, the economic
20   incentives were radically shifted because the originators no longer held the
21   mortgage loans to maturity.   Instead, by selling the mortgages to investors, the
22   originators obtained the funds to make more loans.   Securitization also enabled
23   originators to earn most of their income from transaction and loan-servicing fees,
24   rather than from the spread between interest rates paid on deposits and interest rates
25   received on mortgage loans, as in the originate to hold model.

26        92.   Thus, securitization gave originators an incentive to increase the
27   number of mortgages they issued and reduced their incentive to ensure the
28   mortgages' credit quality.   As the SPSI found: "When lenders kept on their books

Case No. 11-CV-10549-MRP (MANx)
                                                                          AMENDED COMPLAINT

1  the loans they issued, the creditworthiness of those loans determined whether the

2  lender would turn a profit.  Once lenders began to sell or securitize most of the

3  loans, volume and speed, as opposed to creditworthiness, became the keys to a

4  profitable securitization business."  (SPSI Report, at 4.)  Nevertheless, contractual

5  terms and good business practices obligated originators to underwrite loans in

6  accordance with their stated policies, obtain accurate information from borrowers to

7  enable them to assess the credit quality of the loans, and obtain accurate appraisals

8  of the mortgaged properties.

9  **III.   DEFENDANTS OPERATED ON EVERY LEVEL OF THE
       SECURITIZATION PROCESS**

10        93.   Countrywide, Merrill, and Bank of America operated—and made huge

11  profits—on every level of the securitization process, acting as originators,

12  underwriters, sponsors, sellers, depositors, and servicers in the deals at issue.

13  Indeed, in many of the deals, Defendants acted in multiple, if not all, of these roles

14  (so-called "vertical integration"), allowing them complete control over the

15  securitization machine and further providing them with actual knowledge of the

16  abuses at each level of the transaction.

17        94.   Defendants adopted multiple strategies in order to gain control of the

18  securitization process.  Because they wanted to ensure a steady supply of mortgage

19  loans to securitize, investment banks, who underwrote the deals, often acquired their

20  own loan originators.  For example, Merrill acquired First Franklin and a stake in

21  Ownit, both of which were subprime lenders.  Controlling a subprime lender

22  allowed an investment bank like Merrill to dictate the underwriting standards at

23  origination and guaranteed a constant stream of loans to securitize and sell to

24  investors like AIG.  Because Merrill needed high volumes of loans to securitize—

25  and passed off the high default risk to investors—it had every incentive to, and in

26  fact did, lower the underwriting standards at its affiliated lenders.

27

28

95.     The investment banks also engaged in a practice known as "warehouse lending."   Under these type of arrangements, investment banks would extend a line of credit to a third-party loan originator to fund a mortgage loan. The warehouse loan typically lasted from the time it was originated to the time when the underlying mortgage loan was sold on the secondary market, whether directly or through a securitization.   In connection with this process, the originating banks provided the investment banks with documents about the underlying loans, including performance characteristics—information that the originators had reason to expect would be relayed to investors like AIG, as they understood the purpose of the sale was to put the loans into a pool for securitization.

96.     Both Merrill and Bank of America engaged in warehouse lending.   As a result of these close financial ties with otherwise unaffiliated originating lenders, the investment banks had abundant information about the third-party originators' abandonment of publicly disclosed underwriting guidelines and predatory lending practices.

97.     Investment banks like Merrill and Bank of America also entered into purchase agreements with third-party originators to buy batches of mortgages to securitize.   As part of those agreements, the investment banks typically set the prices and quantities of the types of loans they wanted to buy, and also gained access to loan information prior to purchase.

98.     Conversely, Countrywide, a loan originator, formed its own underwriter so it could securitize its loans without paying fees to the Wall Street banks.   Countrywide also entered into purchase agreements with third-party originators to buy bulk lots of mortgages to securitize.

99.     Moreover, as originators themselves, Countrywide, Merrill, and Bank of America both understood and expected that the loans they were generating would end up in securitizations like those purchased by AIG.   Originators provided their underwriting guidelines and loan-level information regarding collateral loans to the

1  sponsors, sellers, depositors, and/or underwriters.   The loan-level information
2  contained representations as to the value of the property, the LTV and/or the CLTV
3  ratio of the loan, the debt-to-income ratio ("DTI"), owner-occupancy, and many
4  other material data points.   This information formed the basis of key representations
5  in the Offering Materials.   The originators thus knew that their representations
6  would be relied upon by RMBS investors.   Indeed, reliance on the data and the
7  purchase of such loans by investors was an integral part of the originators' business
8  plan, as investors in RMBS ensured a steady market for the originators' loans.

