LINKS: 163, 165, 194, 276, 277

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re COUNTRYWIDE FINANCIAL CORPORATION MORTGAGE-BACKED SECURITIES LITIGATION | Case No. 2:11-ML-02265-MRP (MANx) |
| AMERICAN INTERNATIONAL GROUP, INC., *et al.,*<br><br>Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA CORPORATION, *et al.*,<br><br>Defendants. | Case No. 2:11-CV-10549 MRP (MANx)<br><br>**Order Re Motion to Dismiss the Amended Complaint and Motion to Stay Case** |

1

## I.    Background

2       The plaintiffs in this litigation (collectively, "AIG" or "Plaintiffs")

3  purchased hundreds of residential mortgage-backed securities ("RMBS") worth

4  tens of billions of dollars between 2005 and 2007.  The listed defendants acted as

5  sponsors, sellers and underwriters for 346 of the securities, and as originators and

6  depositors for thousands of the mortgages underlying the RMBS themselves

7  (collectively, all listed defendants are the "Defendants").

8       These RMBS were created through a process called "securitization."  In

9  mortgage securitization, originators extend or acquire thousands of mortgage loans.

10  Each loan produces cash-flows from the payments by borrowers.  The loans are

11  pooled and sold to depositors, who transfer the loan pools to trusts.  The trusts

12  issue securities in the form of certificates for purchase by investors.  Each

13  certificate entitles the holder to a portion of the cash flow from the loan pools as

14  the borrowers repay their mortgage debt.  Certificates are often sold in "tranches,"

15  i.e., slices of the loan pool with different priorities of payment, interest rates and

16  credit protection.  Upon issuance, credit rating agencies assign ratings to each

17  tranche.  If they desire, investors can select riskier certificates in the lower tranches

18  with higher interest payments but lower credit ratings, instead of safer certificates

19  in the higher tranches with lower interest payments and higher credit ratings.

20       This case demands careful consideration of the specific RMBS portfolio

21  held by Plaintiffs as well as the Plaintiffs themselves.  AIG purchased the 346

22  securities (the specific RMBS in this lawsuit are called the "Certificates," and are

23  only a small portion of AIG's total RMBS portfolio over time) pursuant to a

24  program AIG called the "securities lending program."  Decl. of David H. Fry in

25  Supp. of Defs.' Supplemental Mem. ("Supp. Fry Decl.") Ex. 5, at 1 (AIG's 2008

26

27

28

Annual Report), ECF No. 251.[1]  In this program, some of AIG's subsidiaries lent some of their securities holdings, usually fixed income securities, to other financial institutions.  *Id.*; Supp. Fry Decl. Ex. 1, at 180:8–181:4, March 15, 2013 (deposition transcript of Steven J. Manzari, a senior vice president at the Federal Reserve Bank of New York, referred to as "Manzari Depo.").  Borrowers gave cash collateral in exchange for the securities.  *Id.* 182:7–13.  AIG then reinvested the cash collateral primarily through the purchase of mortgage-backed securities.  *Id.* 183:7–184:7, 185:18–19.  At the same time, in an additional development not directly relevant here, AIG and its subsidiaries sold billions of dollars of credit protection in credit default swaps.  Supp. Fry Decl. Ex. 5, at 1.

The market decline in 2007 and 2008 triggered enormous obligations on the swaps, and contributed to sharp losses in the value of AIG's RMBS.  *Id.*  When the counterparties in the securities lending program "began in increasing numbers to request a return of their cash collateral," AIG could not cover the demands through the sale of the purchased RMBS, because the value of the Certificates had fallen so precipitously.  *Id.* at 40.  The credit rating agencies downgraded AIG's ratings, which triggered an "acute liquidity crisis," as AIG needed to find alternative sources to repay its counterparties.  *Id.* at 1.

In these crisis conditions, the Federal Reserve Bank of New York ("FRBNY") determined that the "disorderly failure of AIG could add to already significant levels of financial market fragility and lead to . . . materially weaker economic performance," and so extended an $85 billion bridge loan to the company.  Supp. Fry Decl. Ex. 7 (Federal Reserve Board press release from September 16, 2008).  The FRBNY received valuable collateral in exchange from AIG, including most of the stock in AIG and its subsidiaries, and "expected to be

---

[1]     The Court takes judicial notice of all SEC filings and publicly available financial documents under Rule of Evidence 201.  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008).

repaid from the sale of the firm's assets." *Id.* This bridge loan "was essential to prevent an AIG bankruptcy." Supp. Fry Decl. Ex. 6 (Form 8-K/A filed by AIG on November 10, 2008). However, even after the FRBNY made another $37 billion available to AIG, the FRBNY worried that the credit rating agencies would further downgrade AIG, and that AIG was not guaranteed to be viable going forward. Manzari Depo. 175:2–21, 206:23–207:2. As a result, the FRBNY and the U.S. Treasury restructured and increased AIG's financial assistance. Supp. Fry Decl. Ex. 11 (Federal Reserve Board press release from November 10, 2008).

There were four parts to the modified government assistance, which was to be extended "in order to keep the company strong and facilitate its ability to complete its restructuring process successfully." *Id.* The Treasury would purchase $40 billion of newly issued AIG shares, the FRBNY would alter the terms of the bridge loan, and the FRBNY would lend money to two newly created special purpose vehicles. *Id.* One special purpose vehicle would purchase the obligations AIG had promised to protect through credit default swaps. *Id.* The other, later called Maiden Lane II, LLC ("Maiden Lane II" or "MLII,") would purchase a portion of AIG's RMBS portfolio, which makes up most of the RMBS subject to this motion. *Id.*

That purchase was effected through an Asset Purchase Agreement ("APA,") finalized on December 12, 2008. Supp. Fry Decl. Ex. 12.[2] Under the APA, the FRBNY loaned Maiden Lane II $19.8 billion. Maiden Lane II purchased a portfolio of RMBS from AIG in exchange for the $19.8 billion. Maiden Lane II was to sell or collect on the RMBS. Those proceeds would be used to repay the FRBNY's loan. Once the $19.8 billion sum was repaid, AIG would receive the

---

[2]    The Court takes judicial notice of all documents incorporated by reference into AIG's complaint, even if not explicitly mentioned. *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998,) *superseded by statute on other grounds as stated in Abrego Abrego v. Dow Chem. Co.*, 443 F.3d 676, 681–82 (9th Cir. 2006).

first $1 billion of the remaining proceeds of Maiden Lane II.  After both sums were paid by ML II, any residual profits would be split between the FRBNY and AIG, with 5/6 of the recovery going to the Federal Reserve Bank.  Supp. Fry Decl. Ex. 5, at 41.[3]

The APA transferred "RMBS Issues" to Maiden Lane II.  APA § 1.01. "RMBS Issues" are defined as "the securities of a single issue of residential mortgage-backed securities . . . together with all right, title and interest in and to all Related Instruments."  *Id.* § 7.01.  "Related Instruments" are defined as "any participation, pooling, servicing or other agreement, document or instrument" that governs or affects an RMBS Issue.  *Id.*

Almost three years later, AIG filed the instant lawsuit in New York state court, alleging that it was defrauded in purchasing the RMBS at an inflated price. The RMBS at issue here include those sold to Maiden Lane II as well as some that AIG continued to hold past December 2008.  AIG asserts that the documents used to create and market the RMBS "fraudulently misrepresented and concealed the actual credit quality of the mortgages by providing false quantitative data about the loans, thus masking the true credit risk of AIG's investments."  Am. Compl. ("AC") ¶ 3.

The Defendants removed this matter to federal court on the basis of the Edge Act, 12 U.S.C. § 632, and the "related to" bankruptcy jurisdiction statute, 28 U.S.C. § 1334(b).  Judge Jones of the Southern District of New York denied AIG's motion to remand to state court on the basis of the Edge Act, and found that there was jurisdiction under § 1334(b), but did not determine whether to abstain or remand the case based on 28 U.S.C. § 1334(c)(1), because jurisdiction existed

---

[3]    Though not specifically relevant here, the FRBNY was fully repaid for the $19.8 billion loan, and recouped billions of dollars in profits.  *See, e.g.*, Press Release, *New York Fed Sells Remainder of Maiden Lane II LLC Securities; Approximately $2.8 Billion Net Gain Generated for U.S. Public from the Portfolio*, *available at* http://www.newyorkfed.org/newsevents/news/markets/2012/an120228.html.