9          100.   In many cases, for example, the originator sold its loans directly to the
10 depositor of the securitization and was a party to the pooling and servicing
11 agreement that established the securitization trust.   Countrywide-sponsored deals
12 typically reflected this structure.   For example, in CWALT 2006-OC2 and CWL
13 2007-S3, Countrywide Home Loans sold the loans in the mortgage pools to RMBS
14 depositors CWALT, Inc. and CWHEQ, Inc., respectively.   Countrywide Home
15 Loans thus knew that its loans were being securitized and sold to investors like AIG,
16 as it played a direct part in creating the RMBS.   In fact, Countrywide explicitly
17 recognized that the lion's share of the mortgages it originated would ultimately be
18 sold and securitized.   For example, the Prospectus Supplement for CWHL 2007-
19 HY1 dated February 27, 2007, at S-35, stated that:

20          Countrywide Home Loans has historically sold substantially all the
           mortgage loans that it has originated and purchased, generally through
21         securitizations.   Countrywide Home Loans does not always sell
           mortgage loans immediately after origination or acquisition, but may
22         decide to sell certain mortgage loans in later periods as part of its
           overall management of interest rate risk.   Countrywide Home Loans
23         has been involved in the securitization of mortgage loans since 1969
           when it was approved as a Federal National Mortgage Association
24         seller/servicer.   Countrywide Home Loans reviews the structure of its
           securitizations and discusses the structure with the related underwriters.
25
26 Similarly, Countrywide's 2006 Annual Report stated that "[n]early all of the
27 mortgage loans that we produce in the Mortgage Banking and Capital Market
28

1  Segments are sold into the secondary mortgage market, primarily in the form of

2  securities and to a lesser extent it the form of loans."

3      101.  The Originator Defendants often expressly agreed to provide

4  information about their loans to the depositor or sponsor, or more generally to assist

5  with the securitization process, often in agreements that documented the RMBS.

6  For example, in BALTA 2006-3, in the Amendment Reg. AB to the Master

7  Mortgage Loan Purchase and Servicing Agreement between Countrywide Home

8  Loans, as seller and EMC Mortgage Corp. as purchaser, Countrywide Home Loans

9  acknowledged the possibility of the issuance of RMBS based on the loans sold to

10  EMC.  Countrywide Home Loans also expressly agreed that it would cooperate in

11  any securitization efforts.  The Amendment stated that Countrywide Home Loans

12  "agrees to negotiate in good faith with the Purchaser or any Depositor with regard to

13  reasonable requests for delivery of information under these provisions on the basis

14  of evolving interpretations of Regulation AB" and that "[i]f so requested by the

15  Purchaser or Depositor, and required by Regulation AB or as otherwise agreed upon

16  by [Countrywide Home Loans], the Purchaser and/or the Depositor, [Countrywide

17  Home Loans] shall provide . . . Static Pool Information with respect to the mortgage

18  loans."  In BAFC 2006-B, BANA, the sponsor of the RMBS, originated the loans

19  and sold them to the depositor, BAFC, pursuant to a Mortgage Loan Purchase

20  Agreement.  The Agreement stated that BANA "will convey the Mortgage Loans to

21  Banc of America Funding 2006-B Trust" pursuant to a Pooling and Servicing

22  Agreement it had already executed.  In Section 6, BANA expressly "agree[d] to

23  furnish any and all information, documents, certificates, letters or opinions with

24  respect to the mortgage loans, reasonably requested by [BAFC] in order to perform

25  any of its obligations or satisfy any of the conditions on its part to be performed or

26  satisfied" to complete the underwriting of the securities issued for the RMBS, and in

27  particular to permit Banc of America Securities, the underwriter, to complete and

28

1   file with the SEC the Offering Materials used to induce AIG and other investors to
2   purchase the securities.