5

under the Edge Act.  *Am. Int'l Grp., Inc. v. Bank of Am. Corp.* ("*AIG I*,") 820 F.
Supp. 2d 555 (S.D.N.Y. 2011); *Am. Int'l Grp., Inc. v. Bank of Am. Corp.* ("*AIG
II*,") No. 11 Civ. 6212(BSJ), 2011 WL 6778473 (S.D.N.Y. Dec. 20, 2011).  The
Judicial Panel on Multidistrict Litigation transferred all claims involving
Countrywide MBS to this Court as part of the Countrywide Mortgage-Backed
Securities Multidistrict Litigation.  Transfer Order, *In re Countrywide Mortg.-
Backed Secs. Litig.*, 11-ML-2265, slip op. (J.P.M.L. Dec. 21, 2011); Corrected
Copy Transfer Order, *In re Countrywide Mortg.-Backed Secs. Litig.*, 11-ML-2265,
slip op. (J.P.M.L. Jan. 12, 2012).  Claims "relating to non-Countrywide MBS"
were "separated and remanded to the Southern District of New York." *Id.*  The
claims transferred to this Court are "all claims relating to Certificates that
Countrywide issued (including the successor liability claims against Bank of
America with respect to such Certificates)." *Am. Int'l Grp., Inc. v. Countrywide
Fin. Corp.* ("*AIG III*,") 834 F. Supp. 2d 949, 950 (C.D. Cal. 2012)*.  That includes
"claims relating to those Third Party Offerings that contain Countrywide-
originated loans," but not claims "relating to the Bank of America/Merrill
Offerings" that were issued by Bank of America, Merrill Lynch & Co. or their
subsidiaries, even if underwritten by Countrywide Securities Corporation. *Id.*
This Court issued an opinion on timeliness and jurisdiction on May 23, 2012,
dismissing some of the claims before it. *Id.*

    AIG filed an amended complaint on August 29, 2012 (the "Amended
Complaint").  In the Amended Complaint, Plaintiffs allege that the Defendants
made misrepresentations in the legal documents used to create and market the
RMBS ("the Offering Documents").  The Amended Complaint states that the
Offering Documents contained four types of misstatements.  AIG claims the
Defendants deviated from the listed underwriting guidelines and orally provided
assurances regarding the guidelines, AC ¶¶ 117–18, 421, understated the true loan-
to-value ("LTV") and combined loan-to-value ratios ("CLTV") of the mortgaged

houses, *id.* ¶¶ 119–23, included inaccurate owner occupancy information for the houses, *id.* ¶¶ 124–26, and disclosed flawed credit ratings based on false data. *Id.* ¶¶ 127–30. Plaintiffs argue that if the Offering Documents did not include these misrepresentations, they would not have bought the Certificates, avoiding billions of dollars in damage that resulted when the RMBS had higher rates of delinquency and default than represented, and when the secondary market value of the RMBS fell after the fraud was disclosed. *Id.* ¶¶ 423, 425, 427. AIG accuses the Defendants of fraudulent inducement, aiding and abetting fraudulent inducement and negligent misrepresentation, violations of Sections 11, 12(a)(2) and 15 of the federal 1933 Securities Act,[4] and also sue Bank of America Corporation, Bank of America, N.A. and NB Holdings Corporation (collectively, the "Bank of America Defendants") on the basis of *de facto* merger and successor liability.

The Defendants moved to dismiss the Amended Complaint. After submission of briefing and a hearing on January 29, 2013, the Court determined that while Defendants had introduced evidence regarding AIG's standing to bring this lawsuit based on RMBS sold to Maiden Lane II, Plaintiffs had only offered legal arguments. Order re: Discovery as to Standing, Jan. 30, 2013, ECF No. 208. The Court granted both parties the opportunity to take limited depositions and submit evidence that gave "'due consideration to the circumstances surrounding' the execution of the Asset Purchase Agreement [and] 'to the purpose of the parties in making the contract.'" *Id.* (citing *Aron v. Gillman*, 309 N.Y. 157, 163 (1955)). The parties have now submitted deposition testimony, documentary evidence and briefing on the contextual circumstances of the Asset Purchase Agreement.

---

[4] Plaintiffs reassert these federal law claims previously dismissed by this Court with prejudice on timeliness grounds. *See* AC ¶¶ 566–600; *AIG III*, 834 F. Supp. 2d at 951. The repleading of "claims dismissed with prejudice and without leave to amend" is no longer required "in a subsequent amended complaint to preserve them for appeal." *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 928 (9th Cir. 2012). These claims should have been deleted.

Two weeks after this Court's hearing on the standing question, the Second Circuit rejected Judge Jones' determination that the Edge Act provided a basis for subject-matter jurisdiction. *Am. Int'l Grp., Inc. v. Bank of Am. Corp.* ("*AIG Appeal,*") 2013 WL 1689066 (2d Cir. April 19, 2013). The Circuit vacated the lower court's order, but remanded to the district court to determine whether removal was proper on any "alternative ground." *Id.* at *1 n.1. AIG has moved this Court to stay the case before it, pending a ruling from the Southern District of New York on AIG's renewed motion to remand.

If the Court denies the motion to stay, it must resolve the Defendants' motion to dismiss the Amended Complaint. Defendants argue that AIG does not have standing to sue for any RMBS transferred to ML II, more than $7 billion of the claims here, AC ¶ 428, because AIG sold its litigation claims, including tort claims, along with the securities themselves. Separately, Defendants argue that the claims in the Amended Complaint are inadequately pleaded. Defendants also move to dismiss some of the claims on the basis of equitable subrogation and timeliness. Finally, the Bank of America Defendants move to dismiss the *de facto* merger and successor liability claims.

## II. There is no Reason to Stay the Jurisdictional Decision for Resolution by the Southern District of New York

After AIG filed this lawsuit in New York state court, the Defendants removed the matter to federal court on the ground that the lawsuit "ar[ose] out of transactions involving international or foreign banking." Notice of Removal ¶ 18, ECF No. 1 (citing 12 U.S.C. § 632). Defendants also asserted that the action was "related to" bankruptcy proceedings and hence removable to federal court, because certain bankrupt originators and sponsors of the RMBS owe indemnification obligations to the Defendants. *Id.* ¶¶ 45, 24 (citing 28 U.S.C. §§ 1334(b), 1452(a)). Plaintiffs moved to remand the case. Motion to Remand to State Court, ECF No. 22. Judge Jones determined "that federal jurisdiction is proper under § 632," but

1   "decline[d] to address whether jurisdiction is also proper under the 'related to'
2   doctrine."  *AIG I*, 820 F. Supp. 2d at 558 n.1.  A few months later, Judge Jones
3   ruled, at AIG's request, "that there is 'related to' jurisdiction under § 1334(b)."
4   *AIG II*, 2011 WL 6778473, at *5.  AIG also requested that even if jurisdiction
5   existed under § 1334(b), that the court should nonetheless abstain "from hearing
6   [the] particular proceeding" "in the interest of justice, or in the interest of comity
7   with State courts or respect for State law."  28 U.S.C. § 1334(c)(1).  Judge Jones
8   opined "that there are compelling reasons for equitable abstention," but declined to
9   decide the issue, because "the Edge Act also provides a basis for subject matter
10   jurisdiction."  *AIG II*, 2011 WL 6778473, at *5.  She certified the Edge Act issue
11   for interlocutory appeal to the Second Circuit.  *Id.* at **5–6.

12       Weeks after both hearings on the present motion before this Court, the
13   Second Circuit issued its decision on the Edge Act.  The Circuit vacated *AIG I*.
14   *AIG Appeal*, 2013 WL 1689066, at *1.  However, the court "express[ed] no view
15   on the" question of whether the case was properly removable under the "related to"
16   bankruptcy statute.  *Id.* at *1 n.1.[5]

17       AIG now moves to stay these proceedings.  Notice of Motion and Motion to
18   Stay, ECF No. 276.  The Plaintiffs have renewed their motion for abstention or
19   equitable remand before the district court in the Southern District of New York,
20   Pls.' Mem. of Law in Further Supp. of Mot. for Abstention or Equitable Remand,
21   11 Civ. 6212 (LAK), ECF No. 92 (S.D.N.Y.), and requests that this Court stay the
22   matter until the resolution of the renewed motion.

23

24   ───────────────
25   [5]       The Second Circuit seemed to ignore that Judge Jones had in fact decided that the matter
    was "related to" bankruptcy in *AIG II*.  The Second Circuit stated only that "Defendants also
26   justified removal" on that basis, and that the district court "did not decide whether the
    Defendants could also remove the action by reason of its relating to bankruptcy proceedings."
27   *AIG Appeal*, 2013 WL 1689066, at *1 n.1.  The district court *has* already decided that the case
    "related to" bankruptcy under § 1334(b), but has not decided whether to equitably remand or
28   abstain from the case.

1   　　The Court denies the motion to stay.  When the Judicial Panel transferred

2   these claims to this Court, it explicitly mentioned that the Second Circuit's "ruling

3   on that appeal can be carried out by the transferee court."  Corrected Copy Transfer

4   Order at 2 n.2.  This statement is dispositive: this Court, not the Southern District

5   of New York, must resolve any remaining jurisdictional issues raised by the

6   Second Circuit's decision.

7   　　AIG's arguments to the contrary are unconvincing.  They are correct that the

8   current action is pending both in this Court and before Judge Kaplan, which means

9   that Defendants are mistaken when they assert in their Opposition to the Plaintiffs'

10   Application for Expedited Review of the Motion to Stay that "Judge Kaplan has no

11   jurisdiction over the claims that were transferred to this Court."  *See In re Brand-*

12   *Name Prescription Drugs Antitrust Litig.*, 264 F. Supp. 2d 1372, 1379 n.6

13   (J.P.M.L. 2003) ("in instances in which the Panel has separated and remanded only

14   certain claims, the action (though a single entity) is pending simultaneously both in

15   the transferor and transferee districts.").

16   　　AIG is mistaken, though, when they argue that "[b]ecause Judge Kaplan will

17   ultimately be responsible for any trial of the entire litigation, were it to remain in

18   federal court, he therefore must decide the jurisdictional question in the pending

19   remand motion with respect to the entire action."  Reply in Further Supp. of Pls.'

20   Appl. 2, ECF No. 280.  Every case transferred under 28 U.S.C. § 1407 is

21   transferred back to the original court for trial of the litigation, "at or before the

22   conclusion of [the] pretrial proceedings."  *Id.* § 1407(a).  It is the transferee court,

23   not the court with ultimate responsibility for any trial, that decides whether to

24   abstain or equitably remand the case.  *Bondi v. Grant Thornton*, 322 B.R. 44, 47,

25   49 (S.D.N.Y. 2005) (Kaplan, J.), *aff'd in part, vacated in part by Parmalat Capital*

26   *Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572 (2d Cir. 2011) ("the Judicial Panel on

27   Multidistrict Litigation transferred this action here pursuant to Section 1407 of

28   Title 28 . . . even if the motion to remand were construed as a motion to abstain

and remand . . . the Court would deny the motion to abstain."); *In re Enron Corp. Secs., Derivative & "ERISA" Litig.*, 511 F. Supp. 2d 742, 765, 790 (S.D. Tex. 2005) ("the Court denies the motion to abstain . . . In the instant case, however, which was transferred under § 1407 . . . ").  The decision by the JPML to transfer these claims to a court for an MDL proceeding means that any "similar or identical" jurisdictional issues should be resolved by "[t]he MDL court [that] has already decided the issues raised in Plaintiffs' remand motion in virtually identical circumstances."  *N.M. State Inv. Council v. Alexander*, 317 B.R. 440, 446 (D.N.M. 2004).