3         102.   Similarly, First Franklin originated the loans in the mortgage pool for
4   FFML 2006-FFH1 and sold them to Bank of America, N.A. (the sponsor) pursuant
5   to a Flow Sale and Servicing Agreement.   Section 10.01 of that agreement required
6   First Franklin to "use its best efforts to facilitate" any securitization of its loans.
7   The same is true for CMLTI 2006-AR5.   In CMLTI 2006-AR5, CHL
8   acknowledged in the Amended and Restated Master Mortgage Loan Purchase and
9   Servicing Agreement between CHL as seller and Citigroup Global Markets Realty
10  Corp. as purchaser, that some or all of the mortgage loans being purchased would be
11  placed into a "publicly issued or privately placed mortgage-backed securities
12  transaction."   Also, in the Amendment Reg. AB to the Amended and Restated
13  Master Mortgage Loan Purchase and Servicing Agreement, CHL acknowledged that
14  it would "cooperate fully" "in connection with any Securitization Transactions."

15        103.   Across all of the deals where a Defendant is being sued as an
16  originator, the originator was either a seller/sponsor and participated extensively in
17  the securitization of its own loans, or the loan purchase agreements (when publicly
18  available) stated that the originator was aware that securitization was a significant
19  possibility and agreed to cooperate with such efforts.   These agreements are
20  publicly available for most RMBS on http://www.sec.gov, and are incorporated into
21  this Amended Complaint by reference.

22        104.   As sponsors and underwriters of the RMBS at issue, Defendants
23  reassured investors that they had either investigated the mortgage loan originator or
24  had reviewed the underlying mortgage loans, and that such loans conformed to the
25  stated guidelines.   For example, in the MLMI 2006-OPT1 Prospectus Supplement
26  dated September 22, 2006, at S-39-40, Merrill Lynch Mortgage Lending, the
27  sponsor, assured investors that:

28

1
2
3
4
5
6

Prior to acquiring any residential mortgage loans, MLML conducts a review of the related mortgage loan seller that is based upon the credit quality of the selling institution. MLML's review process may include reviewing select financial information for credit quality of the selling institution. MLML's review process may include reviewing select financial information for credit and risk assessment and conducting an underwriting guideline review, senior level management discussion, and/or background checks. The scope of the mortgage loan due diligence varies based on the credit quality of the mortgage loans.

7
8
9
10
11
12
13
14
15

105.   Similarly, in the CWHL 2005-19 Prospectus Supplement dated July 26, 2005, at S-37, the sponsor, Countrywide Home Loans stated that "[a]ll of the mortgage loans in the trust fund will have been originated or, prior to the sale to the seller, acquired by Countrywide Home Loans in accordance with its credit, appraisal and underwriting guidelines." BANA, the sponsor in BOAMS 2006-1 confirmed in the Prospectus dated April 25, 2006, at 6, that "[t]he mortgage loans will either be originated by the sponsor or purchased by the sponsor from various entities that either originated the mortgage loans to the sponsor's underwriting standards or to the underwriting standards described in the related prospectus supplement."

16
17
18
19
20
21
22
23
24

106.   In this way, Defendants participated in every aspect of the securitization process. They had unique and special knowledge about every aspect of the process, from loan origination to sale to AIG. Securitization fed origination and vice versa. The FCIC confirmed that "[s]ecuritization and subprime originations grew hand in hand" as "[t]he nonprime mortgage securitization process created a pipeline through which risky mortgages were conveyed and sold throughout the financial system. This pipeline was essential to the origination of the burgeoning numbers of high-risk mortgages." (FCIC Report, at 70, 125.)   The FCIC concluded that:

25
26
27
28

[F]irms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards. Potential investors were not fully informed or were misled about the poor quality of the mortgages contained in some mortgage-related securities. These problems appear to have been significant.

1  (FCIC Report, at 187.)

2                                  **ALLEGATIONS**

3  **IV.    DEFENDANTS' MATERIAL MISREPRESENTATIONS**

4          **A.    Defendants' Offering Materials**

5          107.   AIG purchased over $27 billion worth of certificates in Defendants'

6  residential mortgage backed securities.   The particular RMBS investments at issue

7  in this litigation are set forth in Exhibit A, which lists, among other things, the

8  name, tranche level, purchaser, purchase date, and purchase price for each of these

9  investments.