The decision whether to abstain or equitably remand the case has repeatedly been resolved by this Court in similar cases brought by investors in Countrywide RMBS claiming there were misstatements in the offering documents for their securities.  *See, e.g.*, *Fed. Deposit Ins. Corp. as Receiver for Franklin Bank, S.S.B. v. Countrywide Secs. Corp.*, 12-CV-3279, slip op. (C.D. Cal. Aug. 3, 2012); *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 447 B.R. 302 (C.D. Cal. 2010).  "Having one court decide the complex jurisdictional issues raised in the[se] actions obviously saves judicial resources and reduces the risk of inconsistent rulings."  *N.M. State Inv. Council*, 317 B.R. at 446.

Though the Court intends to avoid decisions inconsistent with Judge Kaplan's rulings, it has an obligation to determine each issue of federal law assigned to it.  *Accord Newton v. Thomason*, 22 F.3d 1455, 1460 (9th Cir. 1994) ("when reviewing federal claims, a transferee court in this circuit is bound only by our circuit's precedent," in the context of transfers under 28 U.S.C. § 1404, which is "identical" to § 1407).  The Court must determine the issue of abstention or equitable remand for itself, and will not stay the matter to await rulings by another court.  This is particularly true because contrary to AIG's implication, the court in *AIG II* did not rule in favor of equitable remand, but merely opined that it believed "there are compelling reasons for equitable abstention," though "it need not decide

whether to equitably abstain."  2011 WL 6778473, at *5.  These compelling reasons may be less so when other cases involving Countrywide RMBS investors proceed in federal court.  *Stichting*, 447 B.R. at 311–12 (one factor in determining equitable remand is the "presence of related proceeding[s]" in the jurisdiction).

AIG has not renewed its move for abstention or equitable remand in this Court, so there is no need to consider those issues.  The Court can proceed with its decision on the motion, because there is federal jurisdiction pursuant to *AIG II*, 2011 WL 6778473 at *5 ("In sum, because AIG's civil action against BOA could have some 'conceivable effect' on [certain] bankruptcy proceedings, the Court finds that there is 'related to' jurisdiction under § 1334(b).").

## III.    *For Purposes of this Motion, AIG has Standing to Bring All Filed Claims*

Before resolving the motion to dismiss, the Court must determine whether the Plaintiffs have standing to bring all of the asserted claims.  Defendants challenge Plaintiffs' standing to sue for any RMBS transferred to Maiden Lane II, a claim amounting to more than $7.3 billion.  AC ¶ 428.  The APA transferred both the RMBS securities and "all Related Instruments."  APA §§ 1.01, 7.01.  As stated, "Related Instruments" are "any participation, pooling, servicing or other agreement, document or instrument pursuant to which an RMBS Issue has been created, pooled, securitized, issued, sold, serviced, enhanced, insured or guaranteed and each other agreement, document, indenture and instrument that governs or affects the terms of, or secures the obligations represented by, such RMBS Issue or of which the holders of such RMBS Issue are the beneficiaries."  *Id.* § 7.01.  The Defendants argue that fraud claims based on alleged misstatements in the Offering Documents are based upon the "Related Instruments" "pursuant to which" the securities were created, pooled, securitized, issued or sold.  Thus, AIG transferred any fraud claims arising from the documents when they transferred the instruments to Maiden Lane II.

On December 21, 2012, Defendants submitted information from a source with contemporaneous knowledge concerning the contracting parties' intentions. Defendants attached a declaration from James M. Mahoney, a Vice President at the FRBNY who had "principal day-to-day responsibility at the FRBNY for issues relating to AIG's securities lending portfolios" between September and December 2008.  Decl. of Richard St. John in Supp. of Mot. to Dismiss Ex. 2 ("Mahoney Decl.,") ECF No. 191.  Mr. Mahoney declared that "In entering into the APA, the FRBNY and ML II understood that the APA had the effect of transferring to ML II not only the securities listed in 'Schedule A' to the APA, but also all 'right, title, and interest' in such securities and Related Instruments (as defined in the APA). The FRBNY and ML II intended for ML II to receive all transferrable and assignable benefits associated with the securities and Related Instruments, including litigation claims associated with those securities or their acquisition by AIG."  *Id.* ¶ 2.

AIG had previously argued in its Opposition Brief that they had not intended to transfer any tort claims to Maiden Lane II, and that the APA did not do so under governing New York state law.  Mem. of P. & A. in Opp. to Defs.' Mot. to Dismiss ("AIG Opp.,") ECF No. 177.  AIG argued that the APA effected the sale of the securities themselves, along with "any contractual rights [AIG] had in documents appurtenant to those securities."  AIG Opp. 11.  These contractual rights entitle the holder of an RMBS, upon certain conditions, to petition the mortgage originator to "repurchase or substitute" defective mortgages that do not conform to the representations and warranties in the pooling and servicing agreement.  *See, e.g.*, Request for Jud. Notice re: Mot. to Dismiss ("RJN") Ex. 13, at S-15 (Prospectus Supplement for CWALT 2005-10CB,) Aug. 8, 2012, ECF No. 153; *id.* Ex. 14, at S-17 (Prospectus Supplement for CWALT 2005-1CB).

As of January 29, 2013, Mr. Mahoney's Declaration was the only evidence submitted by the parties from an individual who participated in the negotiation and

completion of the APA.  The Court ordered limited discovery with respect to the
negotiations and intentions of AIG and Maiden Lane II.  The Plaintiffs and
Defendants have now completed that discovery, deposing two witnesses each, and
submitting a number of documents.

There are several legal principles applicable to interpreting the Asset

The Court treats the Defendants' assertion that AIG lacks standing as a
motion to dismiss for lack of jurisdiction under Rule 12(b)(1).  *Kingman Reef Atoll
Invs., L.L.C. v. United States*, 541 F.3d 1189, 1195 (9th Cir. 2008).  In assessing
such a motion, a court must evaluate the merits of the jurisdictional claims.  *Id.*
The plaintiff "has the burden of proving jurisdiction in order to survive the
motion."  *Id.* at 1197 (citation omitted).

A.    *Legal Standards for the Assignment of Tort Claims*

There are several legal principles applicable to interpreting the Asset
Purchase Agreement under New York law, which governs the contract.  APA §
6.10.  A court interpreting a contract must follow the language of the contract if the
text is unambiguous, and may not look to extrinsic evidence.  *Teitelbaum
Holdings, Ltd. v. Gold*, 48 N.Y.2d 51, 56 (1979).  However, "in deciding whether
an agreement is ambiguous courts should examine the entire contract and consider
the relation of the parties and the circumstances under which it was executed."
*Kass v. Kass*, 91 N.Y.2d 554, 566 (1998) (further holding that "[p]articular words
should be considered, not as if isolated from the context, but in light of the
obligation as a whole and the intention of the parties as manifested thereby.")
(citation omitted).

A reviewing court should only look to extrinsic evidence of the parties'
intentions if a contractual term is ambiguous.  The court should not consider the
"secret or subjective" intent of one of the parties when the contract is
unambiguous.  *Klos v. Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997); *Awards.com,
LLC v. Kinko's, Inc.*, 42 A.D.3d 178, 187 (N.Y. 1st Dep't 2007) (one party's
"subjective intention or willingness to perform its obligations is irrelevant").  The

same is true when a contract is ambiguous: "[o]nly the parties' objective manifestations of intent are considered." *Nycal Corp. v. Inoco PLC*, 988 F. Supp. 296, 301–02 (S.D.N.Y. 1997) (New York law has an "exclusive reliance upon evidence of objective manifestations of intent," and "unexpressed subjective views have no proper bearing"); *Sally v. Sally*, 225 A.D.2d 816, 818 (N.Y. 3rd Dep't 1996) (the court finds that an ambiguity exists in the contract, but ignores the parties' "own interpretations of the stipulation, which we view as nothing more than expressions of uncommunicated subjective intent" (citations omitted)).

Courts should "not imply a term where the circumstances surrounding the formation of the contract indicate that the parties, when the contract was made, must have foreseen the contingency at issue and the agreement can be enforced according to its terms." *Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195, 199 (2001). This prohibition applies only when the contingency "was clearly foreseeable." *Id.*

Finally, under long-standing New York law, the sale of an asset and the "assignment of the right to assert contract claims does not automatically entail the right to assert tort claims arising from that contract." *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 151 (2d Cir. 1995) (discussing *Fox v. Hirschfeld*, 157 A.D. 364 (N.Y. 1st Dep't 1913)). The "assignment of fraud claims must be explicit." *Id.* This explicit assignment need not take a "specific boilerplate" form. *Id.* Instead, any "act or words" sufficient to "show an intention of transferring the chose in action to the assignee" will "transfer all of [the assignee's] rescission and fraud claims." *Id.* at 151–52 (citation omitted).

Thus, if a contract is ambiguous as to the transfer of fraud claims, the Court must then look to extrinsic evidence of the parties' objective intentions. The contract does not include such a transfer if the assignee did not objectively do or say anything demonstrating an intent to transfer. The Court must not imply a

1  transfer of fraud claims when the parties have not done so, and the existence of

2  fraud claims was foreseeable.  Because the burden for establishing standing is on

3  the Plaintiffs, AIG must demonstrate that the APA is ambiguous as to the transfer

4  of fraud claims, and that during negotiations, the parties engaged in no objective

5  acts in order to effect the transfer.