10         108.   All of the Plaintiffs conducted all of the RMBS investment activity in

11  New York.   All of the RMBS at issue in this litigation were selected, researched,

12  and purchased by investment advisors operating out of the offices of AIG Global

13  Investment Corporation ("AIG Investments"), at 70 Pine Street, New York, New

14  York.   AIG Investments managed the investment activities of AIG's various

15  subsidiaries worldwide out of New York.   Thus, AIG's subsidiaries intentionally

16  centralized their RMBS investment activity under the management of AIG

17  Investments in New York.   Specifically, the Structured Finance Group within AIG

18  Investments was responsible for investment decisions and diligence with respect to

19  the RMBS purchases and their subsequent management.   AIG Investments in New

20  York purchased the RMBS using funds Plaintiffs sent to AIG Investments and held

21  in AIG Investments accounts in New York.

22         109.   AIG purchased the certificates pursuant to the Offering Materials:

23  registration statements, prospectuses, prospectus supplements, free writing

24  prospectuses, presentations, term sheets, customized spreadsheets provided upon

25  AIG's request, and other written materials.   The AIG employees responsible for

26  managing Plaintiffs' portfolios and making the purchase decisions for all the RMBS

27  at issue were located in New York, New York.   These same employees conducted

28  the due diligence described below.

110.   The Offering Materials were prepared by Defendants.   Defendants intended for investors like AIG to rely on the Offering Materials, and AIG relied to its detriment on the Offering Materials in making its purchase decisions.   The depositors filed a Form S-3 Registration Statement with the SEC indicating their intention to sell mortgage-backed securities.   Exhibits 1 to 346 set forth the date the relevant registration statements were filed with the SEC for the deals at issue.

111.   The certificates were issued pursuant to prospectuses.   The prospectuses provided that the issuing trusts would offer a series of certificates representing beneficial ownership interests in the related trust, and that the assets of each trust would generally consist of a pool or pools of fixed or adjustable interest rate mortgage loans secured by a lien on a one- to four- family residential property. The prospectuses also advised that a prospectus supplement would be filed with the SEC at the time of the offering of the certificates.

112.   The prospectus supplements provided the specific terms of a particular certificate series offering.   The prospectus supplements contained a more detailed description of the mortgage pools underlying the certificates, including (but not limited to) the type of loans, the number of loans, the mortgage rates and net mortgage rates, the aggregate scheduled principal balance of the loans, the purported original weighted average LTV ratio and CLTV ratio, the borrowers' DTI ratios, the property type, the owner-occupancy data, and the geographic concentration of the mortgaged properties.   Exhibits 1 to 346 set forth the date the relevant prospectus supplements were filed with the SEC.

113.   Defendants also provided AIG with term sheets and free writing prospectuses that contained detailed information on the mortgage pools underlying the certificates, such as owner-occupancy statistics, LTV and CLTV ratios, credit ratings, and credit enhancement.   Exhibit B provides examples of such term sheets and free writing prospectuses.   AIG often directly requested that the underwriter for a security provide additional analytical information about the certificates being

offered in customized spreadsheets that AIG had developed to assess the quality of the securities. AIG sent the underwriters spreadsheets requesting that the underwriters populate columns with quantitative data about the collateral loans in the securities. These spreadsheets asked for mortgage loan information on loan terms and loan types, FICO scores, LTV and CLTV ratios, DTI ratios, owner-occupancy levels, and documentation programs. Exhibit C provides an example of one of these spreadsheets. The quantitative data at issue that the Defendants provided in the term sheets, free writing prospectuses, and the spreadsheets was substantively the same as data provided in the prospectus supplements.

114. The prospectus supplements further represented, and the contractual documentation for each transaction (pooling and servicing agreements and related loan purchase agreements) confirmed, that each loan underlying the RMBS at issue had been represented and warranted to meet certain quality standards. AIG was entitled to rely on these representations and warranties as to the quality of the underlying loans in each RMBS.