6    B.    *The APA is Ambiguous as to the Transfer of Tort Claims, and the Evidence*

7    *Submitted Shows that the Parties did not Objectively Intend to Transfer the Claims*

8        The APA transferred both the RMBS securities and "all Related

9  Instruments" to Maiden Lane II.  The Defendants assert that the term "Related

10  Instruments" included any litigation claims arising from the documents that created

11  or marketed the securities.  AIG argues that the term was included to clarify that

12  the FRBNY would have full control over the disposition of the RMBS, including

13  the contractual rights arising from the Offering Documents.

14        "The mere fact that the parties disagree on the proper interpretation of the

15  contract does not render the contractual language ambiguous."  *Vetromile v. JPI*

16  *Partners, LLC*, 706 F. Supp. 2d 442, 447–48 (S.D.N.Y. 2010).  Each interpretation

17  must be "reasonable," by reference to the contract and its context alone.  *Seiden*

18  *Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992); *Kass*, 91

19  N.Y.2d at 556.

20        Both interpretations are reasonable.  Under New York law, an assignment

21  that transfers all rights and interests in a "participation agreement" transfers any

22  contractual claims.  *Banque Arabe*, 57 F.3d at 151.  When that agreement itself

23  transfers the assignor's participation in a loan, the assignment must transfer

24  "something more" than the contractual claims.  *Id.* at 152.  When the assignment

25  also includes the rights and interest in the transaction, the transfer is broader than

26  the mere interest in the contract.  *Id.*  These broader interests must include tort

27  claims deriving from the participation agreement.  *Id.*  Defendants argue that

28  "Related Instruments" must be "something more" than the RMBS themselves.

On the other hand, the context of this transaction was not an open-market sale under ordinary circumstances.  The parties were not necessarily assured that all contractual rights would transfer along with the securities themselves.  This is particularly true given the complex and unique rights of RMBS certificate holders, which include the right to distributions, voting rights and the right to direct the trustee to assert claims to repurchase defective loans, under certain conditions. These rights were only described in the Related Instruments that created the Certificates.  The language that transferred the "Related Instruments" was critical to confirm that Maiden Lane II held all enforceable contractual rights as holder of the securities, not just the right to cash flows alone.[6]

Given that the language and context of the APA support two reasonable interpretations of the term "Related Instruments," one where AIG transferred all of its litigation claims including tort claims, and one where it transferred only its complex contractual claims, the Court finds the term ambiguous.  As a result, it must turn to the extrinsic evidence that the parties submitted.

The parties submit the depositions of four individuals in response to this Court's Order concerning the "circumstances surrounding the execution of the Asset Purchase Agreement."  Those individuals are Steven J. Manzari, a current employee of the FRBNY who acted as senior vice president during the financial crisis, Manzari Depo. 8:7–11:14, James M. Mahoney, a current employee of the FRBNY who acted as vice president in the "AIG Monitoring Team" during the financial crisis, Supp. Fry Decl. Ex. 2, at 10:11–13:10, March 18, 2013 (deposition

---

[6]     The Court finds that AIG's interpretation does not render "Related Instruments" surplusage, because the term was necessary to ensure that all contractual rights transferred to Maiden Lane II.  Even if the term might be surplusage, Judge Sack has counseled that courts should apply the rule against surplusage "with a grain or two of salt" when interpreting commercial agreements where words have "similar or even overlapping meaning," because the parties intend that the "field of meaning . . . is covered, not to convey a separate piece of information."  *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 407 n.4 (2d Cir. 2009) (Sack, J., concurring).

transcript of James M. Mahoney, referred to as "Mahoney Depo."), Ronald E. Holmes, an attorney at AIG during the financial crisis, *Id.* Ex. 3, at 12:11–19, March 19, 2013 (deposition transcript of Ronald E. Holmes, referred to as "Holmes Depo.") and Christopher Swift, the CFO of the Life and Retirement Services Business Unit of AIG during the negotiations of the APA. *Id.* Ex. 4, at 10:3–5, March 21, 2013 (deposition transcript of Christopher Swift, referred to as "Swift Depo."). Swift called himself "the principal business person quarterback to find" and "negotiat[e]" the Maiden Lane II transaction. Swift Depo. 35:19–21, 74:18–20. Holmes was "lead internal counsel representing AIG" on the Maiden Lane II transaction, working with AIG counsel and AIG business people as well as with the FRBNY and its advisers. Holmes Depo. 27:18–28:8. Mahoney, as stated earlier, had "principal day-to-day responsibility at the FRBNY for issues relating to AIG's securities lending portfolios" between September and December 2008. Mahoney Decl. ¶ 1. Manzari was the "number two" to the team leader of the "AIG relationship team" beginning in September 2008 through the completion of the APA. Manzari Depo. 15:25–19:5.

The deposition testimony shows that none of the deposed negotiators at AIG intended to transfer litigation claims, and none of the FRBNY negotiators mentioned that the APA did or should have effected such a transfer. For example, James Mahoney did not understand the "Related Instruments" language to refer to the transfer of litigation claims. Mahoney Depo. 51:21–52:2, 160:5–9 ("In 2008, I wouldn't necessarily have tied . . . the language in this definition with the transfer of those types of rights, litigation or tort rights.") Mahoney testified that he believed the transfer of litigation rights "was part of the transaction . . . transferring those rights to the Maiden Lane II vehicle." *Id.* 125:16–22.[7] However, Mr.

---

[7] There is no basis for the harsh implication of AIG's counsel that Mr. Mahoney retreated from his earlier declaration. Mahoney's deposition is clear – he *personally* understood the APA to transfer all claims, including litigation claims, that AIG might have held, but as a business

Mahoney did not discuss this belief within the FRBNY, *id.* 50:22–51:3, 82:11–17, with the FRBNY's outside advisers, *id.* 51:4–8, and most importantly, with anyone from AIG.  *Id.* 52:12–53:3, 80:18–23, 82:18–21, 85:7–86:2 (Mahoney is also unaware of any FRBNY representative who discussed the issue with AIG).

All of the witnesses agree on this key point.  Each witness stated that AIG and the FRBNY did not discuss the transfer of tort or litigation claims during negotiations of the APA.  Christopher Swift stated that AIG was engaged in a collaborative process with the FRBNY and "we talked about everything that was significant, we had a transparent discussion, they had their interest, we had ours. But this [the transfer of fraud claims to Maiden Lane II] was never, ever discussed."  Swift Depo. 127:17–21, 84:20–23 ("Q. Did anyone at the Fed say or suggest that the Fed or ML II wanted AIG's fraud claims.  A. No.").  Ronald E. Holmes answered similarly: "Q. Do you recall any discussion with anyone about whether AIG would be transferring legal claims that can be asserted in a lawsuit to Maiden Lane II as part of the transaction . . . A. To the extent you're asking me – and I think you are – about rights associated with AIG's losses at the time AIG owned the securities, and that were – arose as a result of communications relating to the securities in connection with AIG buying them, those claims, those second set of claims, we never, ever discussed transferring those."  Holmes Depo. 58:23–59:24, 69:23–24 ("there was no discussion of those [statutory or tort] claims.").  Steven Manzari did not "recall any conversations" in regards to "any discussion about AIG giving up claims that it might have to go after the banks that had sold it the RMBS to try to recover those losses."  Manzari Depo. 100:18–101:2, 122:6–18 ("I just don't recall this topic [AIG giving up legal claims] coming up.")

---

negotiator he did not understand the exact legal mechanism for the transfer.  He did not discuss his personal understanding with FRBNY employees or AIG negotiators.  Mahoney's deposition is consistent with his declaration.  His personal belief, unless communicated to AIG, is simply irrelevant as a matter of law under New York contract law.

No witness testified that the term "Related Instruments" was intended to transfer litigation claims.  Both AIG witnesses understood that term to "create[] additional clarity" that the APA included "ancillary rights in the related instruments."  Holmes Depo. 107:12–19; Swift Depo. 63:11–15 ("As we were negotiating, you know, the deal, I had the understanding that we were transferring the security right and interest in all the underlying mortgages that were part of an RMBS package."), 64:2–7 ("I believe what we were transferring was, you know, the securities and all the rights, stuff that back-up the mortgages that make up the RMBS security.").  Mr. Manzari testified that he was "not familiar" with the "Related Instruments" term.  Manzari Depo. 232:6–14.[8]

All of the documentary evidence submitted by both parties confirms Mr. Mahoney's conclusion in his deposition that "there is no reference on this page" or in "any document that [he had] seen anywhere" to Maiden Lane II or the FRBNY obtaining AIG's right to pursue fraud claims.  Mahoney Depo. 200:4–19, 248:18–249:22 (Mahoney has never seen a public or non-public non-privileged statement by the FRBNY that shows "it believes that it acquired from AIG, AIG's fraud or tort claims with respect to the residential mortgage-backed securities that were sold into ML II.").  Neither party offers a single piece of documentary evidence where AIG or the FRBNY discuss or even reference fraud claims.