115. In addition, Defendants made representations to AIG, both orally and in writing, when AIG conducted its own diligence of Defendants' loan underwriting processes. AIG visited Defendants' origination arms on site, and questioned their practices using, among other things, a questionnaire AIG developed for such meetings. For example, AIG Investments met with senior executives at Countrywide in November 2005 and August 2007, and at Merrill's originator, First Franklin, in February 2007. At these meetings, Defendants continued to provide false assurances about the quality of the same loan underwriting practices that were misrepresented in the Offering Materials, perpetuating the fiction of a rigorous underwriting process. For example, at one of these due diligence field visits, First Franklin provided a pitchbook to AIG falsely touting First Franklin's alleged robust underwriting practices. In particular, First Franklin represented that it conducted a "full credit underwriting . . . on all loans prior to funding," and to prevent fraud, it

1   performed "due diligence . . . on every loan transaction."   First Franklin further

2   represented that it conducted "[v]erbal verification of employment on all borrowers

3   regardless of doc type" and had guidelines in place to address "red flags revealed in

4   the loan file."   It also represented it had a robust process to manage exceptions and

5   supposedly never gave exceptions based on FICO or LTV.   AIG relied on these

6   false assurances in making the decisions to purchase the securities at issue in this

7   case.

8       **B.**   **Defendants' Misrepresentations Regarding Loan Underwriting
    Standards and Practices**

9       116.   The underwriting process used to originate the mortgage loans

10  underlying AIG's certificates was material to AIG and an important factor in its

11  decision to purchase securities because the underwriting process is designed to

12  ensure loan quality.   Loan quality in turn determines the risk of the certificates.   If

13  underwriting guidelines are not followed, the underlying loans will be of lesser

14  quality than represented, increasing the probability of defaults by borrowers and

15  shortfalls in principal and interest payments to investors and decreasing the value of

16  the loans from the date of origination.   Systemic failure to abide by underwriting

17  guidelines decreases the reliability of *all* the information investors have about the

18  loans, and thus greatly increases their risk, and decreases the market value of the

19  loans and in turn the RMBS for which the loans serve as collateral.

20      117.   The Offering Materials for AIG's certificates describe underwriting

21  guidelines purportedly employed by Defendants to evaluate the underlying

22  mortgage loans.   In particular, Defendants misrepresented that, as part of their

23  underwriting process, they had: (i) evaluated the credit standing and repayment

24  ability of prospective borrowers and the value and adequacy of the mortgaged

25  property as collateral; (ii) granted exceptions to the underwriting guidelines only if

26  based on compensating factors; (iii) calculated each borrower's DTI ratio and

27  included in the collateral pool only mortgage loans with a DTI ratio below a

28

Case No. 11-CV-10549-MRP (MANx)
AMENDED COMPLAINT

1  threshold level; and (iv) reserved reduced documentation programs for borrowers

2  with excellent credit histories that demonstrated an established ability to repay or

3  ensured that such programs required greater emphasis on other loan characteristics.

4  Defendants also misrepresented that certain loans were eligible for sale to Fannie

5  Mae and Freddie Mac, even though their actual credit characteristics made them

6  ineligible to sell to these entities.   Defendants fraudulently omitted to disclose that

7  high numbers of loans had been rejected by the due diligence process, yet were

8  "waived" into the collateral pools anyway.   Specific misrepresentations for each

9  deal are referenced in Exhibits 1 to 346.   Exemplary representations are set forth in

10  Table 1 below.

11       118.   Defendants' statements regarding underwriting standards and practices

12  were untrue and misleading because they had abandoned these standards, as set

13  forth in detail in Section V.F.

14  **Table 1:   Sample Misrepresentations Regarding Underwriting Guidelines**

| Defendant | Misrepresentations |
|---|---|
| Countrywide | • "All of the Mortgage Loans originated by Countrywide Home Loans have been underwritten pursuant to Countrywide Home Loans' Standard Underwriting Guidelines."   CWALT 2006-OA16 Prospectus Supplement dated August 29, 2006, at S-50.<br>• "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within acceptable limits." CWALT 2006-OA16 Prospectus Supplement dated August 29, 2006, at S-47. |

| Defendant | Misrepresentations |
|---|---|
| | • "As part of its evaluation of potential borrowers, Countrywide Home Loans generally requires a description of income.   If required by its underwriting guidelines, Countrywide Home Loans obtains employment verification providing current and historical income information and/or a telephonic employment confirmation.   Such employment verification may be obtained, either through analysis of the prospective borrower's recent pay stub and/or W-2 forms for the most recent two years, relevant portions of the most recent two years' tax returns, or from the prospective borrower's employer, wherein the employer reports the length of employment and current salary with that organization."   CWALT 2006-OA16 Prospectus Supplement dated August 29, 2006, at S-47.<br>• "The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-Value Ratio, loan purpose, loan amount and credit history of the borrower.   In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs."   CWALT 2006-OA16 Prospectus Supplement dated August 29, 2006, at S-47-48.<br>• "Under its Standard Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%."   CWALT 2006-OA16 Prospectus Supplement dated August 29, 2006, at S-49.<br>• "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower."   CWALT 2006-OA16 Prospectus Supplement dated August 29, 2006, at S-48.<br>• "Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations."   CWALT 2006-OA16 Prospectus Supplement dated August 29, 2006, at S-46. |
| Merrill | • "The Mortgage Loans were originated generally in |