Defendants carefully parse certain statements made by Mahoney and Manzari regarding conversations within the FRBNY itself.  Manzari Depo. 123:2–124:6 ("I recall a conversation with BlackRock [one of the FRBNY's outside advisers] specifically about their statement where they said that there was not – where the likelihood of loss was minimal . . . We were quite concerned that even

---

[8]   The Defendants accuse AIG of "pointedly" choosing not to depose any FRBNY lawyers, and suggest that Mr. Manzari was an inappropriate choice for AIG.  Defs.' Supp. Mem. in Supp. of Mot. 14, ECF No. 273.  Once discovery commences, Defendants are free to depose an FRBNY attorney if they desire, and renew their motion to dismiss on standing grounds.

though BlackRock, on an economic basis or a financial basis, modelled only minimal – you know, some, you know, level of loss where we would have been protected, there were factors that weren't going to be considered in there."); Mahoney Depo. 63:8–12 ("So, we wanted the upside – the claim – the litigation claims to be part of the Maiden Lane vehicle as a very defensive mechanism in case the cash flows were insufficient to pay back our loan."), 64:17–65:9 ("our advisers . . . treated these instruments as other like instruments in the market at the time.  They looked at the underlying value of the property, the loan-to-value ratios, the traditional collateral valuations, as well as the credit quality of the borrowers in this situation.  So, if there was something that made these securities different . . . one of the reasons that might happen is there was something untoward that occurred in the creation of these instruments.").  These statements suggest that the FRBNY intended the transfer of every conceivable right associated with the RMBS, because the Federal Reserve Bank of New York was worried that the securities themselves were not worth enough money to pay back the $19.8 billion loan given to Maiden Lane II.  However, neither Mahoney nor Manzari testified that they discussed these internal conversations or concerns with AIG.  Under New York law, these unexpressed intentions must be ignored in interpreting the APA. *Nycal*, 988 F. Supp. at 301–02.

Defendants next argue that AIG's interpretation is inconsistent with the circumstances and purposes of the parties in drafting and signing the APA.  The Defendants cite to two purposes of the FRBNY in creating Maiden Lane II.  First, the FRBNY sought to "derisk AIG," and infuse AIG with cash to maintain AIG as a viable entity going forward.  Mahoney Depo. 63:23–25, 283:22–284:7; Manzari Depo. 161:24–162:4;  Supp. Fry Decl. Ex. 11 ("These new measures [including Maiden Lane II] establish a more durable capital structure, resolve liquidity issues, facilitate AIG's execution of its plan to sell certain of its businesses in an orderly manner, promote market stability, and protect the interests of the U.S. government

and taxpayers.").  This purpose is entirely consistent with AIG retaining fraud claims based on the RMBS.

The other purpose[9] was to ensure that the loan would be repaid and that taxpayers would not suffer a loss for providing support to AIG.  Manzari Depo. 174:11–15; Mahoney Depo. 119:22–120:7.  Both Mahoney and Manzari were concerned that there may be something "untoward" in the creation of the RMBS. Mahoney Depo. 64:3–65:9; Manzari Depo. 123:2–124:6.  Mahoney wanted to ensure that the FRBNY would be repaid, and "made it very clear that [the Fed] was a lender.  It was intent on having its loan repaid . . . under various economic conditions and scenarios."  Swift Depo. 82:7–12.  Because FRBNY was so set on repayment, Manzari did not question the statement that "Maiden Lane's intent was to receive all transferrable and assignable benefits associated with those securities or their acquisition by AIG."  Manzari Depo. 231:4–232:2.  Defendants argue the purpose of FRBNY's extension of the loan required that Maiden Lane II acquire litigation rights to protect the taxpayer investment against all possible downside risks.

This argument is attractive.  However, the Federal Reserve Bank of New York did not explicitly discuss fraud claims with their counterparts at AIG.  Under New York law, that failure is fatal to the assignment of tort claims.  Additionally, neither the FRBNY or its outside advisers modeled or assessed the value of the tort claims, and all still concluded that the FRBNY was secured based solely on the

---

[9]       There was at least one other purpose to Maiden Lane II besides ensuring a "more durable capital structure" and resolving "liquidity issues" in AIG.  Supp. Fry Decl. Ex. 11.  Maiden Lane II was designed to "crystallize" an $18 billion loss for AIG in 2008.  Mahoney Depo. 68:13-69:15.  That $18 billion loss was another valuable benefit offered by the FRBNY.  That loss could be used as a capital loss at the time, "so that when AIG had future capital gains, it would be able to offset that so that no cash taxes would be due in the future . . . I thought of the program as generating about $20 billion worth of security losses, credit losses.  So a round number [for how large the asset was] would be 35 percent of 20 billion."  Swift Depo.  44:4-45:17.  This tax purpose does not seem to support either parties' interpretation of the APA, but was a critical consideration in negotiations, as it was approximately another $6 billion asset for AIG.

RMBS and the contractual rights.  Mahoney Depo. 79:11–14 ("The estimate – the price estimates were based solely on the cash flows generated by the securities in – were purchased into the vehicle"), 80:13–15 ("there was no premium added on to the prices above and beyond the estimated cash flows discounted back [from the price of the RMBS themselves]"), 71:6–14 ("Q. And is it true, sir, that all of those outside advisers, after evaluating the collateral, their conclusions were that the New York Fed was unlikely to take any losses on the loan even in severe stress scenarios . . . A. That is the conclusion that our advisers arrive at, communicated to us, and which we understood."); Manzari Depo. 67:10–20, 239:7–9 ("The – yes, we, we believed that we were secured to our satis – I believe we were secured to our satisfaction."); Decl. of James R. Asperger in Supp. of Pls.' Mem. Ex. J, at 0000308 (discussion document from BlackRock, the FRBNY's outside advisor about Maiden Lane II dated October 8, 2008) ("Very low likelihood of failing to repay senior debt[], even under extremely severe stress scenarios," and "Significant upside for FRB-NY (e.g., 14% IRR [internal rate of return] in base case)"); *Id.* Ex. K, at 0002308 (internal FRBNY document entitled "RMBS Solution Discussion Document" dated October 25, 2008) ("Results in very low likelihood of failing to repay senior debt[], even under severe stress scenarios," and "Maintains significant upside for FRB-NY (e.g., 13.8% IRR in base case)"). The FRBNY sought assurance that they would be repaid, and was "secured to our satisfaction," in Mr. Manzari's words, even without the fraud claims.

AIG has met its burden to show that they own these claims at this stage of the litigation, and the Court rejects the motion to dismiss on jurisdictional grounds. The deposition and documentary evidence all demonstrate that AIG and the FRBNY did not discuss the transfer of tort claims to Maiden Lane II.  To the extent that the Federal Reserve Bank of New York intended for Maiden Lane II to acquire these claims, its intentions were not expressed to AIG.  If the FRBNY did not expressly indicate to AIG their intent that the claims be transferred under the

"Related Instruments" language, the Court cannot rule in their favor on this issue, because to do so would imply a term which does not appear to be contracted for. *Reiss*, 97 N.Y.2d at 199.  Fraud claims must have been foreseeable to the parties in 2008, even though they seem to have ignored them.  On this record, there is no mutual expression of any intent to transfer the fraud claims, and therefore the Court cannot hold that the fraud claims were transferred to Maiden Lane II.  *See Phx. Light SF Ltd. v. Ace Secs. Corp.*, 2013 N.Y. Slip Op. 50653(U), 2013 WL 1788007, at *3 (N.Y. Supr. Ct. Apr. 24, 2013); *Argyle Capital Mgmt. Corp. v. Lowenthal*, 261 A.D.2d 282, 283 (1st Dep't 1999) (claims not transferred where "there is no indication in the assignment that the transfer of any claim, much less one for fraud, was contemplated by the parties."); *OneWest Bank, FSB v. Joam LLC*, 2011 WL 6967635, at **4–5 (E.D.N.Y July 26, 2011) ("the clear intent of the [contractual language] is to transfer only payments on the note itself, and is limited to that document . . . the law of New York[] requires an affirmative showing of intent to transfer ancillary claims.").

At this point, AIG has provided sufficient information to deny Defendants' motion to dismiss on the basis of Rule 12(b)(1).  However, jurisdictional issues can be raised at any point in an ongoing case.  *See, e.g.*, *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 278 (1977).  The Defendants are free to continue discovery on the APA, and free to move for summary judgment or seek a ruling at trial that AIG does not own these tort claims.  *Accord Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 819 F. Supp. 1282, 1289 (S.D.N.Y. 1993) ("Given this ambiguity on the face of the Assignment, it is appropriate for the Court to receive extrinsic evidence or oral testimony concerning the intention of those who were parties to the Assignment as to whether it was their intent to transfer [the] tort claims. . .").  AIG has met its burden on this motion, which is denied.

24

As this matter proceeds, though, it is important that the parties recognize the linkage between the fraud claims, both federal statutory and common law, and the contractual "putback" claims.  The documents that AIG relied upon in the purchase of the securities are the same documents that list the contractual obligations owed the holders of the RMBS.  When a loan in an RMBS does not conform to the standards given in the documents, the holders have the right to petition for its substitution with a conforming loan, based on the breach of contract.  The holders can also claim that they purchased the security based on false information in the prospectus supplement, that the revelation of the truth caused a decline in the value of the security, and then seek fraud remedies based on securities law.  If the non-conforming loan is replaced under contract law, arguably the investor no longer has a fraud claim, because the RMBS conforms with the offering documents, removing any claimed investor damages.  In New York, "a party seeking to bring a claim of fraud, in addition to a claim of breach of contract, may do so only if it can: (1) demonstrate a legal duty separate from the duty to perform under the contract; (2) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (3) assert special damages that are caused by the misrepresentation and unrecoverable as contract damages."  *MacQuesten Gen. Contr., Inc. v. HCE, Inc.*, 191 F. Supp. 2d 407, 410 (S.D.N.Y. 2002); *see also McKernin v. Fanny Farmer Candy Shops, Inc.*, 176 A.D.2d 233, 234 (N.Y. 2d Dep't 1991) (where a fraud claim "is premised upon an alleged breach of contractual duties and the supporting allegations do not concern representations which are collateral or extraneous to the terms of the parties' agreement, a cause of action sounding in fraud does not lie").