| Defendant | Misrepresentations |
|---|---|
| | accordance with the underwriting criteria, standards and guidelines of each Originator."  MLMI 2006-HE3 Prospectus Supplement dated June 19, 2006, at S-32.<br>• "[U]nderwriting guidelines are designed to evaluate a borrower's credit history, his or her capacity, willingness and ability to repay the loan and the value and adequacy of the collateral."  MLMI 2006-HE3 Prospectus Supplement dated June 19, 2006, at S-34.<br>• "Capacity, which is the borrower's ability to repay, is determined by cash flow.  It must be clearly shown that the borrower has a proven, historical cash flow, which will support the requested loan amount.   This approach anticipates that the loan is going to be repaid from the borrower's recurring cash inflows, not from the sale of the collateral.  Job stability and length of time in current residence are also strong factors in determining a borrower's capacity. Continuity of employment is a strong factor in establishing the income used as a basis for repayment."  OWNIT 2006-4 Prospectus Supplement dated June 22, 2006, at S-32.<br>• "Based on the data provided in the application and certain verifications (if required), a determination was made by the original lender that the mortgagor's monthly income (if required to be stated ) should be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the mortgaged property (such as property taxes, standard hazard insurance and other fixed obligations other than housing expenses).  Generally, scheduled payments on a on the mortgage loan during the first year of its term plus taxes and insurance and other fixed obligations equal to no more than a specified percentage of the prospective mortgagor's gross income.  The percentage applied varies on a case-by-case basis depending on a number of underwriting criteria, including the loan-to-value ratio of the mortgage loan.  The Originators may also have considered the amount of liquid assets available to the mortgagor at the time of origination."  MLMI 2006-HE3 Prospectus Supplement dated June 19, 2006, at S-33.<br>• "The maximum allowable debt-to-income ratio under the Score More Full          Documentation Program is 55%...  The maximum allowable debt-to-income |

-43-

| Defendant | Misrepresentations |
|---|---|
| | ratio under the Score More No Income Verification and Limited Documentation Program is 55%... The maximum allowable debt-to-income ratio under the Premier Score Full Documentation Program is 55%.... The maximum allowable debt-to-income ratio under the Premier Score No Income Verification Program is 50%." MLMI 2006-HE3 Prospectus Supplement dated June 19, 2006, at S-37, S-38, S-39, S-40.
• "[E]xceptions to the underwriting standards described herein may have been made in cases where compensating factors were demonstrated by a prospective mortgagor." MLMI 2006-HE3 Prospectus Supplement dated June 19, 2006, at S-33, S-42.
• "All loans are subject to a specific post-funding loan test, including high-cost tests, to verify that First NLC's originations comply with any applicable laws or regulatory requirements." MLMI 2006-HE3 Prospectus Supplement dated June 19, 2006, at S-36. |
| Bank of America | • "The Mortgage Loans originated by Bank of America and originated or acquired by Countrywide Home Loans or National City Mortgage will have been underwritten materially in accordance with the applicable underwriting standards set forth below . . . . The underwriting standards used by the Originators are intended to evaluate the Mortgagor's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." BAFC 2007-A Prospectus Supplement dated January 30, 2007, at S-39.
• "Regardless of the channel in which the loan was originated, a mortgage application is completed containing information that assists in evaluating the mortgagor's credit standing, capacity to repay the loan and adequacy of the mortgaged property as collateral for the loan. During the application process, the applicant is required to authorize Bank of America to obtain a credit report that summarizes the applicant's credit history with merchants and lenders and any record of bankruptcy or prior foreclosure." BAFC 2007-A Prospectus Supplement dated January 30, 2007, at S-39.
• "As part of the underwriting evaluation, the applicant's "Debt-to-Income Ratio" is calculated as the amount of the monthly debt obligations (including |