In this case, on December 13, 2008, Maiden Lane II owned an RMBS portfolio that was valued at far less than AIG had paid for it.  The portfolio had a lower value for two main reasons.  First, the entire market for RMBS had collapsed based upon the illiquidity of these complex securities.  Second, some of the

mortgage loans in the RMBS pools did not conform to the description in the Offering Documents. The value of the noncomformance equaled the fraud damages that AIG had suffered. But both AIG and Maiden Lane II had a legal ground to recover those damages. As holder of the RMBS and supporting documentation, Maiden Lane II could bring a putback claim that would require Defendants to replace any defective loans with conforming loans. If Defendants replaced all defective loans on December 13, 2008, then the RMBS would conform with the Offering Documents. Theoretically, AIG would no longer be able to bring its massive fraud claim, because the Defendants would have rectified any misstatements about the house or the borrowers.

The Defendants have not moved to dismiss the fraud claims on this ground, but the parties must be aware during discovery that any recovery by Maiden Lane II on contractual claims for mortgages that were defective before December 12, 2008[10] could reduce the available recovery by AIG on its fraud claims, because the two theoretically seek the same damages.[11]

## IV.   Legal Standards for the Motion to Dismiss

The Court now turns to Defendants' motion to dismiss the Amended Complaint. For purposes of this motion, New York substantive and choice-of-law rules apply to all state law legal issues, because the case was transferred from New

---

[10]       This discussion of the linkage between contractual and securities fraud claims does not answer many questions regarding the timing of the non-conforming loans. Contractual claims for loans that became non-conforming only after the APA was signed cannot overlap with AIG's fraud claims. There could also conceivably be loans that were non-conforming in December 2008 that conformed by the time Maiden Lane II brought its contractual claims.

[11]       The concern that AIG may be doubly enriched on the same claim is still evident here, because AIG receives 1/6 of the residual value of Maiden Lane II, which was enriched by the contractual rights transferred in the APA. By law, AIG cannot recover both fraud damages and 16% of contractual damages for the same injuries. *See, e.g.*, *Ostano Commerzanstalt v. Telewide Sys., Inc.*, 880 F.2d 642, 649 (2d Cir. 1989) ("plaintiffs cannot recover both benefit-of-the-bargain damages for breach of contract and warranty *and* out-of-pocket expenses for fraud. Such a double recovery would put them in a better position than they would have been in had the contract been satisfactorily performed.") (emphasis in original).

York.  *In re Nucorp Energy Secs. Litig.*, 772 F.2d 1486, 1491–92 (9th Cir. 1985).  The entire Amended Complaint must comply with the heightened pleading standard of Rule 9(b)[12] of the Federal Rules of Civil Procedure.   *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1141 (C.D. Cal. 2003) ("It is well-established in the Ninth Circuit that both claims for fraud and negligent misrepresentation must meet Rule 9(b)'s particularity requirements.").  Rule 9(b) requires the Plaintiffs to allege particularly the circumstances of Defendants' fraud.  *Cafasso v. Gen. Dynamics C4 Sys, Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011).

## V.    *AIG Adequately Pleads that Defendants are Liable for Fraudulent Inducement*

The elements of a claim for fraudulent inducement are "the misrepresentation of a material fact, which was known by the defendant to be false and intended to be relied on when made, and that there was justifiable reliance and resulting injury."  *Ventur Grp., LLC v. Finnery*, 68 A.D.3d 638, 639 (N.Y. 1st Dep't 2009).  This Court has repeatedly denied motions to dismiss complaints alleging that Countrywide committed fraud against RMBS investors through misstatements in the offering documents.  This motion and complaint are no different.

### A.    *The Complaint Adequately Alleges that the Offering Documents Contained Misstatements, but not Regarding Owner-Occupancy*

The Complaint alleges that the Offering Documents contain four types of false statements.  AIG complains that an automated valuation model ("AVM") demonstrates that the Offering Documents misrepresented the LTV and CLTV ratios, which were "material to AIG's investment because higher ratios correlate with a higher risk of default."  AC ¶¶ 135–156.  This is a plausible allegation that

---

[12]     The federal claims that would be subject to Rule 8(a) are time-barred, *see supra*, and will not be considered by the Court.  *AIG III*, 834 F. Supp. 2d at 953.

1   the Offering Documents contained misstatements, because the allegations in the

2   Complaint must be accepted as true.  *Fed. Hous. Fin. Agency v. Countrywide Fin.*

3   *Corp.* ("*FHFA*,") No. 2:12-CV-1059, 2013 WL 1189311, at **5–6 (C.D. Cal. Mar.

4   15, 2013).  The Court must accept that the AVM reflects reality, and the model

5   reveals that the LTV and CLTV ratios disclosed in the Offering Documents were

6   misstated.  *Id.*  The AVM results demonstrate that the Offering Documents

7   misstated the ratios, regardless of the margin of error used in the model.  *Id.* at *7;

8   *Bank Hapoalim B.M. v. Countrywide Fin. Corp.*, No. 2:12-CV-4316, 2012 WL

9   6814194, at **5–7 (C.D. Cal. Dec. 21, 2012).  Defendants attempt to show

10  variation between the actual performance data and the AVM results, but that fact is

11  irrelevant to this motion, because the Amended Complaint alleges that the Offering

12  Documents contained misstatements regardless of the magnitude of the alleged

13  fraud.[13]

14      AIG also plausibly alleges that the underwriting guidelines stated in the

15  Offering Documents were false.  AC ¶¶ 199–385.  The Amended Complaint

16  describes a company-wide culture of abandonment of underwriting standards and

17  wholesale use of "exceptions" to the normal standards.  This raises an inference,

18  however strong, that the loans in AIG's RMBS deviated from the underwriting

19  standards.  *See FHFA*, 2013 WL 1189311, at *8; *Me. State Ret. Sys. v.*

20  *Countrywide Fin. Corp.*, No. 2:10-CV-302, 2011 WL 4389689, at *17 (C.D. Cal.

21  May 5, 2011).  Also, the mere fact that AIG alleges widespread misconduct among

22  many different originators does not inoculate any individual originator from suit.

23  *Id.*

24      AIG claims that the appraisals and credit ratings in the Offering Documents

25  were false.  Statements of opinion are actionable when the "statement was both

26

27

28

---

[13]    Defendants also argue that the AVM results for AIG-originated loans undermine AIG's case for fraud, but this fact is legally irrelevant.

1   objectively false and disbelieved by the defendant at the time it was expressed."

2   *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011).  AIG alleges that the

3   appraisals were objectively false, based on the AVM data.  The credit ratings are

4   objectively false because they were based upon the allegedly false information

5   Defendants provided to the credit rating agencies who constructed the ratings.  AC

6   ¶¶ 184–198.

7        AIG alleges that "neither Defendants nor the appraisers themselves

8   genuinely believed the appraisal values."  *Id.* ¶¶ 122, 273–293.  The Defendants

9   did not believe the information that they provided to the rating agencies, AC ¶191,

10   and hence could not believe that the credit ratings were accurate when they

11   repeated them.  *FHFA*, 2013 WL 1189311, at **10–11; *Plumbers' Union Local*

12   *No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 775 (1st

13   Cir. 2011) ("An opinion may still be misleading if it does not represent the actual

14   belief of the person expressing the opinion, lacks any basis or knowingly omits

15   undisclosed facts tending seriously to undermine the accuracy of the statement.

16   Liability may on this theory also extend to one who accurately described the

17   opinion." (citations omitted)); *Assured Guar. Mun. Corp. v UBS Real Estate Sec.,*

18   *Inc.*, 2012 WL 3525613, at *5 (allowing a claim for breach of contract to proceed

19   when plaintiff "asserts that [defendant] procured the false ratings by its provision

20   of misleading information.").

21        The Amended Complaint cannot allege that the owner-occupancy data in the

22   Offering Documents was misrepresented by the Defendants when Defendants

23   disclosed that the information was "[b]ased upon representations of the related

24   borrowers at the time of origination."  *See, e.g.*, RJN Ex. 13, at S-26; Ex. 71, at S-

25   35.  Defendants merely "accurately repeated information about occupancy

26   provided by borrowers."  *FHFA*, 2013 WL 1189311, at *11 (citations omitted).

27   The accurate repeating of information, especially when Plaintiffs do not allege that

28   Defendants "passed on information that they knew was false," cannot amount to

1   fraudulent inducement.  *Id.*  However, some of the prospectus supplements do not

2   include the disclaimer.  AC ¶ 169 ("*In some* prospectus supplements Defendants

3   included a footnote which stated that the owner-occupancy data was provided by

4   the borrowers." (emphasis added)).  For those supplements, AIG has alleged that

5   the owner-occupancy data was false.  *Id.* ¶¶ 157–170; *Capital Ventures Int'l v.*

6   *UBS Secs.* LLC, No. 11–11937–DJC, 2012 WL 4469101, at **7–8 (D. Mass. Sept.

7   28, 2012).  Owner-occupancy data is material for RMBS investors "because

8   borrowers are less likely to default on mortgages for the homes they live in than on

9   investment or vacation properties."  AC ¶ 158; *Capital Ventures Int'l*, 2012 WL

10  4469101, at *12 (for purposes of a motion to dismiss, alleged "misstatements or

11  omissions regarding . . . owner-occupancy statistics . . . are material because they

12  are [] indicative of the quality and nature of" an investment in RMBS).

13          Defendants argue that the "only reasonable inference" is that AIG

14  understood that all the owner-occupancy data in all of the Offering Documents,

15  even without the disclaimer, came from borrowers.  This argument is wrong,

16  because AIG could believe these Offering Documents used a different source of

17  information for occupancy, and that the absence of the disclaimer was intentional.

18  The Court cannot rule as a matter of law that AIG must have understood that all

19  owner-occupancy information came from borrower reports.  AIG may proceed

20  with their owner-occupancy allegations as to the 26 prospectus supplements that

21  did not contain any disclaimer.

22      *B.*      *The Complaint Does not Adequately Allege that Defendants Made Oral*

23                                  *Misrepresentations*

24          AIG separately alleges that Defendants made oral misrepresentations of

25  underwriting practices, falsely assuring investors of the quality of the guidelines.

26  AC ¶ 115.  This allegation does not satisfy Rule 9(b) because the Amended

27  Complaint clearly does not name the "who, what, when, where, and how of the

28  misconduct charged."  *Cafasso*, 637 F.3d at 1055 (citation omitted).  AIG does not

1  name the "senior executives at Countrywide" who made the alleged

2  misrepresentations, and claims that "First Franklin provided a [fraudulent]

3  pitchbook" without specifying the employee who provided these materials.  The

4  Amended Complaint mentions individual Countrywide employees who attended

5  meetings with Plaintiffs, AC ¶ 420, but never accuses them of making false

6  statements.  The failure to specify *who* made the false statements, which are

7  attributed only to "Countrywide" or "First Franklin," dooms this allegation under

8  Rule 9(b).  *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986) (as a general rule,

9  complaints that allege "numerous representations attributed only to the

10  'defendants' . . . fail to specify the time, place, speaker, and sometimes even the

11  content of the alleged misrepresentations," and hence "lack the 'particulars'

12  required by Rule 9(b)." (citations omitted)).  This dismissal is without prejudice,

13  and AIG has an opportunity to amend the complaint once more with specific facts

14  about the oral misrepresentations.

15  *C.*   *The Complaint Alleges that Defendants Made Misrepresentations Regarding*

16  *Third Party Deals*

17  Fifty four of the claims transferred to this Court are "third-party" offerings,

18  where the Defendants are sued only as originators of some of the underlying loans.

19  Notice of Mot. & Mot. to Dismiss, App. A, ECF No. 163.  Defendants move to

20  dismiss for claims based on these offerings, because the alleged misstatements

21  were made by individuals or companies outside of the Defendants' authorization or

22  control.   This motion is denied.

23  Under New York law, an injured party can sue anyone who "was aware that

24  its misrepresentations would be reasonably relied upon by the plaintiff."

25  *Houbigant, Inc. v. Deloitte & Touche*, 303 A.D.2d 92, 100 (N.Y. 1st Dep't 2003);

26  *Fed. Hous. Fin. Agency v. Goldman, Sachs & Co.*, No. 11 Civ. 6198(DLC), 2012

27  WL 5494923, at **2, 4 (S.D.N.Y. Nov. 12, 2012) (predicting that New York

28  would not "retreat from its long-held" "broad primary liability for fraud" even after

the Supreme Court's narrower interpretation of the federal antifraud statute in
*Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011)).  An
injured plaintiff can also sue a person who provided false information to a third
party "for the purpose of inducing plaintiff's detrimental reliance on those
representations."  *Litvinov v. Hodson*, 74 A.D.3d 1884, 1886 (N.Y. 4th Dep't
2010).

AIG adequately pleads both theories.  The Amended Complaint alleges that
the Defendants made material misrepresentations as an originator, AC ¶¶ 172–174,
and "provided these misrepresentations to the RMBS sponsor, depositor and
underwriter knowing the information would be passed on to investors in the
Offering Materials."  *Id.* ¶ 175.  The Complaint also offers specific allegations that
Defendants intended that the false representations would be passed along and
relied upon by investors.  *Id.* ¶¶ 99–102.[14]

**D.**    *The Amended Complaint does not Allege that the Underwriter Defendants*
*Knew of Malfeasance by Countrywide*

Merrill Lynch Pierce, Fenner & Smith Inc. ("Merrill Lynch") and Banc of
America Securities ("BoA Securities," and collectively, the "Underwriter
Defendants") move to dismiss the claims against them, arguing that AIG does not
adequately allege that they intended to defraud the Plaintiffs through the
underwriting of the Certificates.  Because the only claims before this Court are
those based on Countrywide securities or deals backed by Countrywide loans, AIG
must plead that Merrill Lynch and BoA Securities knew of malfeasance at
Countrywide.  They have not so pleaded, which means that the fraud claims
against the Underwriter Defendants must be dismissed.  AIG never alleges that the

---

[14]    In its third-party claims, AIG only accuses the Defendants of misrepresenting
information about owner-occupancy, LTV and CLTV ratios.  Defendants do not offer any
information about the use of disclaimers regarding the source of the information about owner-
occupancy.  Therefore, AIG can proceed for the third-party offerings on those
misrepresentations.

1   expert due diligence firm hired by the Underwriter Defendants reported that the

2   non-conforming loans the firm found were originated by a Countrywide entity.

3   AC ¶¶ 375, 403.  The dismissal is without prejudice, to give AIG the opportunity

4   to amend the complaint with facts that allege the Underwriter Defendants knew of

5   the problems at Countrywide.

6          E.      *AIG Has Pleaded that They Justifiably Relied on Defendants'*

7                               *Representations*

8          A misrepresentation is only actionable when it induces the plaintiff to act,

9   and the plaintiff was justified in so acting.  *Allstate Ins. Co. v. Countrywide Fin.*

10  *Corp.*, 824 F. Supp. 2d 1164, 1187 (C.D. Cal. 2011).  Even "[s]ophisticated

11  business person[s] or entit[ies] . . . should not be denied recovery" where they have

12  "taken reasonable steps to protect [themselves] against deception."  *DDJ Mgmt.,*

13  *LLC v. Rhone Grp., L.L.C.*, 15 N.Y.3d 147, 154 (2010).

14         AIG "has met its burden to plead actual reliance by stating that it 'received,

15  reviewed, and relied upon the Offering Materials' and that 'but for the

16  misrepresentations and omissions in the Offering Materials, [it] would not have

17  purchased or acquired the Certificates.'"  *Allstate*, 824 F. Supp. 2d at 1187 (citing

18  the complaint in that case); AC ¶ 418 ("In making the investments, AIG relied

19  upon Defendants' representations and assurances regarding the quality of the

20  mortgage collateral underlying the certificates . . .  AIG received, reviewed, and

21  relied upon the Offering Materials . . .  Had the true characteristics of the RMBS

22  been disclosed to AIG, AIG would not have purchased the securities at issue

23  here.").

24         AIG has also pleaded that they made a "significant effort to protect

25  themselves against the possibility of false financial statements: they obtained

26  representations and warranties to the effect that nothing in the financials was

27  materially misleading."  *DDJ*, 15 N.Y.3d at 156; *contra Stuart Silver Assocs., Inc.*

28  *v. Baco Dev. Corp.*, 245 A.D.2d 96, 97 (N.Y. 1st Dep't 1997) (rejecting plaintiffs'

reasonable reliance when they failed to visit the premises); AC Exs. 1–346; AC ¶ 113 ("AIG often directly requested that the underwriter for a security provide additional analytical information about the certificates being offered"), ¶ 115 ("AIG visited Defendants' origination arms on site").  There is no allegation that AIG contractually disclaimed reliance on the Defendants' representations.  *Contra HSH Nordbank AG v. UBS AG*, 95 A.D.3d 185 (1st Dep't 2012).  At this stage of the litigation, the Court cannot resolve whether the steps AIG[15] did take were "adequate" given the wealth of other statistics about the loan pools available to investors.  *Allstate*, 824 F. Supp. 2d at 1187–88; *FHFA*, 2013 WL 1189311, at *12.  AIG has offered allegations that they justifiably relied upon the Offering Documents.  That is sufficient at the pleading stage.

*F. AIG has Pleaded that the Misrepresentations were the Proximate Cause for the Suffered Losses*

Another element of a claim for fraud is that "a defendant's misrepresentations were the direct and proximate cause of the claimed losses." *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 87 A.D.3d 287, 295 (N.Y. 1st Dept. 2011).  In illiquid markets, a corrective disclosure that a security was overvalued does not automatically lead to a corrective price decline.  *Dexia Holdings, Inc. v. Countrywide Fin. Corp.*, No. 2:11-CV-7165, 2012 WL 1798997, at *6 (C.D. Cal. Feb. 17, 2012).  If the securities trade in an illiquid market, like these mortgage-backed securities, plaintiffs need only allege an "adequate causal nexus between misrepresentation and damage." *Id.*; *Thrivent Fin. for Lutherans v. Countrywide Fin. Corp.*, No. 2:11-CV-7154, 2012 WL 1799028, at *3 (C.D. Cal. Feb. 17, 2012).

---

[15]   The Court recognizes that AIG may be a "dominant force[] in the mortgage market" and hence may be so sophisticated that it can never rely on representations like the Offering Documents.  But the Court cannot so "conclude that as a matter of law." *FHFA*, 2013 WL 1189311, at *12.

Here, AIG alleges that they "purchased securities whose true risks greatly exceeded the represented ones." AC ¶ 424. The Amended Complaint states that when borrowers began to default on the loans, "the performance and value of the certificates plummeted," which led to ratings downgrades, and ultimately "rendered the certificates unmarketable at prices anywhere near the prices paid by AIG." *Id.* ¶ 425. The facts may prove otherwise, but for now those allegations suffice to demonstrate an adequate causal nexus between misrepresentation and damage. *Dexia*, 2012 WL 1798997, at *6 ("Plaintiffs have alleged that the underlying loans had a higher-than-advertised risk of default, and that they were therefore worth less than Plaintiffs paid for them. Plaintiffs have also alleged that the Certificates have experienced higher-than-anticipated rates of default and that they are now worth less than Plaintiffs paid for them."); *Thrivent*, 2012 WL 1799028, at *4. The Defendants' objections reduce to the argument that the value of AIG's securities declined in 2008 because of the financial crisis, not because of fraud. Distinguishing between the two is a "factual question better addressed on a more complete record." *Id.*

## VI.   *AIG has not Adequately Pleaded its Asserted Claim for Negligent Misrepresentation*

In New York, plaintiffs can recover for negligent misrepresentation when they have a "special relationship" with the defendants. *Kimmell v. Schaefer*, 89 N.Y.2d 257, 263–64 (1996). In the commercial context, such a relationship exists only when the defendants "possess unique or specialized expertise," or "are in a special position of confidence and trust with the injured party." *Id.*

AIG has not pleaded that a special relationship exists. The only unique knowledge that Plaintiffs highlight involves the origination and credit information in the loan files, and the "special position of confidence" offered is that Defendants knew that AIG relied on their knowledge and expertise. That is insufficient to plead a special relationship, and therefore a claim for negligent misrepresentation.

*FHFA*, 2013 WL 1189311, at *14; *Fed. Hous. Fin. Agency v. UBS Ams., Inc.*, 858 F. Supp. 2d 306, 335 (S.D.N.Y. 2012) (Plaintiffs "cannot plausibly assert that [they] were so unequally situated vis-à-vis the defendants as to give rise to a claim for negligent misrepresentation . . . [plaintiffs] were highly sophisticated players in the mortgage-backed securities market, which they participated in not only as purchasers but also as packagers and marketers of securities.").

### VII.   The Parties Agree About the Scope of AIG's Aiding and Abetting Claims

AIG agrees in its Opposition that it "is pursuing aiding and abetting claims," against Countrywide Financial and the Originator Defendants, "only where AIG has brought claims on an RMBS in this action against an Underwriter, Depositor, Sponsor, or Seller as a primary violator."  AIG Opp. 56.  Defendants do not move to dismiss such claims.  Reply Mem. in Supp. of Mot. to Dismiss 31–32, ECF No. 189.

### VIII.  AIG has Pleaded a Basis for Equitable Subrogation

Plaintiffs assert that American International Group, Inc. ("AIG Parent") is entitled to pursue claims based on securities purchased by AIG Securities Lending Corporation ("AIG GSL") because AIG Parent entered into a series of make whole agreements and made payments to offset AIG GSL's losses.  AC ¶ 31.  Plaintiffs allege that "AIG Parent became equitably subrogated to all of the respective rights and remedies of AIG GSL Corp. with respect to these RMBS-related losses."  *Id.* The doctrine of subrogation is "applicable to cases where a party is compelled to pay the debt of a third person to protect his own rights, or to save his own property."  *Broadway Houston Mack Dev., LLC v. Kohl*, 71 A.D.3d 937, 937 (N.Y. 2d Dep't 2010) (citations omitted).  This is a "broad" doctrine, but the party seeking subrogation must establish that the payment were not voluntary.  *Id.*  A payment is not voluntary if it is contractually obligated or necessary to "protect its own legal or economic interests."  *Id.*  This latter ground is met when the party

seeking subrogation shows "that the act is not merely helpful but necessary to the protection of its interests."  *Id.*

The allegations in the Amended Complaint are barely sufficient to meet this standard.  AIG GSL was a wholly owned subsidiary of AIG Parent.  AC ¶ 30.  It is plausible that the payments made by AIG Parent to offset AIG GSL's losses were made in order to protect AIG Parent's interests.  The Court cannot conclude from the Amended Complaint that this payment was voluntary,[16] and the resolution of that "factual question" must remain for the "trier of fact."  *Underpinning & Foundation Skanska, Inc. v. Travelers Cas. & Sur. Co. of Am.*, 726 F. Supp. 2d 339, 354 (S.D.N.Y. 2010).

## IX.   *The Claims under Massachusetts Law are Timely for Purposes of this Motion*

On February 26, 2012, the Court ordered that "Defendants shall file and serve any motion to dismiss based on jurisdiction, venue, and the applicable statutes of limitation and repose no later than February 27, 2012."  Order Regarding Schedule for Motion to Dismiss Pending Case, ECF No. 112.  Plaintiff Lexington Insurance Company included claims based on securities CSMC 2007-3, CWALT 2006-OA1, LUM 2005-1 and LXS 2006-GP1 in the original complaint. The Defendants failed to move to dismiss state law claims for these securities on statute of limitations grounds in their initial motion.  This motion is late, and therefore denied, without regard to whether Defendants will be able to move on the same grounds at another stage of the litigation.

## X.   *Plaintiffs' Federal Claims for Newly Added Securities are Time-Barred*

---

[16]      The Court so concludes without reference to the new allegations in the Plaintiffs' opposition, because a complaint may not be amended by a party's brief.  *Schneider v. Cal. Dep't of Corrections*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) ("The 'new' allegations contained in the [plaintiff's] opposition motion, however, are irrelevant for Rule 12(b)(6) purposes.").

1    The Court will not reconsider its prior rulings on timeliness.  As a result, all

2    of AIG's federal claims are time-barred.  *AIG III*, 834 F. Supp. 2d at 953 (citing

3    *Allstate*, 824 F. Supp. 2d at 1178–79); *see also Fed. Deposit Ins. Corp. as Receiver*

4    *for Sec. Sav. Bank v. Banc of Am. Secs. LLC*, No. 2:12-CV-6690, 2013 WL

5    1191785, at **6–12 (C.D. Cal. Mar. 21, 2013); *Fed. Deposit Ins. Corp. as*

6    *Receiver for Strategic Capital Bank v. Countrywide Fin. Corp.*, No. 2:12-CV-

7    4354, 2012 WL 5900973, at **8–14 (C.D. Cal. Nov. 21, 2012).  As the transferee

8    court, this Court will apply its own interpretation of federal law, not that of the

9    transferor court.  *Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir. 1993) ("a transferee

10   federal court should apply its interpretations of federal law, not the constructions of

11   federal law of the transferor circuit"); *accord Newton*, 22 F.3d at 1460 ("a

12   transferee court in this circuit is bound only by our circuit's precedent.").  The

13   statute of limitations for AIG's claims was not tolled by the state court class action

14   *Luther v. Countrywide Home Loans Servicing LP*, BC380698 (Cal. Super. Ct.

15   2007), both because the Luther named plaintiffs did not have standing to bring the

16   tranches AIG purchased, *contra NECA-IBEW Health & Welfare Fund v. Goldman*

17   *Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012), and because the *Luther* class action was

18   filed in state court.  *Strategic Capital Bank*, 2012 WL 5900973, at **12–14.  The

19   negligent misrepresentation claims brought by Western National Life Insurance for

20   newly added securities are also time-barred.  *AIG III*, 834 F. Supp. 2d at 964.

21   **XI.    AIG has not Pleaded De Facto Merger or Successor Liability**

22   AIG reiterates allegations this Court has considered many times regarding

23   Bank of America's successor liability for Countrywide.  The Court rejects this

24   assertion once again.  New York would apply the law of Delaware to the issue of

25   successor liability.[17]  *Allstate*, 824 F. Supp. 2d at 1174.  The law of Delaware does

26

27   [17]    The Court is aware of the recent New York state supreme court decision to the contrary.
28   *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, No. 602825/08, 2013 WL 1845525, at **6–7
     (N.Y. Super. Ct. Apr. 29, 2013) (the court applies the "most significant contacts" test, and finds

not support a claim for *de facto* merger in these circumstances. *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 842 F. Supp. 2d 1216, 1231 (C.D. Cal. 2012). The Amended Complaint fails to plead assumption of liabilities or fraudulent conveyance. *Id.* at 1223–31. The Amended Complaint is dismissed, with prejudice and leave to amend in conformance with this Court's April 3, 2013 Order, ECF No. 264.

## XII.   Conclusion

The Court denies the motion to stay this litigation. Federal jurisdiction exists in this case on the basis of its relation to ongoing bankruptcy proceedings. *AIG II*, 2011 WL 6778473, at *5. Any motion to remand or abstain must be filed in this Court. For purposes of this motion, AIG has standing to bring claims for RMBS sold to Maiden Lane II, though Defendants are free to renew their objections upon further discovery.

AIG's fraudulent inducement claims are adequately pleaded with three exceptions. Causes of action based on misstatements of owner-occupancy data, where the Offering Documents included a disclaimer about the source of the information, are dismissed. Claims that Defendants made oral misstatements are dismissed. Claims that the Underwriter Defendants defrauded AIG are dismissed. All negligent misrepresentation claims are dismissed. The parties agree about the scope of the aiding and abetting claim. AIG has pleaded a basis for equitable subrogation, although barely. Defendants waived their statute of limitations defense for this stage of the litigation by not moving in the first round of briefing. The Court does not reconsider its rulings on timeliness, so that all newly added

---

that is "the [Defendants'] domicile asserted—North Carolina." Because "North Carolina law does not conflict with New York law," "New York law applies."). The Court rejects the reasoning of the supreme court, and continues to apply Delaware law to the *de facto* merger question.

federal claims, and certain newly added state claims, are time-barred and dismissed.  The *de facto* merger and successor liability claims are dismissed.

All dismissals are with prejudice except the fraudulent inducement claims based on oral misrepresentations and against the Underwriter Defendants, and the successor liability claims.  Plaintiffs are not free to amend their complaint where this Court has rejected AIG's legal theory, and have no need to do so under *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 928 (9th Cir. 2012).  The Court will strike any such attempt.  Amendment on the fraudulent inducement claims is limited to facts that provide further support for their plausibility.

IT IS SO ORDERED.

DATED:  May 6, 2013

*Mariana R. Pfaelzer*

Hon. Mariana R. Pfaelzer
United States District Judge